**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBERLY GARTHWAIT, PAUL CORCORAN, CUMAL T. GRAY, KRISTINE T. TORRANCE, and MICHAEL J. HUSHION, Individually, as representative of a class of similarly situated persons and on behalf of the EVERSOURCE 401(K) PLAN f/k/a NORTHEAST UTILITIES SERVICE COMPANY 401(K) PLAN, | Civil Action No: 3:20-cv-00902-JCH |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| EVERSOURCE ENERGY SERVICE COMPANY; THE BOARD OF DIRECTORS OF EVERSOURCE ENERGY SERVICE COMPANY; THE EVERSOURCE PLAN ADMINISTRATION COMMITTEE; THE EVERSOURCE INVESTMENT MANAGEMENT COMMITTEE and DOES No. 1-30, Whose Names Are Currently Unknown, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CONSOLIDATED AMENDED COMPLAINT

### I.    INTRODUCTION

1.    Plaintiffs Kimberly Garthwait ("Garthwait"), Paul Corcoran ("Corcoran", Cumal

T. Gray (Gray"), Kristine T. Torrance ("Torrance"), and Michael J. Hushion ("Hushion")

(collectively, "Plaintiffs"), individually as participants of the Eversource 401(k) Plan ("Plan"),

bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated

participants and beneficiaries of the Plan, against Defendants, Eversource Energy Service

Company ("Eversource"), the Board of Directors of Eversource Energy Service Company

("Board"), the Eversource Plan Administration Committee ("Administrative Committee"), the

Eversource Investment Management Committee ("Investment Oversight Committee") (collectively "Committees"), and Does No. 1-30, who are members of the Board and the Committees and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. and related breaches of applicable law beginning six years from the date this action is filed and continuing to the date of judgment (the "Class Period").  This Consolidated Amended Complaint ("CAC" or "Complaint") is filed pursuant to Fed.R.Civ.P. 15(a)(2).

2.     Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.     The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.     As of December 31, 2018, the Plan had 11,484 participants with account balances and assets totaling over $3 billion, placing it in the top 0.1% of all 401(k) plans by plan size.[1] Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.

---

[1]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (pub. June 2019).

The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under ERISA Sections 409 and 502, 29 U.S.C. §§ 1104, and 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.  A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.  Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.  Attorneys' fees, costs and other recoverable expenses of litigation; and

e.  Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

9.    Garthwait is a former employee of Eversource and a participant in the Plan under 29 U.S.C. § 1002(7).  Garthwait is a resident of Williamstown, New Jersey.

10.    Corcoran is a former employee of Eversource and a participant in the Plan under 29 U.S.C. § 1002(7).  Corcoran is a resident of Holden, Massachusetts.

11.    Gray is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  Gray is a resident of Hartford, Connecticut.

12.    Torrance is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  Torrance is a resident of East Haddam, Connecticut.

13.    Hushion is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  Hushion is a resident of Tampa, Florida.

14.    Eversource is a domestic Connecticut corporation headquartered in Hartford, Connecticut.  Eversource is New England's largest energy delivery company, offering retail utility services to customers in New Hampshire, Massachusetts, and Connecticut.

15.     The Board appointed "authorized representatives" of Eversource, including the Committees, as plan fiduciaries.  Does No. 1-10 are members of the Board who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committees, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

16.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Hartford, Connecticut.  The Administrative Committee and its members are appointed by Eversource to administer the Plan on Eversource's behalf.

17.     The Investment Oversight Committee is designated by the Plan and established by Eversource to assist Eversource with establishing and implementing Plan investment policies, selecting investment fund options available to Plan participants, and monitoring the performance and operations of the Plan's investment managers and trustee.

18.     Defendants, Does No. 1-30, are the members of the Administrative Committee and Investment Oversight Committee and, by virtue of their membership, fiduciaries of the Plan. Plaintiffs are currently unable to determine the membership of the Committees or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Committees and the identity of any other fiduciaries are not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Committees, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.   JURISDICTION AND VENUE

19.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

21.      Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Eversource's principal place of business is in this district. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

22.     Plaintiffs have standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

### IV.   FACTUAL ALLEGATIONS

**A.   Background And Plan Structure**

23.     The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each

participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds, Eversource common stock, and a self-directed brokerage account.

