**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBERLY GARTHWAIT, CUMAL T. GRAY, KRISTINE T. TORRANCE, and MICHAEL J. HUSHION, Individually, as representative of a class of similarly situated persons and on behalf of the EVERSOURCE 401(K) PLAN f/k/a NORTHEAST UTILITIES SERVICE COMPANY 401(K) PLAN, | Civil Action No: 3:20-cv-00902-JCH |
| Plaintiffs, v. | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| EVERSOURCE ENERGY SERVICE COMPANY; THE BOARD OF DIRECTORS OF EVERSOURCE ENERGY SERVICE COMPANY; THE EVERSOURCE PLAN ADMINISTRATION COMMITTEE; and THE EVERSOURCE INVESTMENT MANAGEMENT COMMITTEE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I.      INTRODUCTION

1.      Plaintiffs, Kimberly Garthwait ("Garthwait"), Cumal T. Gray ("Gray"), Kristine

T. Torrance ("Torrance"), and Michael J. Hushion ("Hushion") (collectively, "Plaintiffs"),

individually as participants of the Eversource 401(k) Plan ("Plan"), bring this action under 29

U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and

beneficiaries of the Plan, against Defendants, Eversource Energy Service Company

("Eversource"); the Board of Directors of Eversource Energy Service Company ("Board"); the

Eversource Plan Administration Committee ("Administrative Committee"); and the Eversource

Investment Management Committee ("Investment Oversight Committee") (with the

Administrative Committee, "Committees") (collectively, "Defendants"), for breach of their

fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1001 *et seq.* and related breaches of applicable law beginning six years from the date this action

was filed and continuing to the date of judgment (the "Class Period").  This Second Amended

Complaint ("SAC" or "Complaint") is filed pursuant to Federal Rule of Civil Procedure 15(a)(2)

and the Court's order entered September 28, 2021 (ECF No. 103).

2.      Defined contribution plans that are qualified as tax-deferred vehicles under

Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have

become the primary form of retirement savings in the United States and, as a result, America's

*de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the

employer typically promises a calculable benefit and assumes the risk with respect to high fees

or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate

in a manner in which participants bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement

system has become pronounced as employer-provided defined benefit plans have become

increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2018, the Plan had 11,484 participants with account balances

and assets totaling over $3 billion, placing it in the top 0.1% of all 401(k) plans by plan size.[1]

Defined contribution plans with substantial assets, like the Plan, have significant bargaining

power and the ability to demand low-cost administrative and investment management services

within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.

---

[1] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (pub. June 2019).

The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.     Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.     Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.     Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

        a.     A declaratory judgment holding that the acts of Defendants described

               herein violate ERISA and applicable law;

     b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

     c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

     d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

     e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.     **THE PARTIES**

9.     Garthwait is a former employee of Eversource and a participant in the Plan under 29 U.S.C. § 1002(7).  During the Class Period, Garthwait maintained an investment through the Plan in the Fidelity Freedom 2030 Fund.  Garthwait is a resident of Williamstown, New Jersey.

10.     Gray is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  During the Class Period, Gray maintained an investment through the Plan in the Fidelity Freedom 2040 Fund until December 2015, at which point he transferred the entire balance in the 2040 Fund into the Fidelity Freedom 2050 Fund.  Gray is a resident of Hartford, Connecticut.

11.     Torrance is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  During the Class Period, Torrance maintained an investment through the Plan in the Fidelity Freedom 2030 Fund.  Torrance is a resident of East Haddam, Connecticut.

12.     Hushion is a former employee of Eversource and a former participant in the Plan under 29 U.S.C. § 1002(7).  During the Class Period, Hushion maintained an investment through

the Plan in the Fidelity Freedom 2030 Fund, the Morgan Stanley Institutional Fund Emerging Markets Portfolio, the Frank Russell Small Cap Fund, the Morgan Stanley Institutional Fund Small Company Growth Portfolio, the Lord Abbett Developing Growth Fund, the Fidelity Growth Company Fund, the Fidelity Low-Priced Stock Fund, and the Fidelity International Discovery Fund.  Hushion is a resident of Newtown, Connecticut.

13.     Eversource is a domestic Connecticut corporation headquartered in Hartford, Connecticut.  Eversource is New England's largest energy delivery company, offering retail utility services to customers in New Hampshire, Massachusetts, and Connecticut.

14.     The Board appointed "authorized representatives" of Eversource, including the Committees, as plan fiduciaries.  The Board is a fiduciary of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the Committees, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     The Administrative Committee is the Plan Administrator and, along with its individual members, is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Hartford, Connecticut.  The Administrative Committee and its members are appointed by Eversource to administer the Plan on Eversource's behalf, and are tasked with, among other duties, the selection and replacement of the Plan's recordkeeper.  During the relevant time period, Christine M. Carmody, Robert J. DeAngelo, Richard J. Morrison, and Michael P. Synan were members of the Administrative Committee.

16.     The Investment Oversight Committee is designated by the Plan and established by Eversource to assist Eversource with establishing and implementing Plan investment policies, selecting investment fund options available to Plan participants, and monitoring the performance

and operations of the Plan's investment managers and service providers. In addition, while the

hiring and retention of the Plan's recordkeeper was within the purview of the Administrative

Committee, the Investment Oversight Committee was expressly tasked with the monitoring and

evaluation of the costs and fees charged by the recordkeeper, in addition to investment

management fees and other costs borne by the Plan.  During the relevant time period, Gregory B.

Butler, Christine M. Carmody, James J. Judge, Philip J. Lembo, Thomas J. May, David R.

McHale, and John M. Moriera were members of the Investment Oversight Committee.  The

Investment Oversight Committee and its members are fiduciaries of the Plan.

### III.    JURISDICTION AND VENUE

17.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement

remedies with respect to fiduciaries and other interested parties and, specifically, under 29

U.S.C. § 1109 and 29 U.S.C. § 1132.

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 because this action arises under the laws of the United States.

19.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. §

1332(e), and 28 U.S.C. § 1391 because Eversource's principal place of business is in this district.

Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein

occurred in this District.

20.    Plaintiffs have standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C.

§ 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a

representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein,

the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches

and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although

standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.   FACTUAL ALLEGATIONS

### A.   Background And Plan Structure

21.   The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds, Eversource common stock, and a self-directed brokerage account.

22.   Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

23.   The Plan operates in part as an employee stock ownership plan, which enables Eversource employees to acquire an ownership interest in the company through units of the

Eversource Common Shares Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in Eversource stock and cash or cash equivalents.

24.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.     The Investment Management Staff**

25.     Under the Plan's Investment Policy Statement ("IPS"), the Investment Oversight Committee delegates certain responsibilities to the Director – Investment Management and other Investment Management Staff of Eversource (respectively, the "Director" and the "Staff"), none of whom are members of the Investment Oversight Committee.  Those responsibilities included the following:

> … [T]he day-to-day oversight of the Plan including executing documents to implement decisions approved by the Committee, monitoring, evaluating and reporting on investment providers and investment option performance and any Committee approved changes associated with those options and providers. The Investment Management Staff is also responsible for recommending to the Committee changes to the Investment Policy Statement, trustee(s), investment providers and investment options.

26.     Although the Investment Oversight Committee delegates these duties, the IPS expressly disclaims any fiduciary responsibility for the Director and the Staff:

> The Staff[2] is not expected to have fiduciary liability as its functions are administrative rather than discretionary and it does not exercise authority over the Plan or control Plan assets.