24.     Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

25.     The Plan operates in part as an employee stock ownership plan, which enables Eversource employees to acquire an ownership interest in the company through units of the Eversource Common Shares Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in Eversource stock and cash or cash equivalents.

26.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.      Defendants' Breaches of Fiduciary Duties**

27.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

### 1.     The Plan's Investment in the Fidelity Freedom Funds

28.     Among other investments, the Plan lineup offers a suite of seven target date funds[2].  A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  Target date funds offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.  All target date funds are inherently actively managed, because managers make changes to the allocations to stocks, bonds and cash over time.  These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

29.     According to the Plan's Form 5500s,[3] since at least December 31, 2009,[4] the Plan has offered the Fidelity Freedom fund target date suite.  Fidelity Management & Research Company ("Fidelity") is the second largest target date fund provider by total assets.  Among its several target date offerings, Fidelity offers the Freedom funds (the Active suite") and the substantially less costly Freedom Index funds (the "Index suite").  Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by

---

[2] The Fidelity Freedom fund suite offers a different fund for target dates every five years. The Plan has opted not to offer the full suite (2020, 2025, etc.); only the Freedom funds with a target date at the beginning of each decade (2020, 2030, etc.) are in the Plan lineup.
[3] The Form 5500 is the annual report that 401(k) plans are required to file pursuant to the reporting requirements of ERISA.
[4] The Form 5500 provides a detailed schedule of the Plan's holdings at the end of each calendar year. The suite of Fidelity Freedom funds appears as a Plan investment option as far back as the 2009 Form 5500, the earliest publicly available filing.

Fidelity, or those of any other target date provider.  Defendants failed to compare the Active and Index suites and consider their respective merits and features.  A simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and consequently the more appropriate choice for the Plan.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

30.     The two fund families have nearly identical names and share a management team.[5]   But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[6] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy.  Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

31.     Given that the vast majority of plan participants are not sophisticated investors, many of the Plan participants, by default, concentrate their retirement assets in target date funds. As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2018, approximately 15% of the Plan's assets were invested in the Active suite.

---

[5] Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. The Index suite added Finola McGuire Foley to the team in 2018.
[6] Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

i.      The Active Suite is High-Risk and Unsuitable for Plan Participants

32.      The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan.  At first glance, the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, which would suggest both target date options have a similar risk profile.  However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues.  At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

33.      The goal of an active manager is to beat a benchmark—usually a market index or combination of indices – by taking on additional risk.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants in this action.  Actively managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios).  These extra costs present an additional hurdle for active managers to clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[7]  Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds subjects investor dollars to the decision-making skill and

---

[7]"How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds

success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

34.     At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their respective lifetimes.  The Intrinsic Opportunities Fund, which is currently allocated 8.13% of the total assets in the 2040-2060 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an astonishing 326 basis points (3.26%) on an annualized basis.  The Large Cap Stock Fund, which is currently allocated 7.11% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 357 basis points (3.57%).  The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent over 15% of the 2040 through 2060 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

35.     Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns.  Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

36.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation."  This strategy heaps further unnecessary risk on investors, such a Plan participants, in the Active suite.  A March 2018 Reuters special report[8] on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."  The report quotes a member of Longfellow Advisors, who told Reuters that after the 2014 changes "it was not clear to us that [the managers of the Active suite] knew what they were doing."  While many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[9]  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor

---

[8]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI
[9]*Id.*

decision to heavily weight to commodities.  Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given carte blanche to take further risks to the severe detriment of the Plan and its participants.

37.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate towards the all-in-one savings solution a target date fund offers.  Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.  The Active suite's lack of downside protection has been magnified by the current COVID-19 crisis, and is felt most sharply by Plan participants approaching their target date.  That is because Plan participants close to retirement age do not have ample time to recoup significant losses before they start withdrawing their retirement savings.  The more conservative Fidelity Freedom Index 2020 Fund has handled the current volatility well, with year to date returns through June 24, 2020 ranking in the 29th percentile among other 2020 target date funds.[10]  In stark contrast, the Fidelity Freedom 2020 Fund (i.e., part of the Active suite), in which the Plan had over $166 million at the end of 2018, ranks in the 68th percentile among the same peer group.

ii.     The Active Suite's Considerable Cost

---

[10]For Morningstar's peer group rankings, 1st percentile is the best performers.