---

[2]The definition of "Staff" includes the "Director" within the meaning of the IPS.

27.     Accordingly, it is evident that fiduciary responsibility for the matters with which the Investment Oversight Committee was charged rested exclusively as a matter of express delegation with the Investment Oversight Committee and its members.  Moreover, since the IPS expressly disclaimed fiduciary responsibility for the Director and the Staff, the members of the Investment Oversight Committee should have understood that they had a responsibility to ensure that the Director and the Staff were acting in a prudent and loyal manner in their oversight of the Plan, and that it was unreasonable for members of the Investment Oversight Committee to rely on the recommendations of, as well as monitoring, evaluation, and reporting performed by, individuals who were not expressly delegated fiduciary responsibility.

## C.     The Defined Contribution Industry

28.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan."  *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

29.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[3]

---

[3] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019),

30.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in 401(k) plans, and 37% were unaware that they paid 401(k) fees at all.[4]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided and properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control.

**D.     Recordkeeping and Administrative Services**

31.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative ("RK&A") services for the plan.  These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

32.     The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper" – that is recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

---

https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited October 14, 2021).

[4] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited August 27, 2021).

33.     Recordkeepers typically collect their fees in the form of both what is referred to as "direct" compensation and "indirect" compensation.

34.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

35.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to Plan Participants.  In other words, the fees are taken from the investment options prior to the value of the investment option being provided to the participant.  Thus, in most cases, participants are not aware that they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

36.     Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, *e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*, or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services.  In other words, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues).  In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

37.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet

style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

    a.  Recordkeeping;

    b.  Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

    c.  Administrative services related to converting a plan from one recordkeeper to another;

    d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

    e.  Maintenance of an employer stock fund (if needed);

    f.  Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    g.  Plan consulting services, including assistance in selecting the investment lineup offered to participants;

    h.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[5] (excluding the separate fee charged by an independent third-party auditor);

    i.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and

---

[5]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

38.     This suite of essential RK&A services can be referred to as "Bundled RK&A" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services and any claim by Defendants that recordkeeping expenses depend upon the service level provided to a plan with respect to the above services is both false and frivolous.  Nonetheless, as is all too often the case, fiduciary-defendants often disingenuously assert that the cost of Bundled RK&A services depend upon service level (even though such an assertion is plainly untrue based upon the actual marketplace for such services), as part of attempt to perpetuate misunderstanding by the less informed in order to stave off breach of fiduciary duty claims.

39.     The second type of essential RK&A services, hereafter referred to as "A La Carte RK&A" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte RK&A services typically include, but are not limited to, the following:

a.   Loan processing;

b.   Brokerage services/account maintenance (if offered by the plan);

c.   Distribution services; and

d.   Processing of qualified domestic relations orders.

40.    All national recordkeepers have the capability to provide all of the aforementioned RK&A services to all large defined contribution plans, including those much smaller than the Plan.

41.    For large plans with greater than 5,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all recordkeepers quoting fees for the Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested—which are treated by recordkeepers as immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

42.    While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all actually offer the same bundles and combinations of services as their competitors. Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans that, like the Plan, have a considerable number of participants and significant assets.

43.    The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

44.     Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A are dependent on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper is willing to accept a lower fee to provide RK&A as the number of participants in the plan increases.

45.     As a result, it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) that as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

46.     Similarly, the average cost to a recordkeeper of providing services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to one with a balance of $1,000,000.

47.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics. Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will, therefore, leverage the plan's participant count to obtain lower effective per-participant fees.

48.     Because recordkeeping fees are actually paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

49.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

50.     Having received quotes, if necessary, a prudent fiduciary can then negotiate with its current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

51.     After negotiating the fee to be paid to the recordkeeper and electing to have the plan (*i.e.*, participants) pay that fee, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances, among other less common ways.

**E.     Defendants' Breaches of Fiduciary Duties**

52.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before the original complaint was filed.

**1.     The Plan's Excessive Recordkeeping/Administrative Costs**

53.     An obvious indicator of Defendants' breaches of their fiduciary duties is the

Plan's excessive RK&A costs.  The impact of such high fees on participant balances is

aggravated by the effects of compounding, to the significant detriment of participants over time.

This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact

on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100

basis points (1.00%).



54.     Despite this potential for substantial harm to participant accounts, and although

the Investment Oversight Committee was explicitly charged with monitoring the Plan's costs, it

largely ignored the Plan's RK&A fees and failed to identify a reasonable fee through any sort of

competitive bidding process.  Indeed, the Plan's RK&A fees are hardly ever mentioned in the

minutes taken at each of the Investment Oversight Committee's quarterly meetings, and were not

discussed once in the meetings in the years 2014, 2015, 2018, or 2019.

55.     Moreover, the Investment Oversight Committee failed to engage the incumbent

recordkeeper, Fidelity, and other service providers in a competitive bidding process in order to

solicit pricing bids to determine whether the fees charged by Fidelity were comparable to the

fees competitors would charge for providing the identical services required by the Plan. The Plan's recordkeeping contract was not put out to bid once during the Class Period and, astonishingly, Defendants' last formal review of RK&A fees was conducted in 2013. As a result of the inexplicable and disturbing failure to engage in this standard practice, it was impossible for the Investment Oversight Committee to be assured that any fee rate obtained by the Plan was a reasonable market rate. Ignoring the process commonly known and understood to assist in determining the reasonable market rate is contrary to the best interests of the Plan and participants, and resulted in participants paying unnecessary and excessive fees.

56.     Instead of observing standard industry practice to obtain reasonable fees, the Investment Oversight Committee relied primarily on two flawed strategies: 1) the Director's conversations with the Plan's Fidelity representative, in which he naively accepted Fidelity's representation that the Plan's RK&A fees were reasonable; and 2) the annual defined contribution industry fee surveys conducted by the investment advisor the Plan engaged in 2016, NEPC, LLC ("NEPC").

57.     It is well known and understood by retirement plan industry professionals that plan fiduciaries who merely ask their incumbent recordkeeper for a price reduction do not receive as low a price as they would if they solicited competitive bids from other recordkeepers and used those bids to negotiate with the incumbent. Likewise, the average or median prices found in surveys conducted in a non-efficient, non-competitive market like the market for RK&A services do not provide an appropriate indication of the reasonable market rate. Indeed, NEPC (the Plan's investment advisor) itself notes in its surveys that competitive bidding exercises are a best practice for comparing RK&A fees and services.

58.     The RK&A services provided to the Plan are and were the same standard RK&A

services identified above, and those provided to comparable plans.  There are no services

provided to the Plan and its participants by Fidelity that are unusual or out of the ordinary.

Regardless, for large plans, like the Plan here, any differences in services are immaterial to

pricing considerations, the primary drivers of which are the number of participants and whether

the plan fiduciaries employed a competitive process of soliciting bids to determine the

reasonable market rate for the services required by the plan.