38.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets), can considerably reduce long term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

39.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



40.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's current investment in the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $2.22 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.  As the costs for recordkeeping services have dropped precipitously over the past decade,[11] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan.

                    iii.     Investors Have Lost Faith in the Active Suite

---

[11]"NEPC: Corporate Defined Contribution Plans Report Flat Fees", https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees

41.     The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[12] investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years. Defendants' act in offering and maintaining the Active suit in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

---

[12]"2019 Target-Date Fund Landscape: Simplifying the Complex"

iv.   The 5-Star Index Suite

42.    Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on."  This measurement emphatically favors the Index suite.  Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund (other than the Income Index Fund, which has the same 3 stars as the Income Active Fund).  With the exception of the Income and 2060 iterations, the full Index suite is assigned 5 stars, Morningstar's highest rating.  The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers.  The Active suite does not achieve a single 5-star rating, and only receives one 4-star rating.  Defendants were likely aware, or should have been aware, of the higher ratings of the Index suite, yet continued to offer the Active suite to the detriment of Plan participants.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 3 | Income Inst Prem | FFGZX | 3 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2020 K | FSNOX | 4 | 2020 Inst Prem | FIWTX | 5 |
| 2030 K | FSNQX | 3 | 2030 Inst Prem | FFEGX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

v.   The Active Suite's Inferior Performance

43.    In the period following the strategy overhaul in 2013 and 2014, the Active suite's higher levels of risk have failed to produce substantial outperformance when compared to the Index suite.  While assuming significantly higher levels of risk with investor dollars (and among them, the Plan participants' hard earned savings), the Active suite has simply failed to measure up to the returns produced by its index cousin, in which the Plan participants' assets would be

significantly better off.  Since the strategic changes took effect in 2014, the Index suite has

outperformed the Active suite in four out of six calendar years.  Broadening the view to

historical measures that encompass a period closer to a full market cycle, the Active suite has

substantially underperformed the Index suite on a trailing three- and five-year annualized basis:

| 3-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.17% | Income Inst Prem | 5.81% | -0.64% |
| 2010 K | 6.26% | 2010 Inst Prem | 6.98% | -0.72% |
| 2020 K | 7.15% | 2020 Inst Prem | 8.09% | -0.94% |
| 2030 K | 8.07% | 2030 Inst Prem | 9.11% | -1.04% |
| 2040 K | 8.49% | 2040 Inst Prem | 9.73% | -1.24% |
| 2050 K | 8.50% | 2050 Inst Prem | 9.73% | -1.23% |
| 2060 K | 8.50% | 2060 Inst Prem | 9.73% | -1.23% |

| 5-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.35% | Income Inst Prem | 5.25% | 0.10% |
| 2010 K | 6.86% | 2010 Inst Prem | 6.88% | -0.02% |
| 2020 K | 8.01% | 2020 Inst Prem | 8.21% | -0.20% |
| 2030 K | 9.27% | 2030 Inst Prem | 9.69% | -0.42% |
| 2040 K | 9.89% | 2040 Inst Prem | 10.48% | -0.59% |
| 2050 K | 9.89% | 2050 Inst Prem | 10.49% | -0.60% |
| 2060 K | 9.87% | 2060 Inst Prem | 10.48% | -0.61% |

44.     It is unclear at what point in 2014 the Active suite's major strategic changes were

implemented, but using a start date of January 1, June 30, or December 31, 2014, the Index suite

has outperformed the Active suite to date.  Investing research and information websites

commonly show the growth of $10,000 invested in a mutual fund and a benchmark over a period

to provide a comparison of returns in a simple-to-understand format.  Using this method to

compare the two suites, at each proposed start date, across every vintage of the fund families, the

Index suite would have earned investors significantly greater sums on a $10,000 investment.

Defendants breached their fiduciary duty to Plan participants by choosing to select and retain the

Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings.