59.     As of January 1, 2014, Fidelity's contractual bundled RK&A fee was $55 per

participant.  In 2016, Fidelity offered to reduce this contractual charge to $45 per participant,

which Defendants accepted without any negotiation.  Though this reduction became effective

January 1, 2017, the Investment Oversight Committee failed to recognize that $4 per participant

of the fee difference was simply being shifted (i.e., added back in) to Plan participants holding

the company stock, which accounted for nearly 90% of participants throughout the Class Period,

in a manner completely lacking in transparency to participants, thereby resulting in the actual

level of fees being paid by Plan participants amounting to much closer to $49 per participant.  No

further reductions were achieved during the Class Period.

60.     In addition to the contractual RK&A rate, Fidelity earned hundreds of thousands

of dollars annually in other revenues through its relationship with the Plan, all of which came

directly out of participant accounts, and which was not disclosed in Fidelity's standard fee

disclosure documents.  These additional amounts included revenue earned from Fidelity's

Portfolio Advisory Service, which increased from $107,697 in 2014 ($8 per participant on

average) to $513,497 in 2019 ($41 per participant on average), as well as brokerage services,

stock custody and trading services.  The Investment Oversight Committee failed to monitor these

extra sources of revenue and neglected to consider them when negotiating the Plan's RK&A

fees, even though they should have been considered and treated as part of the RK&A rate, based

upon the applicable standard of care in the industry.

61.     Fidelity also charged extra "Ad Hoc Billable Fees" that were passed on to Plan

participants, *e.g.*, a $9,000 fee for nondiscrimination testing.  By soliciting bids from competitor

recordkeepers, the Investment Oversight Committee would have been able to eliminate those

additional fees.  In a competitive environment, prudent plan fiduciaries can require recordkeepers

to waive ad hoc fees to enable a meaningful apples-to-apples comparison.

62.     In failing to follow a process that met minimum standards, since the start of the

Class Period, the Investment Oversight Committee allowed the Plan to be charged total amounts

of RK&A fees that far exceeded the reasonable market rate.  The table below sets forth the

annual amounts per participant the Plan ultimately paid to Fidelity in RK&A fees, per the Plan's

Form 5500s.

| RK&A Fees | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
| Participant Accounts with a Balance | 12,192 | 11,651 | 11,507 | 11,470 | 11,484 | 11,722 | *11,671* |
| Direct Compensation | $173,902 | $166,214 | $217,828 | $178,549 | $180,566 | $182,429 | *$183,248* |
| Indirect Compensation | $1,675,944 | $1,692,787 | $1,703,169 | $2,151,515 | $1,901,651 | $2,373,751 | *$1,916,469* |
| Administrative Credit to Plan | ($978,722) | ($1,007,386) | ($951,942) | ($1,413,355) | ($1,705,234) | ($1,690,514) | *-$1,291,192* |
| **Fidelity RK&A Fee ($)** | **$871,124** | **$851,615** | **$969,055** | **$916,709** | **$376,983** | **$865,666** | ***$808,525*** |
| Fidelity RK&A Fee ($/pp) | $71 | $73 | $84 | $80 | $33 | $74 | *$69* |

63.     Given the Plan's size, expected growth, and resulting negotiating power, with

prudent management and administration, the Plan should have unquestionably been able to

obtain reasonable rates for RK&A services that were significantly lower than the effective per-

participant RK&A rates set forth above.

64.     According to publicly available data and information from the Form 5500 filings

of similarly sized defined contribution plans during the Class Period, other comparable plans

were paying much lower fees than the Plan throughout the Class Period.  That is clear and

compelling evidence that the reasonable market rate is lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services.

65.     The table below lists the average RK&A fees paid by similarly sized plans during the Class Period.  Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers.  The table also indicates the average number of participants and assets of each plan.  Using averages over a period of years can help eliminate fee rates that are the result of the impact of accounting timing issues such as mid-year fee reductions or mid-year rebates of excess revenue.

| Comparable Plans' RK&A Fees Based on Publicly Available Information from 2014-2019 Form 5500 | | | | |
|---|---|---|---|---|
| Plan | Avg Participants | Avg Assets | Avg RK&A Fee /pp | Recordkeeper |
| The Boston Consulting Group, Inc. Employees' Savings Plan... | 8,844 | 1,059,017,012 | $41 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,474 | 904,815,428 | $50 | Fidelity |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 8,779 | 323,874,727 | $53 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 8,601 | 553,276,289 | $48 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 6,949 | 91,697,282 | $51 | Great-West |
| Southern California Permanente Medical Group Tax Savings... | 9,785 | 720,781,250 | $53 | Vanguard |
| Sutter Health Retirement Income Plan | 12,114 | 418,199,870 | $37 | Fidelity |
| Fortive Retirement Savings Plan | 12,272 | 1,619,518,471 | $31 | Fidelity |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 14,295 | 684,935,643 | $30 | Vanguard |
| Michelin 401(K) Savings Plan | 16,122 | 2,330,744,086 | $36 | Vanguard |

66.     The RK&A fees calculated[6] for each similar comparable plan in the table above includes all the direct compensation paid to the recordkeeper disclosed on each plan's Form 5500, as well as all indirect compensation.  Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing

---

[6] Fee calculations for the comparable plans are based on the information disclosed in each plan's 2014-2019 Form 5500s.

and, as a result, any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

67.     The comparable plans above received at least the same RK&A services received by the Plan for the fees paid.  In other words, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

68.     The graph below visually illustrates the average RK&A fees paid by these similarly sized plans during the Class Period and shows the average RK&A fees paid by the Plan participants compared to what the other similarly sized plans paid.[7]  The green data point labels represent plans that used Fidelity as their recordkeeper.  The white data points represent plans that used other recordkeepers.  The blue line represents the trend line created by all the data points.  The green line represents the trend line for plans that use Fidelity as a recordkeeper.

---

[7]The average RK&A fees that are calculated from each plan's Form 5500 reflect both the bundled RK&A fee rate (Fidelity's contractual rate) plus other revenue such as transaction and loan revenue.  Thus, just as the Plan's average RK&A fee rate from 2014 through 2019 as calculated from the Form 5500 filing is $69 per participant, which is higher than the Plan's contractual Bundled RK&A fee rates of $55 and then $45, the bundled RK&A fee rate of each of these comparable plans is also lower than the RK&A fee rate reflected in the chart.



69.     These data points and the trend lines reflect the general trend in the retirement plan industry that plans with more participants can obtain lower effective per participant fee rates.  As a result, the trend lines represent an RK&A fee rate that recordkeepers, including Fidelity, would have bid to provide materially identical RK&A services to the Plan.

70.     Additionally, each of the NEPC fee surveys provided by and utilized by the Investment Oversight Committee during the Class Period also corroborates the conclusion that comparable plans were able to obtain fees in the $30s or lower.  Thus, the Investment Oversight Committee literally had facts staring it in the face that the Plan was paying grossly excessive recordkeeping fees.

71.     Moreover, if Fidelity had solicited reasonable RK&A fee rate bids from other competing recordkeepers (i.e., through a competitive exercise), it would have been compelled to reduce its fee to the reasonable RK&A fee rate.