### 2. The Plan's Objectively Imprudent Investment Options

45.     In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$$ERi = Rf + \beta i(ERm - Rf), \text{ where:}$$

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
$(ERm-Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[13]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

---

[13]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

i.    The Morgan Stanley Institutional Fund Emerging Markets
Portfolio I

46.    The Morgan Stanley Institutional Fund Emerging Markets Portfolio Class I has

consistently and significantly underperformed its benchmark, the MSCI Emerging Markets Index

(Net), on a rolling ten-year annualized basis:

**10-year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI Emerging Markets Index (Net) Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2014 | 7.90% | 8.43% | -0.53% |
| 4Q2015 | 3.61% | 3.61% | 0.00% |
| 4Q2016 | 0.98% | 1.84% | -0.86% |
| 4Q2017 | 0.50% | 1.68% | -1.18% |
| 4Q2018 | 7.14% | 8.02% | -0.88% |
| 4Q2019 | 3.45% | 3.68% | -0.23% |



47.     This poor performance is not the result of a single bad year from which the Fund

has failed to recover. Rather, the Fund has demonstrated a regular inability to meet or exceed the

returns of its benchmark since 2014:

**Annual Return v. Benchmark**

| Year | Performance, adjusted for investment expense | MSCI Emerging Markets Index (Net) Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|------|------|------|
| 2014 | -4.47% | -2.19% | -2.28% |
| 2015 | -10.33% | -14.92% | 4.59% |
| 2016 | 6.73% | 11.19% | -4.46% |
| 2017 | 34.97% | 37.28% | -2.31% |
| 2018 | -17.32% | -14.57% | -2.75% |
| 2019 | 19.44% | 18.42% | 1.02% |



48.     The trend has continued into 2020. As of June 26, 2020, the Fund trailed its

benchmark year-to-date by 350 basis points (3.50%).

49.     When the investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Fidelity Emerging Markets Index Fund that simply tracks the MSCI Emerging Markets Index, with a very low expense ratio of 7.6 basis points (0.076%).  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Morgan Stanley Emerging Markets Portfolio instead forced them to pay 105 basis points (1.05%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.

ii.     The Frank Russell Small Cap Fund

50.     The Frank Russell Small Cap Fund Class Y[14] has consistently and significantly underperformed its benchmark, the Russell 2000 Index, on a rolling ten-year annualized basis:

**10-year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2014 | 7.26% | 7.77% | -0.51% |
| 4Q2015 | 5.93% | 6.80% | -0.87% |
| 4Q2016 | 6.45% | 7.07% | -0.62% |
| 4Q2017 | 7.39% | 8.71% | -1.32% |
| 4Q2018 | 12.32% | 11.97% | 0.35% |
| 4Q2019 | 11.57% | 11.83% | -0.26% |

[14]No share class is provided on the Plan's Form 5500s. To be conservative, Plaintiffs have assumed the Plan offered the least expensive available share class.



51.   This poor performance is not the result of a single bad year from which the Fund has failed to recover. Rather, the Fund has demonstrated a regular inability to meet or exceed the returns of its benchmark since 2014:

**Annual Return v. Benchmark**

| Year | Performance, adjusted for investment expense | Russell 2000 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|------|------|------|
| 2014 | 4.22% | 4.89% | -0.67% |
| 2015 | -6.19% | -4.41% | -1.78% |
| 2016 | 22.04% | 21.31% | 0.73% |
| 2017 | 14.52% | 14.65% | -0.13% |
| 2018 | -11.92% | -11.01% | -0.91% |
| 2019 | 23.72% | 25.52% | -1.80% |



52.    The trend has continued into 2020. As of June 26, 2020, the Fund trailed its benchmark year-to-date by 458 basis points (4.58%).

53.    Once again, it is objectively imprudent to retain an investment option that does not consistently outperform (or, at the very minimum, meet) its benchmark.  The imprudent retention is exacerbated when the investment also persistently lags the returns of its peers.  When the investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Index Fund that simply tracks the Russell 2000 Index, with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class.  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Frank Russell Small Cap Fund instead forced them to pay 96 basis points (0.96%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.

> iii.   The Morgan Stanley Institutional Fund Small Company Growth
>        Portfolio I

54.   The Morgan Stanley Institutional Fund Small Company Growth Portfolio Class I

was replaced in 2018, but had been consistently and substantially underperforming its

benchmark, the Russell 2000 Growth Index, by just about any performance metric for many

consecutive years and should have been jettisoned from the Plan's investment menu long before

it was ultimately removed.