72.     The fees paid by the Plan were at all times much higher than those paid by similarly sized plans for materially identical RK&A services.  Based on fees paid by other large plans during the Class Period receiving materially identical RK&A services, it is clear and more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  Indeed, meeting minutes of the Investment Oversight Committee confirm the same since they literally paid virtually no attention to recordkeeping expenses in breach of their duties to the Plan.  Defendants' failure to ever engage in a competitive bidding process, inappropriate reliance on the word of Fidelity and the results of NEPC's fee surveys, and general disinterest in the Plan's excessive RK&A costs, as well as their failure to take any effective action to remedy the unnecessary overpayment, amounts to a shocking breach of their fiduciary duties to the Plan.  What processes Defendants did have in place were imprudent and ineffective given the objectively unreasonable level of RK&A fees the Plan paid.  Had Defendants appropriately monitored the compensation paid to Fidelity and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

## 2.     The Plan's Investment in the Fidelity Freedom Funds

73.     Among other investments, the Plan lineup offers a suite of seven target date funds.[8]  A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  Target date funds offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.  All target date

---

[8]The Fidelity Freedom fund suite offers a different fund for target dates every five years. The Plan has opted not to offer the full suite (2020, 2025, etc.); only the Freedom funds with a target date at the beginning of each decade (2020, 2030, etc.) are in the Plan lineup.

funds are inherently actively managed, because managers make changes to the allocations to stocks, bonds and cash over time.  These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

74.     Since April 1, 2002, the Plan has offered the Fidelity Freedom fund target date suite.  Fidelity Management & Research Company ("Fidelity") is the second largest target date fund ("TDF") provider by total assets.  Among its several target date offerings, Fidelity offers the riskier and more costly Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite").  Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider.  Defendants failed to compare the Active and Index suites, as well as other available TDFs, and consider their respective merits and features.  A simple weighing of the benefits of the two suites at the beginning of the Class Period would have raised a significant red flag for prudent fiduciaries and indicated that the Active suite was not a suitable and prudent option for the Plan.  In addition, any objective evaluation of the Active suite would have resulted in an examination of and the selection of a more consistent and better performing and more appropriate TDF than the Active suite.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

75.     The two fund families (meaning the Active suite and the Index suite) have nearly identical names and share a management team.[9] But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[10] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices.  The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy.  Defendants' decision to add the Active suite over another prudent TDF suite, and their failure to replace the Active suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.[11]

76.     Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA").  Under DOL regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be

---

[9]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. Finola McGuire Foley was added to the Index suite team in 2018.

[10]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

[11]While the Active suite has enjoyed some positive performance since the original complaint in this action was filed, such performance does not absolve Defendants of their breaches throughout the Class Period.  Indeed, unbeknownst to Defendants, the managers of the Active suite made certain tactical shifts in the funds' asset allocation in or about 2020 that yielded positive returns in the high-volatility environment in 2020 and 2021, effectively undertaking a further strategy change and rendering the Active suite's recent performance less than meaningful in assessing the prudence of maintaining the Active suite in the Plan during the Class Period.  It is apparent from the meeting minutes of the Investment Oversight Committee that the Plan's fiduciaries were entirely unaware of these changes and, like their earlier monitoring of the Active suite, failed to consider the continuing prudence of maintaining the Active suite in the Plan.  The fact that the changes in the Active suite produced more positive returns (as additional risk was undertaken) over a short period of time does not exonerate Defendants.  To hold otherwise would require a hindsight analysis not permitted under controlling precedent.

invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  The Fidelity Freedom fund with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) serves as the QDIA in the Plan.

77.     Given that the vast majority of plan participants are not sophisticated investors, many of the Plan's participants, by default, concentrate their retirement assets in target date funds.  As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2018, approximately 15% of the Plan's assets were invested in the Active suite.

                    i.     The Active Suite is High-Risk and Unsuitable for Plan Participants

78.     The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan.  At first glance, the equity glide paths of the Active suite and Index suite appear nearly identical, which would suggest both target date options have a similar risk profile.  However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues.  At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

79.     The goal of an active manager is to beat a benchmark—usually a market index or combination of indices—by taking on additional risk.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants in this action.  Actively managed funds tend to charge higher fees than

index funds (which are passed on to the target date fund investor through higher expense ratios). These extra costs present an additional hurdle for active managers to clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[12]  Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds subjects investor dollars to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

80.     At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their entire respective lifetimes.  The Intrinsic Opportunities Fund, which is currently allocated 8.26% of the total assets in the 2040-2060 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an incredible 133 basis points (1.33%) on an annualized basis.  The Large Cap Stock Fund, which is currently allocated 7.02% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 234 basis points (2.34%).  The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent over 15% of the 2040 through 2060 vintages, meaning for at least 20 years (because those target date funds

---

[12]"How Actively and Passively Managed Funds Performed: Year-End 2018"; https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

have an associated target retirement date of at least twenty years from now), 15% of investor

dollars are subject to the poor judgment exercised by just those two managers.

81.     Manager performance issues among the underlying investments in the Active

suite are not limited to the largest positions.  Of the 26 actively managed Fidelity Series Funds in

the Active suite portfolio, exactly half similarly trail their respective benchmarks over their

respective lifetimes.  The Investment Oversight Committee never undertook a review of the

performance of the funds comprising the Active suite portfolio during the Class Period.

Similarly, as already explained, the Investment Oversight Committee was unaware, in or about

2020, when the managers of the Active suite undertook an effective strategy change under which

they materially shifted the funds' asset allocation.  The Investment Oversight Committee's

ignorance of these factors, consideration of which is consistent with minimum standards of

prudent investment monitoring, illuminates Defendants' breaches.

82.     Moreover, as of June 30, 2014 (the start of the Class Period), several of the

underlying funds used within the FFF lacked a sufficient performance history to enable

fiduciaries to perform meaningful analysis.  No prudent fiduciary would have been able to

properly evaluate these funds.  Indeed, 15 out of 24 funds[13] failed to meet the basic criteria of at

least a five-year performance track record.  Accordingly, almost two-thirds of the funds used in

the Active suite portfolio would have failed one of the most basic fiduciary requirements.  The

Investment Oversight Committee failed to undertake any such analysis at the start of, or at any

subsequent point during, the Class Period.

---

[13]The two short-term debt funds, namely the Fidelity Institutional Money Market Fund and the
Fidelity Short-Term Bond Fund, are excluded.  History and outperformance are less relevant in
this market segment given the limited scope for outperformance.

| Underlying Fund Name | Ticker | Inception Date | Less than 5-Years Performance |
|---|---|---|---|
| Fidelity Series 100 Index | FOHIX | 20070329 | |
| Fidelity Series 1000 Value Index | FSIOX | 20130711 | x |
| Fidelity Series All-Sector Equity | FSAEX | 20081017 | |
| Fidelity Series Blue Chip Growth | FSBDX | 20130711 | x |
| Fidelity Series Commodity Strategy | FCSSX | 20090110 | |
| Fidelity Series Emerging Markets Debt | FEDCX | 20110317 | x |
| Fidelity Series Emerging Markets | FEMFX | 20080912 | |
| Fidelity Series Equity-Income | FRLLX | 20120612 | x |
| Fidelity Series Floating Rate Hi Inc | FFHCX | 20111020 | x |
| Fidelity Series Growth & Income | FTBTX | 20120612 | x |
| Fidelity Series Growth Company | FCGSX | 20130711 | x |
| Fidelity Series High Income | FSHNX | 20111003 | x |
| Fidelity Series Infl-Prtct Bd Idx | FSIPX | 20090929 | x |
| Fidelity Series International Growth | FIGSX | 20090312 | |
| Fidelity Series International Sm Cap | FSTSX | 20090312 | |
| Fidelity Series International Value | FINVX | 20090312 | |
| Fidelity Series Intrinsic Opps | FDMLX | 20120612 | x |
| Fidelity Series Investment Grade Bond | FSIGX | 20080810 | |
| Fidelity Series Opportunistic Insights | FVWSX | 20120612 | x |
| Fidelity Series Real Estate Equity | FREDX | 20111020 | x |
| Fidelity Series Real Estate Income | FSREX | 20111020 | x |
| Fidelity Series Small Cap Discovery | FJACX | 20130711 | x |
| Fidelity Series Small Cap Opps | FSOPX | 20070322 | |
| Fidelity Series Stk Selec Lg Cp Val | FBLEX | 20120612 | x |

83.     Of the remaining underlying funds with a sufficient track record, only two had outperformed their prospectus benchmark over the previous three- and five-year period as of the start of the Class Period.  Accordingly, 22 of the 24 funds comprising the Active suite portfolio at the start of the pertinent period would not have fulfilled the most basic fiduciary criteria. Clearly, the Investment Oversight Committee neglected to undertake any such analysis.