**Annual Return v. Benchmark**

| Year | Performance, adjusted for investment expense | Russell 2000 Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|------|------|------|
| 2014 | -9.68% | 5.60% | -15.28% |
| 2015 | -9.58% | -1.38% | -8.20% |
| 2016 | -0.35% | 11.32% | -11.67% |
| 2017 | 21.87% | 22.17% | -0.30% |
| 2018 | 0.29% | 9.31% | -9.02% |



**5-year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|-------|-----------|-----------|-----------|
| 4Q2014 | 14.68% | 16.80% | -2.12% |
| 4Q2015 | 7.12% | 10.67% | -3.55% |
| 4Q2016 | 9.11% | 13.74% | -4.63% |
| 4Q2017 | 9.98% | 15.21% | -5.23% |
| 4Q2018 | -0.11% | 5.13% | -5.24% |



**10-year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|-------|-----------|-----------|-----------|
| 4Q2014 | 8.37% | 8.54% | -0.17% |
| 4Q2015 | 5.93% | 7.95% | -2.02% |

| 4Q2016 | 4.71% | 7.76% | -3.05% |
| 4Q2017 | 6.48% | 9.19% | -2.71% |
| 4Q2018 | 12.45% | 13.52% | -1.07% |



55.     Defendants were far too late in eliminating this fund as investment option.

Retention of an investment that, by the end of 2016, trailed its benchmark by 463 basis points

(4.63%) on a five-year annualized basis and by an astounding 305 basis points (3.05%) on a ten-

year annualized basis, is imprudent and unjustifiable.  When an investment option's poor track

record is so apparent, the Plan should select or replace the investment option with one that has

shown that it can consistently outperform the benchmark, or, at the very least, retain an

investment option that tracks the benchmark.  By way of example and to illustrate, there is a

Vanguard Russell 2000 Growth Index Fund that simply tracks the Russell 2000 Growth Index,

with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class.  While

participants should have had the option to achieve the index's returns at minimal cost,

Defendants' imprudence in retaining the Morgan Stanley Small Company Growth Portfolio

instead forced them to pay 100 basis points (1.00%) to consistently lag the index. Defendants'
failure to replace this underachieving investment option with better performing alternatives
earlier than they ultimately did was a severe breach of fiduciary duty.

### 3.      The Plan's Excessive Recordkeeping Costs

56.      Another obvious indicator of Defendants' breach of their fiduciary duties is the
Plan's excessive recordkeeping costs. According to one industry publication,[15] the average
annual cost for recordkeeping and administration in 2017 for plans much smaller than the Plan
(plans with 100 participants and $5 million in assets) was $35 per participant.[16] As of December
31, 2018, the Plan had more than $3 billion in assets and 11,484 participants. Given its size, and
resulting negotiating power, with prudent management and administration, the Plan should have
unquestionably been able to obtain recordkeeping and administrative services for significantly
lower than $35 per participant.

57.      In 2017, and likely for at least three years prior and subsequently, the Plan
contracted for per-participant annual recordkeeping fees of $45, a figure 29% higher than that
cited above. Indeed, given its size and negotiating power, the Plan should have been able to
negotiate a recordkeeping fee of no more than the $14-$21 per-participant figure that Fidelity
itself admitted its recordkeeping services were worth.[17] Thus, Defendants clearly engaged in a
shocking breach of fiduciary duty by allowing the Plan to pay two to three times more than it
should have paid for such services if they had engaged in any modestly prudent approach to
ensuring that the Plan's recordkeeping expenses were fair and reasonable.

---

[15]The 401k Averages Book (20th ed.).

[16]Other courts have acknowledged that a plan with $3.4 billion in assets and 41,863 active participants should be
paying $30 per participant (Cassell v. Vanderbilt Univ., 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018)) and that the
"market rate" of total administrative fees for "jumbo" plans, i.e., those within the top 1%, should be $35 per participant
(Sacerdote v. New York Univ., No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017)).

[17]*Moitoso v. FMR LLC*, No. 18-CV-12122 (WGY), 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020).

58.     As such, it is clear that Defendants either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.  Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Fidelity at levels inappropriate for its size and scale.  Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings since the excessive fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

59.     Even though the Plan already paid a flat $45 per head for recordkeeping services, Defendants elected to augment it further through revenue sharing.  The following structure was implemented.  If the revenue sharing amount of the investment(s)/mutual fund(s) exceeds the total administration cost(s), a "credit" is applied to the investment option(s) and may be rebated back to the participant(s) at the Plan fiduciary's discretion with regards to when and how much. If the revenue sharing amount is less than the total administrative costs then that credit becomes a fee and is applied.