84.     Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

85.     This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns.  Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to classes like emerging markets and high yield bonds.  The Investment Oversight Committee failed to investigate the level of risk inherent in the Active suite portfolio and did not determine whether the risk level was suitable for Plan participants at any point during the Class Period.

86.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation."  This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite.  A March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."[14]  The report quotes a member

---

[14] "Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

of Longfellow Advisors, who told Reuters that after the 2014 changes "it was not clear to us that [the managers of the Active suite] knew what they were doing."[15]  While many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[16]  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities.  Other industry experts have criticized the "chaotic glide paths" of the Active suite relative to peer target date providers.[17]  Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given carte blanche to take further risks to the severe detriment of the Plan and its participants.  The Investment Oversight Committee never initiated or undertook any review or scrutiny of the Active suite's strategy changes.

87.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund

---

[15] *Id.*

[16] *Id.*

[17] Idzorek, T., J. Stempien, and N. Voris, 2011, Bait and Switch: Glide Path Instability, Ibbotson Associates.

offers.  Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.

ii.  <u>The Active Suite's Considerable Cost</u>

88.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets), can considerably reduce long term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

89.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.  Higher fees significantly reduce retirement account balances over time.  Considering just the gap in expense ratios from the Plan's current investment in the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $2.22 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.  As the costs for

recordkeeping services have dropped precipitously over the past decade,[18] recordkeepers like Fidelity have been forced to chase profits elsewhere. The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services. Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan.

iii.    <u>Investors Have Lost Faith in the Active Suite</u>

90. The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large. According to Morningstar's report on the 2019 Target Date Fund Landscape,[19] investor demand for low-cost target date options has skyrocketed in recent years. Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows. The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years. Defendants' conduct in offering and maintaining the Active suit in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite. The Investment Oversight Committee never even discussed the Active suite's capital flight and appears to have been totally unaware that the Plan's QDIA was experiencing such capital flight.

---

[18] "NEPC: Corporate Defined Contribution Plans Report Flat Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.

[19] "2019 Target-Date Fund Landscape: Simplifying the Complex," https://www.morningstar.com/lp/tdf-landscape

iv.  The Investment Oversight Committee Ignored the Active Suite

91.     The meeting materials distributed to the members of the Investment Oversight Committee by the Director and the Staff contained nothing pertaining to the Active suite other than standard performance metrics and the Plan's asset allocation.  These materials, which the members of the Investment Oversight Committee reviewed before each meeting, contained no analysis, investigation, information, or recommendation related to the Active suite's risk level, underlying portfolio, cost, glide path, function as the QDIA, strategy changes, capital flight, or substantial negative press.  Moreover, the Active suite is not mentioned a single time in any of the minutes taken at every meeting during the Class Period, indicating that the Investment Oversight Committee never discussed the fund family once – even though it most assuredly was the most important investment in the Plan.

92.     Indeed, a detailed discussion concerning the Active suite failed to take place even after NEPC, in its first quarterly report to the Staff after it was engaged as the Plan's investment advisor, drew specific attention to the Active suite.  As part of this initial Plan review, dated June 1, 2016, NEPC observed that the Active suite had been originally selected more than ten years previously, at a time when the universe of target date fund opportunities was limited.  The review further noted that the Active suite had not been reviewed by Defendants since the initial selection.  Citing the Department of Labor's February 2013 guidance on target date fund selection and monitoring, NEPC recommended that Defendants undertake a review of the QDIA, including its glide path and managers, as well as the level of risk in the Active suite in light of the fact that some Plan participants were entitled to benefits as a result of participation in a defined benefit plan, while other Plan participants were not entitled to benefits as a result of participation in such other plan.

93.     NEPC even proposed the Fidelity Institutional Asset Management Target Date Collective Trusts (the "FIAM TDFs") as an alternative to the Active suite, informing the Committee that the FIAM TDFs were a "lower fee solution" that shared the Active suite's glide path, a label that also applies to the Index suite.  The investment advisor further added that 60% of Fidelity's target date fund clients in the $1 billion to $3 billion asset range had moved to the FIAM TDFs, and that 78% of clients with $3 billion or more in assets had done the same.

94.     No part of the above assessment was ever provided to the Investment Oversight Committee by the Staff; accordingly, no part of it was ever considered or discussed by the Committee members.

95.     Throughout the Class Period, there were TDFs that consistently outperformed the Active suite.  If Defendants had taken their fiduciary duties seriously during the Class Period, they would have replaced the Active suite with a suitable alternative TDF.

96.     As a result of Defendants' breaches relating to the selection and retention of the Active suite, the Plan has sustained losses in excess of $10 million.

### 3.     The Plan's Objectively Imprudent Investment Options

97.     In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi = Rf + \beta i(ERm - Rf)$, where:

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
$(ERm - Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[20]  Otherwise, the model collapses, and it would be imprudent to assume any risk without an expectation of achieving associated return above the benchmark returns.

i.    <u>The Morgan Stanley Institutional Fund Emerging Markets Portfolio I</u>

98.    The Morgan Stanley Institutional Fund Emerging Markets Portfolio Class I has consistently and significantly underperformed both its benchmark, the MSCI Emerging Markets Index (Net), and its peer group during the Class Period.  However, due to the Investment Oversight Committee's deficient investment review procedures, a general lack of understanding of how to evaluate investment returns, and a general atmosphere of neglect towards the Plan, Defendants failed to appropriately scrutinize, and ultimately replace, this poor performing fund.

99.    The meeting materials distributed to the members of the Investment Oversight Committee by the Director and the Staff regularly gave short shrift to the Plan, typically including just the Plan's asset allocation and an investment performance chart, with little to no analysis or recommendation.  However, the performance data presented to the Investment

---

[20]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

Oversight Committee would have been sufficient to convince a fiduciary following a prudent

process that the Emerging Markets Portfolio should be removed:

- The materials presented at the meeting on February 21, 2017, reflecting investment returns as of the end of the Fourth Quarter of 2016, showed the Emerging Markets Portfolio underperforming its benchmark on a 3- and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the Emerging Markets Portfolio.

- The materials presented at the meeting on May 30, 2017, reflecting investment returns as of the end of the First Quarter of 2017, showed the Emerging Markets Portfolio underperforming its benchmark on a 3- and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the Emerging Markets Portfolio.