60.     Throughout the pertinent period, the arrangement of placing revenue sharing into an account before disbursement to pay for Plan expenses, at Defendants' discretion with regards to amount and timing, deprived participants of use of their retirement assets and millions of dollars in lost opportunity costs.  This arrangement was completely unnecessary given that Defendants had already agreed to a per participant/capita fee.  In the Plan's 2016 Form 5500, for example, it appears that $2.3 million dollars of revenue credit amassed from prior years was re-allocated to Plan participants.  This is money that never should have left participant accounts

only to be returned years later at the expense of the compounding returns that participants should have received.

61.     By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

### 4.     The Plan's Excessive Investment Management Fees

62.     In another obvious breach of their fiduciary duties, Defendants also failed to monitor the average expense ratios charged to similarly sized plans.  Indeed, participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider ways in which to lessen the fee burden on participants during the pertinent period.  The majority of the funds in the Plan stayed relatively unchanged during the Class Period.  In 2018, a majority of the funds in the Plan, 12 out of the Plan's 18 investment options (67%), were substantially more expensive than comparable funds found in similarly sized plans (plans with over $1 billion in assets), according to the most recent Brightscope/ICI study published in August 2020:

| Fund | Exp. Ratio | Category | ICI Average Fee |
|---|---|---|---|
| Fidelity Freedom Income K | 0.42% | Target Date | 0.40% |
| Fidelity Freedom 2010 K | 0.46% | Target Date | 0.40% |
| Fidelity Freedom 2020 K | 0.53% | Target Date | 0.40% |
| Fidelity Freedom 2030 K | 0.60% | Target Date | 0.40% |
| Fidelity Freedom 2040 K | 0.65% | Target Date | 0.40% |
| Fidelity Freedom 2050 K | 0.65% | Target Date | 0.40% |
| Fidelity Freedom 2060 K | 0.65% | Target Date | 0.40% |
| Fidelity Low-Priced Stock K | 0.43% | Domestic Equity | 0.34% |
| Lord Abbett Developing Growth I | 0.69% | Domestic Equity | 0.34% |
| Fidelity Growth Company K | 0.75% | Domestic Equity | 0.34% |
| Fidelity International Discovery K | 0.66% | International Equity | 0.49% |
| Morgan Stanley Emerging Markets Inst | 1.05% | International Equity | 0.49% |

63.     The above comparisons understate the excessiveness of the investment management fees in the Plan lineup throughout the Class Period.  The ICI Average fee is based on a study conducted in 2017 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years.  Accordingly, current average expense ratios would be lower than indicated above, demonstrating a greater disparity between the expense ratios of the Plan's investment options and the average expense ratios in the same category.

64.     A further indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select collective trusts where available.  A prudent fiduciary conducting an impartial review of the Plan's investment lineup would have recognized that the Plan could have shaved off a portion of its excessive spend on investment management fees by converting the following fund to a collective trust:

| Fund | Expense Ratio | 2018 Plan AUM | Collective Trust Version | Inception Date | Expense Ratio |
|------|---------------|---------------|--------------------------|----------------|---------------|
| Fidelity Growth Company K | 0.75% | $276.1m | Fidelity Growth Company Commingled Pool | Dec. 13, 2013 | 0.43% |

65.     During the Class Period, Defendants knew or should have known of the existence of this available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's substantial assets from the mutual fund into this alternative investment vehicle.  The above collective trust was comprised of the same underlying investments as its mutual fund counterpart, but charged lower fees.  The Plan did not receive any additional services or benefits based on its use of the more expensive fund; the sole consequence was higher costs for participants.  Defendants' failure to negotiate aggressively enough with Fidelity to obtain better pricing, or their inexplicable ignorance to the availability of the collective trust vehicle, was a severe breach of fiduciary duty.