- The materials presented at the meeting on August 31, 2017, reflecting investment returns as of the end of the Second Quarter of 2017, showed the Emerging Markets Portfolio underperforming its benchmark on a 10-year basis and ranking in the bottom half of its peers on a 5- and 10-year basis. The minutes of this meeting make no mention of the Emerging Markets Portfolio.

- The materials presented at the meeting on November 29, 2017, reflecting investment returns as of the end of the Third Quarter of 2017, showed the Emerging Markets Portfolio underperforming its benchmark on a 3- and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the Emerging Markets Portfolio.

100.    At this point, the Investment Oversight Committee had been presented with

materials at *four consecutive quarterly meetings* that clearly displayed a troubling pattern of

underperformance by the Emerging Markets Portfolio. These indicators were ignored, and the

returns only got worse.

- The materials presented at the meeting on March 14, 2018, reflecting investment returns as of the end of the Fourth Quarter of 2017, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5- and 10-year basis, and in the 50th percentile of its peers on a 3-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on May 29, 2018, reflecting investment returns as of the end of the First Quarter of 2018, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom

half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting again specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on August 28, 2018, reflecting investment returns as of the end of the Second Quarter of 2018, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting again specifically note that the Staff did not have concerns with the Plan's investments.

101.    At this point, the Investment Oversight Committee had been presented with materials displaying the Emerging Markets Portfolio trailing its benchmark and generating returns in the bottom half of its peers by every long-term metric (except for the 3-year peer ranking of 50 in the Fourth Quarter of 2017, missing out on the bottom half by a single percentile point) at *four consecutive quarterly meetings*, dating back to the November 29, 2017 meeting.  In defiance of this negative trend, the Investment Oversight Committee continued to ignore the Emerging Markets Portfolio's woeful performance, when it should have considered removing the Emerging Markets Portfolio.

- The materials presented at the meeting on November 27, 2018, reflecting investment returns as of the end of the Third Quarter of 2018, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on March 28, 2019, reflecting investment returns as of the end of the Fourth Quarter of 2018, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on June 4, 2019, reflecting investment returns as of the end of the First Quarter of 2019, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on September 10, 2019, reflecting investment returns as of the end of the Second Quarter of 2019, showed the Emerging Markets

Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.

102.     At this point, the Investment Oversight Committee had been presented with materials displaying the Emerging Markets Portfolio trailing its benchmark and generating returns in the bottom half of its peers by every long-term metric at ***eight consecutive quarterly meetings***, yet still did not act to relieve participants of this imprudent investment option.  Per the minutes of this meeting, the Staff merely deemed it sufficient to undertake a review of this investment option.

- The materials presented at the meeting on December 3, 2019, reflecting investment returns as of the end of the Third Quarter of 2019, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  Incredibly, at this ***ninth consecutive meeting*** in which the materials showed the Emerging Markets Portfolio to be failing every single long-term performance metric, the Staff's presentation to the Investment Oversight Committee finally included an analysis of the underperformance.  The Staff's materials explained that, after a brief investigation into the Emerging Markets Portfolio's performance, it was satisfied with the Emerging Markets Portfolio's manager, philosophy, and portfolio.  This conclusion was despite the fact that the managers of the Emerging Markets Portfolio had presided over a fund that had performed terribly by just about any metric for the past several years.  To illustrate: at this meeting, the Emerging Market Portfolio's 3-year return ranked in the 78th percentile of all emerging markets equity managers, its 5-year return ranked in the 76the percentile of all emerging markets equity managers, and its 10-year return ranked in the 81st percentile of all emerging markets equity managers.

- The materials presented at the meeting on March 10, 2019, reflecting investment returns as of the end of the Fourth Quarter of 2019, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on June 2, 2020, reflecting investment returns as of the end of the First Quarter of 2020, showed the Emerging Markets Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.

103.    When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark and rank in the top half of its peers, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Fidelity Emerging Markets Index Fund that simply tracks the MSCI Emerging Markets Index (the benchmark chosen by the Emerging Markets Portfolio's managers), with a very low expense ratio of 7.6 basis points (0.076%).  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Morgan Stanley Emerging Markets Portfolio instead forced them to pay 105 basis points (1.05%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.  As a result of this breach, the Plan has sustained losses in excess of $13 million.

ii.    The Frank Russell Small Cap Collective Trust

104.    The Frank Russell Small Cap Collective Trust Class B (the "Small Cap CIT") has consistently and significantly underperformed its benchmark, the Russell 2000 Index, and its peer group during the Class Period.  However, the Investment Oversight Committee again neglected to follow a prudent investment evaluation process and ignored this negative trend presented in the same materials as the Emerging Markets Portfolio.

- The materials presented at the meeting on June 7, 2016, reflecting investment returns as of the end of the First Quarter of 2016, showed the Small Cap CIT underperforming its benchmark on a 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  Though this was the first quarter in the Class Period that the CIT's 3- and 5-year metrics had turned negative, materials presented at every single quarterly meeting dating back to the start of the Class Period show the Small Cap CIT both lagging its benchmark and generating returns in the bottom half of its peers on a 10-year basis, meaning that although its recent performance had been acceptable, it had not demonstrated the ability to beat its peers over the long-term.  The minutes of this meeting make no mention of the CIT.

- The materials presented at the meeting on August 30, 2016, reflecting investment returns as of the end of the Second Quarter of 2016, showed the Small Cap CIT underperforming its benchmark on a 3- and 10-year basis and ranking in the bottom half of its peers on a 3- and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on November 30, 2016, reflecting investment returns as of the end of the Third Quarter of 2016, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that the Investment Oversight Committee was of the opinion that no action was necessary with respect to the Plan's investments.

- The materials presented at the meeting on February 21, 2017, reflecting investment returns as of the end of the Fourth Quarter of 2016, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the CIT.

105. At this point, the Investment Oversight Committee had been presented with materials at *four consecutive quarterly meetings* that clearly displayed a troubling pattern of underperformance by the Small Cap CIT. These indicators were ignored, and the poor returns persisted, harming participant retirement accounts.

- The materials presented at the meeting on May 30, 2017, reflecting investment returns as of the end of the First Quarter of 2017, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the CIT.

- The materials presented at the meeting on August 31, 2017, reflecting investment returns as of the end of the Second Quarter of 2017, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting make no mention of the CIT.

106. At this point, the Investment Oversight Committee had been presented with materials displaying the Small Cap CIT trailing its benchmark and generating returns in the bottom half of its peers by every long-term metric at *four consecutive quarterly meetings*, dating back to the November 30, 2016 meeting. In defiance of this negative trend, the Investment

Oversight Committee continued to ignore the CIT's woeful performance, when it should have considered removing the CIT.

- The materials presented at the meeting on November 29, 2017, reflecting investment returns as of the end of the Third Quarter of 2017, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting make no mention of the CIT.

- The materials presented at the meeting on March 14, 2018, reflecting investment returns as of the end of the Fourth Quarter of 2017, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3- and 10-year basis, and in the 50th percentile of its peers on a 5-year basis.  The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on May 29, 2018, reflecting investment returns as of the end of the First Quarter of 2018, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on August 28, 2018, reflecting investment returns as of the end of the Second Quarter of 2018, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

107.    At this point, the Investment Oversight Committee had been presented with materials displaying the Small Cap CIT trailing its benchmark and generating returns in the bottom half of its peers by every long-term metric at *eight consecutive quarterly meetings*, yet still did not act to relieve participants of this imprudent investment option.