66.     Compounding this issue is Defendants' failure to monitor the Plan's investment options to ensure that they were in the least expensive available share class.  There is no distinction whatsoever, *other than price*, between the share classes for the same investment option.  The share class used is typically, if not always, dependent on the negotiating leverage of the investor; in other words, large institutional investors, such as the Plan, have significant amounts of monies to invest such that mutual fund managers will agree to lower fees/offer cheaper share classes for access to those Plan assets.  Despite the negotiating leverage based on the size of the Plan, Defendants neglected to utilize the least expensive share class for the following fund:

| Fund | 2018 AUM | Exp Ratio | Cheaper Share Class | Exp Ratio |
|------|----------|-----------|---------------------|-----------|
| Lord Abbett Developing Growth I | $59.2m | 0.69% | Lord Abbett Developing Growth R6 | 0.60% |

67.     As long as Defendants continue to refrain from offering the least expensive share class for each investment option in the Plan lineup, participants will suffer harm to their retirement savings through the payment of needless extra fees.  By failing to recognize that the Plan and its participants were being paying higher investment management fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

## V.     ERISA'S FIDUCIARY STANDARDS

68.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
>         (i)     providing benefits to participants and their

beneficiaries; and

 (ii) defraying reasonable expenses of administering the plan;

[and]

 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

69. Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

70. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

71. ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

72. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

 (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

>    (2)    if, by his failure to comply with section 404(a)(l) in
>           the administration of his specific responsibilities
>           which give risk to his status as a fiduciary, he has
>           enabled such other fiduciary to commit a breach; or
>
>    (3)    if he has knowledge of a breach by such other fiduciary,
>           unless he makes reasonable efforts under the
>           circumstances to remedy the breach.

73.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

## VI.   CLASS ALLEGATIONS

74.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class ("Class"):

> All participants and beneficiaries in the Eversource 401(k) Plan (the
> "Plan") at any time on or after June 30, 2014 to the present (the "Class
> Period" or "Relevant Time Period"), including any beneficiary of a
> deceased person who was a participant in the Plan at any time during the
> Class Period.

75.    Excluded from the Class are Defendants and Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

76.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

77.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

78.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

79.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

80.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

81.     **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish

incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

82.     **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

83.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of the virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

84.     **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

85.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

86.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

87.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(1).

**COUNT I**
**(For Breach Of Fiduciary Duty)**

88.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

89.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth

above, Defendants violated their respective fiduciary duties under ERISA to monitor other

fiduciaries of the Plan in the performance of their duties.

90.     To the extent that any of the Defendants did not directly commit any of the

foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under

29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in

(or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of

fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to

his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by

another fiduciary and/or failed to take reasonable efforts to remedy the breach.

91.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses

and damages.

92.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132,

Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of

Defendants' breaches of fiduciary duty and are liable for damages and any other available

equitable or remedial relief, including prospective injunctive and declaratory relief, and

attorneys' fees, costs and other recoverable expenses of litigation.

### <u>COUNT II</u>
**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

93.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

94.     Eversource is responsible for appointing, overseeing, and removing members of

the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and

removing members of the Committees.

95.     In light of its appointment and supervisory authority, Eversource had a fiduciary

responsibility to monitor the performance of the Committees and its members.  In addition, Eversource, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committees.

96.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

97.     To the extent that fiduciary monitoring responsibilities of Eversource or the Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

98.     Eversource and the Committees breached their fiduciary monitoring duties by, among other things:

> (a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and  omissions with respect to the Plan;
>
> (b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and
>
> (c)   Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

99.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan

suffered substantial losses.  Had Eversource and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

100.     Eversource and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

101.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach Of Trust)

102.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

103.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

104.     To the extent any of the Defendants are not deemed to be fiduciaries and/or not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants

are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

### JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.


DATED: September 22, 2020

/s/ Laurie Rubinow
James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile:  (866) 300-7367
Email: jmiller@sfmslaw.com
          lrubinow@sfmslaw.com

James C. Shah
Alec J. Berin
Shepherd Finkelman Miller & Shah, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile:  (866) 300-7367
Email: jshah@sfmslaw.com
          aberin@sfmslaw.com

Kolin C. Tang
Shepherd Finkelman Miller & Shah, LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

Mark K. Gyandoh
Capozzi Adler, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200

Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2020, a copy of the foregoing

was served on all counsel of record via the Court's ECF system.

_/s/_ Laurie Rubinow
Laurie Rubinow