- The materials presented at the meeting on November 27, 2018, reflecting investment returns as of the end of the Third Quarter of 2018, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5- and 10-year basis.  The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on March 28, 2019, reflecting investment returns as of the end of the Fourth Quarter of 2018, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on

a 5- and 10-year basis, while ranking in the 50th percentile of its peers on a 5-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on June 4, 2019, reflecting investment returns as of the end of the First Quarter of 2019, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5- and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on September 10, 2019, reflecting investment returns as of the end of the Second Quarter of 2019, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

108.    At this point, although the Small Cap CIT's 3-year returns had barely crept into the top half of peers, it still trailed its benchmark over every period and remained in the bottom half of peers by 5- and 10-year measures, as it had repeatedly for the past 12 quarters. This substandard track record was present in the materials furnished to the Investment Oversight Committee at every meeting. Yet Defendants obstinately declined to take remedial action and remove the CIT to curtail the harm it had done to participant account balances.

- The materials presented at the meeting on December 3, 2019, reflecting investment returns as of the end of the Third Quarter of 2019, showed the Small Cap CIT failing to beat its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5-year basis, while ranking in the 50th percentile of its peers on a 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on March 10, 2019, reflecting investment returns as of the end of the Fourth Quarter of 2019, showed the Small Cap CIT underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5- and 10-year basis. The minutes of this meeting specifically note that the Staff did not have concerns with the Plan's investments.

- The materials presented at the meeting on June 2, 2020, reflecting investment returns as of the end of the First Quarter of 2020, showed the Small Cap CIT underperforming its

benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5-year basis.

109.    Once again, it is objectively imprudent to retain an investment option that does not consistently outperform (or, at the very minimum, meet) its benchmark.  The imprudent retention is exacerbated when the investment also persistently lags the returns of its peers.  When the investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark and rank in the top half of its peers, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Index Fund that simply tracks the Russell 2000 Index, with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class.  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Small Cap CIT instead forced them to pay 96 basis points (0.96%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.  As a result of this breach, the Plan has sustained losses in excess of $5 million.

### iii.    The Morgan Stanley Institutional Fund Small Company Growth Portfolio I

110.    The Morgan Stanley Institutional Fund Small Company Growth Portfolio Class I was replaced at the end of the First Quarter of 2018, but had been consistently and substantially underperforming its benchmark, the Russell 2000 Growth Index, and its peers in the small cap growth space by just about any performance metric for many consecutive years and should have been jettisoned from the Plan's investment menu long before it was ultimately removed.  The Investment Oversight Committee was regularly furnished with materials that should have raised

the alarm far sooner, but once again their process, or lack thereof, for evaluating investment

performance led to the Portfolio remaining in the Plan far past its "sell by" date.

- The materials presented at the meeting on March 6, 2015, reflecting investment returns as of the end of the Fourth Quarter of 2014, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 5-year basis. The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

- The materials presented at the meeting on June 30, 2015, reflecting investment returns as of the end of the First Quarter of 2015, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 10-year basis, while ranking in the 50th percentile of its peers on a 5-year basis. The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

- The materials presented at the meeting on September 3, 2015, reflecting investment returns as of the end of the Second Quarter of 2015, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 10-year basis. The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

- The materials presented at the meeting on December 7, 2015, reflecting investment returns as of the end of the Third Quarter of 2015, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

111.    At this point, the Investment Oversight Committee had been presented with

materials at four consecutive quarterly meetings that clearly displayed a troubling pattern of

underperformance by the Small Company Growth Portfolio. These indicators were ignored, and

the poor returns significantly worsened, harming participant retirement accounts.

- The materials presented at the meeting on March 7, 2016, reflecting investment returns as of the end of the Fourth Quarter of 2015, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

- The materials presented at the meeting on June 7, 2016, reflecting investment returns as of the end of the First Quarter of 2016, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom

half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that the Staff was satisfied with the fund's manager.

- The materials presented at the meeting on August 30, 2016, reflecting investment returns as of the end of the Second Quarter of 2016, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that there were no concerns with the Plan's investments.

112.    At this point, the Investment Oversight Committee had been presented with materials displaying the Small Company Growth Portfolio trailing its benchmark and generating returns in the bottom half of its peers by every long-term metric at *four consecutive quarterly meetings*, dating back to the December 7, 2015 meeting.  The Investment Oversight Committee ignored these performance concerns and failed to appropriately investigate replacing the Portfolio.

- The materials presented at the meeting on November 30, 2016, reflecting investment returns as of the end of the Third Quarter of 2016, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.  The minutes of this meeting specifically note that the Investment Oversight Committee was of the opinion that no action was necessary with respect to the Plan's investments.

113.    At this point, the writing was well and truly on the wall for the Portfolio.  Its trend of lagging the benchmark and its peers aside, the Portfolio's performance metrics were, by this meeting, truly shocking, and necessitated swift and decisive action by Defendants.  The Portfolio's 3-year annualized return of -1.0% ranked in the 98th percentile among its peers and was a far cry from the benchmark's 6.6% return for the same period.  Similarly, its 5-year annualized return significantly lagged the benchmark and ranked in the 88th percentile among peers, while the 10-year annualized return also trailed the benchmark and ranked in the 83rd percentile.  Yet Defendants dragged their feet, failing to actively investigate alternatives until the Second Quarter of 2017, approximately six months later.  The Portfolio was not ultimately

removed for a further nine months, during which time its returns fell further behind those of its peers and its benchmark, further damaging participants who were stuck with the woefully inappropriate investment.

- The materials presented at the meeting on February 21, 2017, reflecting investment returns as of the end of the Fourth Quarter of 2016, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting note the Staff's intent to review the Plan's small cap equity managers.

- The materials presented at the meeting on May 30, 2017, reflecting investment returns as of the end of the First Quarter of 2017, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. At this meeting, the Staff confirmed that it was finally reviewing the Plan's small cap equity managers. In addition to its shortcomings relating to the benchmark, the Portfolio's 3-, 5-, and 10-year peer rankings were the 98th, 93rd, and 96th percentile, respectively. In a shocking breach of fiduciary duty, Defendants waited to even begin to review this investment option until it had deteriorated so far as to render *nearly every single other small cap growth investment* in the marketplace a better choice. Yet the Plan would still not be rid of the Small Company Growth Portfolio for another ten months.

- The materials presented at the meeting on August 31, 2017, reflecting investment returns as of the end of the Second Quarter of 2017, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. The minutes of this meeting reflect a continuing review of small cap equity managers by the Staff.

- The materials presented at the meeting on November 29, 2017, reflecting investment returns as of the end of the Third Quarter of 2017, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis. At this meeting, the Staff finally recommended the Portfolio be terminated.

- The materials presented at the meeting on March 14, 2018, reflecting investment returns as of the end of the Fourth Quarter of 2017, showed the Small Company Growth Portfolio underperforming its benchmark on a 3-, 5-, and 10-year basis and ranking in the bottom half of its peers on a 3-, 5-, and 10-year basis.

114.    Defendants were far too late in eliminating this fund as investment option, and their delay was to the significant detriment of Plan participants' retirement savings. When an investment option's poor track record is so apparent, the Plan should select or replace the

investment option with one that has shown that it can consistently outperform the benchmark and rank in the top half of its peers, or, at the very least, retain an investment option that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Growth Index Fund that simply tracks the Russell 2000 Growth Index, with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class.  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Morgan Stanley Small Company Growth Portfolio instead forced them to pay 100 basis points (1.00%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives earlier than they ultimately did was a severe breach of fiduciary duty.  As a result of this breach, the Plan has sustained losses in excess of $48 million.

### 4.      The Plan's Excessive Investment Management Fees

115.     In another obvious breach of their fiduciary duties, Defendants also failed to monitor the average expense ratios charged to similarly sized plans.  Indeed, participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider ways in which to lessen the fee burden on participants during the pertinent period.  The majority of the funds in the Plan stayed relatively unchanged during the Class Period.  In 2018, a majority of the funds in the Plan, 12 out of the Plan's 18 investment options (67%), were substantially more expensive than comparable funds found in similarly sized plans (plans with over $1 billion in assets), according to the most recent Brightscope/ICI study published in August 2020:

| Fund | Exp. Ratio | Category | ICI Average Fee |
|------|------------|----------|-----------------|
| Fidelity Freedom Income K | 0.42% | Target Date | 0.40% |
| Fidelity Freedom 2010 K | 0.46% | Target Date | 0.40% |

| Fidelity Freedom 2020 K | 0.53% | Target Date | 0.40% |
|---|---|---|---|
| Fidelity Freedom 2030 K | 0.60% | Target Date | 0.40% |
| Fidelity Freedom 2040 K | 0.65% | Target Date | 0.40% |
| Fidelity Freedom 2050 K | 0.65% | Target Date | 0.40% |
| Fidelity Freedom 2060 K | 0.65% | Target Date | 0.40% |
| Fidelity Low-Priced Stock K | 0.43% | Domestic Equity | 0.34% |
| Lord Abbett Developing Growth I | 0.69% | Domestic Equity | 0.34% |
| Fidelity Growth Company K | 0.75% | Domestic Equity | 0.34% |
| Fidelity International Discovery K | 0.66% | International Equity | 0.49% |
| Morgan Stanley Emerging Markets Inst | 1.05% | International Equity | 0.49% |

116.    The above comparisons understate the excessiveness of the investment management fees in the Plan lineup throughout the Class Period.  The ICI Average fee is based on a study conducted in 2017 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years.  Accordingly, current average expense ratios would be lower than indicated above, demonstrating a greater disparity between the expense ratios of the Plan's investment options and the average expense ratios in the same category.

117.    A further indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select collective trusts where available.  A prudent fiduciary conducting an impartial review of the Plan's investment lineup would have recognized that the Plan could have shaved off a portion of its excessive spend on investment management fees by converting the following fund to a collective trust:

| Fund | Expense Ratio | 2018 Plan AUM | Collective Trust Version | Inception Date | Expense Ratio |
|---|---|---|---|---|---|
| Fidelity Growth Company K | 0.75% | $276.1m | Fidelity Growth Company Commingled Pool | Dec. 13, 2013 | 0.43% |

118.    During the Class Period, Defendants knew or should have known of the existence of this available collective trust and therefore also should have immediately identified the prudence of transferring the Plan's substantial assets from the mutual fund into this alternative

investment vehicle.  The above collective trust was comprised of the same underlying investments as its mutual fund counterpart, but charged lower fees.  The Plan did not receive any additional services or benefits based on its use of the more expensive fund; the sole consequence was higher costs for participants.  Defendants' failure to negotiate aggressively enough with Fidelity to obtain better pricing, or their inexplicable ignorance to the availability of the collective trust vehicle, was a severe breach of fiduciary duty.

119.    Compounding this issue is Defendants' failure to monitor the Plan's investment options to ensure that they were in the least expensive available share class.  There is no distinction whatsoever, *other than price*, between the share classes for the same investment option.  The share class used is typically, if not always, dependent on the negotiating leverage of the investor; in other words, large institutional investors, such as the Plan, have significant amounts of monies to invest such that mutual fund managers will agree to lower fees/offer cheaper share classes for access to those Plan assets.  Despite the negotiating leverage based on the size of the Plan, Defendants neglected to utilize the least expensive share class for the following fund:

| Fund | 2018 AUM | Exp Ratio | Cheaper Share Class | Exp Ratio |
|------|----------|-----------|---------------------|-----------|
| Lord Abbett Developing Growth I | $59.2m | 0.69% | Lord Abbett Developing Growth R6 | 0.60% |

120.    As long as Defendants continue to refrain from offering the least expensive share class for each investment option in the Plan lineup, participants will suffer harm to their retirement savings through the payment of needless extra fees.  By failing to recognize that the Plan and its participants were being paying higher investment management fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

121.     Defendants' failure to monitor the costs of the Plan's investment lineup fell far short of their duty to ensure that the Plan and participants only pay reasonable fees and left all participants without the opportunity to select suitably-priced prudent investments throughout the Class Period.  As a result of Defendants' breaches, the Plan sustained losses in excess of $31 million.

## V.     ERISA'S FIDUCIARY STANDARDS

122.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

123.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

124.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

125.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

126.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

127.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.   CLASS ALLEGATIONS

128.   This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class ("Class"):

> All participants and beneficiaries in the Eversource 401(k) Plan (the "Plan") at any time on or after June 30, 2014 to the present (the "Class Period" or "Relevant Time Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

129.   Excluded from the Class are Defendants and Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

130.   This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

131.   **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

132.   **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)   Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)   Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)   Whether and what form of relief should be afforded to Plaintiffs and the Class.

133.   **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise

out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

134. **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

135. **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

136. **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

137. **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never

bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of the virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

138.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

139.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

140.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

141.    Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(1).

## COUNT I
### (For Breach Of Fiduciary Duty)

142.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

143.    Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

144.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

145.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

146.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available

equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

147.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

148.    Eversource is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

149.    In light of its appointment and supervisory authority, Eversource had a fiduciary responsibility to monitor the performance of the Committees and its members.  In addition, Eversource, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committees.

150.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

151.    To the extent that fiduciary monitoring responsibilities of Eversource or the Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

152.    Eversource and the Committees breached their fiduciary monitoring duties by, among other things:

> (a)   Failing to monitor and evaluate the performance of their appointees or have a
>
> system in place for doing so, standing idly by as the Plan suffered enormous losses as

a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

153.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Eversource and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

154.    Eversource and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

155.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach Of Trust)

156.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

157.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

158.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Second Amended Class Action Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: October 18, 2021                           /s/ Laurie Rubinow
                                                  James E. Miller
                                                  Laurie Rubinow
                                                  Miller Shah LLP
                                                  65 Main Street
                                                  Chester, CT 06412
                                                  Telephone: (866) 540-5505
                                                  Facsimile: (866) 300-7367
                                                  Email: jemiller@millershah.com
                                                         lrubinow@millershah.com

                                                  James C. Shah
                                                  Alec J. Berin
                                                  Miller Shah LLP
                                                  1845 Walnut Street, Suite 806
                                                  Philadelphia, PA 19103
                                                  Telephone: (866) 540-5505
                                                  Facsimile: (866) 300-7367
                                                  Email: jcshah@millershah.com
                                                         ajberin@millershah.com

                                                  Kolin C. Tang

Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

Mark K. Gyandoh
Capozzi Adler, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*