# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY GARTHWAIT, et al. | No. 3:20-cv-00902-JCH |
| Plaintiffs, | |
| v. | |
| EVERSOURCE ENERGY SERVICE COMPANY, et al. | |
| Defendants. | |

**Expert Report of Michael Geist**

December 17, 2021

Confidential

**TABLE OF CONTENTS**

I.    ENGAGEMENT .................................................................................................... 1

II.   QUALIFICATIONS AND EXPERIENCE ........................................................... 2

III.  INTRODUCTION ................................................................................................ 6

IV.   EXECUTIVE SUMMARY ................................................................................... 7

V.    DEFINED CONTRIBUTION INDUSTRY ......................................................... 9

    A.   Defined Contribution Plans .................................................................... 9

    B.   Recordkeeping and Administrative Services ......................................... 10

    C.   Retirement Plan Services Fee Categories ............................................... 14

        1.   Bundled Service Offering .......................................................... 14

        2.   A La Carte RK&A Fees / Participant Transaction Fees ............. 14

        3.   Other Ad Hoc Billable Fees ....................................................... 15

    D.   Retirement Plan Services Fee Structures ................................................ 16

        1.   Asset-based ................................................................................. 17

        2.   Flat Per Participant Fee Rate ..................................................... 18

    E.   Revenue Sharing .................................................................................... 18

    F.   Net Investment Expense Available to Retirement Plan Participants ........... 20

    G.   Market for Retirement Plan Services ..................................................... 21

VI.   FACTUAL BACKGROUND .............................................................................. 29

    A.   The Plan .................................................................................................. 29

    B.   The Eversource Plan Fiduciaries ........................................................... 29

    C.   The Investment Committee ..................................................................... 29

i

D. The Administrative Committee ................................................................ 30

E. Relevant Service Providers ..................................................................... 31

VII. BACKGROUND ON FIDUCIARY DUTIES UNDER ERISA .......................................... 31

VIII. APPLICATION OF THE STANDARD OF CARE FOR PLAN FIDUCIARIES ............... 32

IX. STANDARD OF CARE FOR FIDUCIARIES PRIOR TO AND DURING THE CLASS
PERIOD ................................................................................................................ 34

X. DETAILED APPLICATION OF STANDARD OF CARE .................................................. 39

A. Process for Determining Reasonable RK&A Fees ...................................... 39

B. Impact of Proprietary Assets .................................................................. 40

C. Understanding the Different Business Models of Recordkeepers ................ 40

D. Obtaining a Reasonable Fee from a Recordkeeper .................................... 41

XI. ANALYSIS OF THE EVERSOURCE PLAN FIDUCIARIES' CONDUCT ...................... 43

A. The Eversource Plan Fiduciaries did not monitor the Plan's recordkeeping and
administrative fees consistent with the standard of care, custom and practice. ........... 43

B. The Eversource Plan Fiduciaries employed no process to monitor the recordkeeping
and administrative fees paid by Plan participants during significant portions of the class
period. ......................................................................................................... 45

C. The Eversource Plan Fiduciaries naively relied on a statement by its recordkeeper
Fidelity that the RK&A fees charged by Fidelity were reasonable and that the Plan
"compares well" to other Fidelity clients without asking for, or receiving any, proof or
verification of the facts supporting that statement from Fidelity. ................................. 45

D. The Eversource Plan Fiduciaries improperly failed to return millions of dollars in
unreasonable and excess fees paid by Plan participants in a timely manner. ............... 48

E. The Eversource Plan Fiduciaries failed to follow the standard of care, custom, and
practice by solely using an unreliable industry survey to attempt to determine the
reasonableness of its recordkeeping and administrative fees. ....................................... 50

F. The Eversource Plan Fiduciaries failed to solicit any bids from any competitor
recordkeepers to determine the reasonable market price to provide the RK&A services
required by the Plan. .................................................................................... 54

G.     The Eversource Plan Fiduciaries failed to conduct a formal RFP to determine the reasonable market price for the Plan's required RK&A services................................. 55

H.     The Eversource Plan Fiduciaries did not monitor all the revenue earned by its recordkeeper Fidelity to ensure the fees paid by Plan participants were reasonable..... 56

XII.     LOSSES ................................................................................................................ 58

A.     Methodology ................................................................................................. 58

B.     Calculations ................................................................................................. 62

## I.    ENGAGEMENT

1.      I have been retained by Plaintiffs' counsel in this matter to provide expert analysis and opinions related to the administration of the Eversource 401(k) Plan (the "Plan")[1] by Eversource Energy Service Company ("Eversource"), the Board of Directors of Eversource Energy Service Company ("Board"), the Eversource Plan Administration Committee ("Administrative Committee"), the Eversource Investment Management Committee ("Investment Oversight Committee") (collectively "Committees"), and the Retirement Plan Services fees charged to the Plan.

2.      Specifically, I have been asked to apply my knowledge of the standard of care, skill, prudence, and diligence for plans like this Plan from the time period including and immediately preceding June 30, 2014, through the present, that knowledgeable and prudent fiduciaries of defined contribution ("DC") retirement plans applied in the administration and recordkeeping of such plans. I have also been asked to apply my knowledge and expertise in the terms of engagement and compensation of recordkeepers for such plans and provide my opinion as to whether Defendants discharged their duties to the Plan with that same level of care, skill, prudence, and diligence from the period immediately preceding June 30, 2014, through the present. My analysis does not endeavor to reach ultimate legal conclusions; rather, it is intended to describe industry custom and practice relevant to the application of the appropriate legal standards.

3.      I am the owner of ClearSage Advisory Group. I am compensated at the rate of $600

---

[1] I have reviewed the Court's Ruling on Defendants' Motion to Dismiss entered on September 28, 2021, as amended on October 12, 2021, and have been advised by counsel for Plaintiffs that the Plaintiffs amended their operative complaint on October 18, 2021 to address the concerns identified in the Court's Ruling but that the amendment will not affect the substantive nature of the claims asserted in this litigation.

per hour. I received assistance in the preparation of this report from certain professionals associated with ClearSage Advisory Group, who are compensated at their normal hourly rates. Neither my compensation nor that of anyone at ClearSage Advisory Group is dependent on my opinions or on the outcome in this matter. My opinions are based on my review of the documents in this case, deposition testimony, and my professional experience. My opinions on this matter are ongoing. I specifically reserve the right to supplement, revise, or amend these opinions.

4.      A list of the materials considered in this matter is attached hereto as **Exhibit 1**.

**II.      QUALIFICATIONS AND EXPERIENCE**

5.      I am currently consulting primarily in the retirement plan, recordkeeping, and asset management industries. I am an expert in standard customs and practices utilized by plan fiduciaries to obtain reasonable retirement plan services fees, revenue sharing, retirement plan pricing structures, recordkeeping fees, and recordkeeping fee equalization solutions as well as comprehensive business process optimization and governance in the sales, service, marketing, and finance functions of the distribution of asset management services through retirement plans.

6.      As a retirement plan consultant for ClearSage Advisory Group, I provide fiduciary oversight to Plan Sponsors. This includes, among other things, soliciting bids from recordkeepers and other retirement plan service providers on behalf of plan fiduciaries as well as evaluating the services contained in proposals for retirement plan services. I also perform research on retirement plans and retirement plan fees and provide strategic analysis and institutional consulting services to providers in the retirement plan space. As part of my work for ClearSage Advisory Group, I have had the opportunity to review more than twenty proposals or RFP responses from at least nine recordkeepers for plans that each have more

than 7,000 participants.

7.    Before starting my consulting practice, I spent over ten years in the Retirement Plan Services division of T. Rowe Price ("TRP-RPS") holding a variety of senior level roles. Over the course of my employment at T. Rowe Price, I was responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans. In various roles since 2005, I was directly involved with pricing proposals for retirement plan services, including recordkeeping and administrative services, provided by TRP-RPS to defined contribution plans, including recordkeeping-only clients. I had direct experience with large defined contribution plan clients and prospective clients, including those ranging from $500 million to well over $1 billion in total plan assets. In my professional experience at TRP-RPS, I developed extensive knowledge of the sales and competitive bidding process for recordkeeping and administrative services provided by TRP-RPS and other competitor recordkeeping service providers for large defined contribution plans. I gained a firm understanding and insight into how recordkeepers price recordkeeping services, the costs of providing such services, and how sophisticated recordkeepers respond to requests for proposals ("RFP(s)") to maintain or secure business from large DC plan clients. Over my career, I acquired extensive knowledge of fiduciary best practices for DC plans, including those employed by fiduciaries and industry professionals, to ensure that only reasonable recordkeeping and administrative fees are charged to plan participants.

8.    Most recently, I was a Senior Vice President in the Product Development and Management department of TRP-RPS from February 2015 until August 2016. I was responsible for the development and management of recordkeeping fee services and solutions for TRP-RPS. Among other things, I developed and launched the TRP-RPS "Fee Allocation Solutions" service, which assists plan sponsors in carrying out their fiduciary duties to monitor

recordkeeping fees and make decisions about the equitable allocation of plan expenses among plan participants. These services utilized database technologies to more precisely account for revenue sharing and recordkeeping credits attributable to the investments selected by plan fiduciaries and made available to plan participants. In that role, I also partnered with the Pricing Governance department to develop enhanced recordkeeping fee pricing solutions for plan sponsors.

9.      I spent approximately two and a half years as the National Pricing Governance and Data Strategy Manager for TRP-RPS from August 2012 until February 2015. In that capacity I was responsible for, among other things, the financial evaluation and governance of all retirement plan pricing for TRP-RPS. This included developing, leading, and governing the bidding and pricing process as well as the pricing negotiation process for both new and existing business. In that role I was responsible for developing and governing pricing proposals for over 4,000 retirement plans and 8,000 pricing proposals. Additionally, I was responsible for developing and conducting a regular financial evaluation and pricing review for all current clients. In this role I was also responsible for developing a pricing model and pricing strategy for non-qualified plan administration and overseeing the implementation of that pricing model as T. Rowe Price transitioned the recordkeeping of its non-qualified plan business to a new provider. In this role I also worked with third party consultants such as Deloitte to analyze the costs of delivering retirement plan services and the impact of various service delivery models on costs. In this role I was also responsible for formalizing the use of data collection and analysis to build predictive models to predict the price at which competitors would bid for retirement plan services for plans with greater than 500 participants.

10.      I was Vice President, Sales Support and Business Development from February 2011 until August 2012. I managed and oversaw multiple departments supporting sales producers

including Lead Generation, Product Governance/Underwriting, RFP Response, Internal Sales
Support, and the Pricing, Metrics, and Reporting teams. In that role, I was responsible for,
among other things, the financial evaluation and governance of all new business retirement plan
pricing for TRP-RPS, which amounted to approximately 2,000 retirement plans and 4,000
pricing proposals. My responsibilities also included developing, leading, and governing the
bidding and pricing process for new business as well as the pricing negotiation process for new
business. In this role I was responsible for developing all pricing related data and language
necessary for T. Rowe Price to provide its 408(b)(2) fee disclosures to its clients.  In this role I
also contributed as a subject matter expert for TRP-RPS to a firm-wide analysis of the revenue
and cost impact of alternative strategies for the distribution of asset management services
across multiple distribution channels such as retail, retirement plan services, third-party, and
institutional distribution. I was also responsible for the analysis and segmentation of the
retirement plan market.

11.    From January 2008 until February 2011, I was a Vice President of TRP-RPS serving
as the National Sales Operations Manager. In that capacity, I was responsible for developing,
managing, and governing all aspects of the sales process for TRP-RPS, including the bidding
and pricing process as well as the pricing negotiation process. In this role I was responsible for,
among other things, the financial evaluation and governance of all new business retirement plan
pricing for TRP-RPS which amounted to over 4,000 retirement plans and 8,000 pricing
proposals. I was also responsible for market analysis that supported the development of sales
and segmentation strategies as well as sales targets. From around September 2009 through
February 2011, I also served as the National Small Market Sales Manager. I was also
responsible for managing a team of sales producers and supporting their efforts to win new
business for recordkeeping and administrative services provided by TRP-RPS.

12.    From January 2005 through December 2008, I was a sales producer responsible for winning new recordkeeping and asset management business for TRP-RPS. During that period, I provided recordkeeping proposals for over 400 retirement plans and over 800 pricing proposals.

13.    Prior to joining T. Rowe Price, I served as the Director of Marketing for E-centives, a database marketing company. Prior to joining E-centives I practiced law for five years.

14.    I earned my MBA from University of Maryland, Robert H. Smith School of Business, and my JD from the University of Baltimore School of Law. While working for T. Rowe Price, I passed the Principal/Supervisory Exam (Series 24 - General Securities Principal Examination), the General Industry/Products Exam (Series 7 - General Securities Representative Examination), and the Maryland State Securities Law Exam (Series 63 - Uniform Securities Agent State Law Examination).

15.    I have also passed the test to earn the Certified Fiduciary Plan Advisor designation from the National Association of Plan Advisors in affiliation with the Retirement Plan Academy of the American Retirement Association.

16.    My curriculum vitae outlining my experience is attached as **Exhibit 2**.

III.    **INTRODUCTION**

17.    The Plan is a DC retirement plan sponsored by Eversource.

18.    Authority and control over the selection and monitoring of service providers is the responsibility of the fiduciaries of the plan ("Eversource Plan Fiduciaries").

19.    The Plan has, from the time period from June 30, 2014, through the present (the "Class Period") been among the top 1% largest defined contribution plans in the United States in terms of the number of plan participants and assets. The Plan was also one of the top 1% of plans prior to the Class Period as well. The below chart provides the Plan's participants and

assets throughout and just prior to the Class Period.[2]

### Exhibit 5 - Plan Demographic Rank

| Year | Participants | Participant Rank | Assets | Asset Rank |
|------|-------------|------------------|--------|-----------|
| 2013 | 12,487 | 99.89% | $2,655,318,000 | 99.96% |
| 2014 | 12,192 | 99.88% | $2,900,300,629 | 99.96% |
| 2015 | 11,651 | 99.87% | $2,754,211,785 | 99.96% |
| 2016 | 11,507 | 99.86% | $2,846,026,655 | 99.96% |
| 2017 | 11,470 | 99.86% | $3,209,332,663 | 99.96% |
| 2018 | 11,484 | 99.85% | $3,023,341,879 | 99.96% |
| 2019 | 11,722 | 99.85% | $3,588,747,512 | 99.96% |

20.    The Eversource Plan Fiduciaries did not employ a process consistent with the standard of care, custom, and practice when attempting to fulfill their fiduciary duties of prudence and loyalty to participants in the Plan ("Plan Participants") and, as a result, the Plan Participants have suffered significant losses.

## IV.    EXECUTIVE SUMMARY

21.    The conduct of the Eversource Plan Fiduciaries throughout and prior to the Class Period is characterized by neglect and half measures. The Eversource Plan Fiduciaries' conduct is not consistent with the standard of care for prudent fiduciaries based on my experience working in the retirement plan industry for over sixteen years.

22.    This conclusion is supported not just by a few insignificant errors or mistakes over the past several years. Rather, it is supported by a pattern of unserious conduct prior to and throughout the class period that was not consistent with ensuring that Plan Participants paid only reasonable fees for retirement plan services.

23.    The following is a summary of the pattern of neglect and failure to follow the

---

[2] Derived from 5500 filing for the Plan and compared to all 5500s filed during these years. *See* Exhibit 5.

7

standard of care for prudent plan fiduciaries exhibited by the Eversource Plan Fiduciaries prior to and throughout the Class Period.

1.  The Eversource Plan Fiduciaries did not monitor the Plan's recordkeeping and administrative fees consistent with the standard of care, custom and practice.

2.  The Eversource Plan Fiduciaries did not employ any process to monitor the recordkeeping and administrative fees paid by Plan participants during significant portions of the class period.

3.  The Eversource Plan Fiduciaries naively relied on a statement by its recordkeeper Fidelity that the recordkeeping and administrative fees charged by Fidelity were reasonable and that the Plan "compares well" to other Fidelity clients without asking for, or receiving any, proof or verification of the facts supporting that statement from Fidelity.

4.  The Eversource Plan Fiduciaries improperly failed to return millions of dollars in unreasonable and excess fees paid by Plan participants in a timely manner.

5.  The Eversource Plan Fiduciaries failed to follow the standard of care, custom, and practice by using an unreliable industry survey to attempt to determine the reasonableness of its recordkeeping and administrative fees.

6.  The Plan Fiduciaries failed to solicit any bids from any competitors to determine the reasonable market price to provide the recordkeeping and administrative fees required by the Plan.

7.  The Eversource Plan Fiduciaries failed to conduct a formal RFP or some other competitive process to determine the reasonable market price for the Plan's required retirement plan services.

8.  The Eversource Plan Fiduciaries did not monitor all the revenue earned by its

recordkeeper Fidelity to ensure the fees paid by Plan participants were reasonable.

24.     Each of these process lapses is described in detail in Section XI below and supports the conclusion that the Eversource Plan Fiduciaries failed to manage and administer the Plan consistent with the standard of care and custom and practice and is evidence that the Eversource Plan Fiduciaries did not employ a prudent process.

25.     The Eversource Plan Fiduciaries' failure to act in accordance with the standard of care and employ a prudent process caused Plan Participants to pay unreasonable and excessive fees and the Plan Participants have suffered losses as a direct result of the Eversource Plan Fiduciaries' process failures.

## V.    DEFINED CONTRIBUTION INDUSTRY

### A.    Defined Contribution Plans

26.     To remain competitive and attract and retain quality and talented employees, employers often sponsor DC plans to offer to their employees as an employee benefit.

27.     Over the past three decades, DC plans have become the most common employer-sponsored retirement plan. A DC plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under the plan. Among many options, employers may make contributions on behalf of all participants and/or make matching contributions based on the employees' elective deferrals. Unless the plan fiduciary chooses to make a brokerage window available, the employees can direct their contributions only among investment options selected by the plan fiduciary. This is why the selection and monitoring of investment options is such a critical responsibility of plan fiduciaries.

28.     According to Investment Company Institute Quarterly Retirement Market Data, as of the end of the first quarter of 2021, Americans had approximately $9.9 trillion in assets invested

in defined contribution plans.[3]

29.　　In a DC plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). In fact, the vast majority of plan sponsors pass the costs of administering the plan onto plan participants which, unfortunately, tends to reduce the incentive for the sponsoring employer to keep administrative costs low.

### B.　　Recordkeeping and Administrative Services

30.　　Recordkeeping and related administrative services are necessary for all DC plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

31.　　The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided to a defined contribution plan by a plan's "Recordkeeper."

32.　　Recordkeepers are also known as Retirement Plan Services providers because they are entities that can provide (through partnering or by themselves) the entire suite of recordkeeping and administrative services required by a plan sponsor to administer a defined contribution retirement plan.

33.　　By the start of the Class Period, plan sponsors of large 401(k) plans virtually always

---

[3] *See* Investment Company Institute, *Quarterly Retirement Market Data: Retirement Assets Total $35.4 Trillion in First Quarter 2021* (June 16, 2021), https://www.ici.org/statistical-report/ret_21_q1.

hired one primary Recordkeeper to provide the entire suite of recordkeeping and administrative ("RK&A") services required by a plan sponsor to administer a 401(k) defined contribution plan, which includes services such as processing individual transactions and/or services that are utilized only by specific participants (e.g., loan initiation and maintenance, services related to qualified domestic relations orders, etc.).

34.     Recordkeepers typically collect their fees in the form of both what is referred to as "direct" compensation and "indirect" compensation.

35.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

36.     Indirect Compensation is paid to the Recordkeeper indirectly by third parties and is not transparent to Plan Participants. In other words, the fees are taken from the investment options prior to the value of the investment option being provided to the participant. Thus, in most cases participants are not aware that they are paying these fees. As explained in more detail below, most indirect compensation is typically collected by Recordkeepers through "revenue sharing."

37.     Virtually all Recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to DC plans, e.g., mutual funds, insurance products, collective trusts, separate accounts, etc., or have some other ancillary line of business (e.g., consulting) to sell to DC plans. As a result, all Recordkeepers consider the economic benefit of their entire relationship with a DC plan when setting the fees for the RK&A services. In other words, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (e.g., investment management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the Recordkeeper for providing RK&A services.

38.     While there are currently more than 50 Recordkeepers in the marketplace, with recent

11

consolidation, there are now fewer than 30 that are considered national top-tier Recordkeepers. Some Recordkeepers deliver services to plans of all sizes while others focus on different market segments.

39.     Some of the Recordkeepers that are more frequently hired to provide services to plans with greater than 10,000 participants include Fidelity, Empower, Vanguard, Wells Fargo, Alight, Principal, Schwab, Prudential, and T. Rowe Price.

40.     There are two types of essential recordkeeping services provided by all Recordkeepers. For large plans with substantial bargaining power (like the Plan here), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that most of the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

1. Recordkeeping;

2. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

3. Administrative Services related to converting a plan from one Recordkeeper to another Recordkeeper;

4. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., summary plan descriptions and other participant materials);

5. Maintenance of an employer stock fund (if needed);

6. Plan document services, which include updates to standard plan documents to ensure

12

compliance with new regulatory and legal requirements;

7. Plan consulting services, including assistance in selecting the investments offered to participants;

8. Accounting and reporting services, including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

9. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

10. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.    The second type of essential RK&A services, hereafter referred to as "A La Carte RK&A" services, provided by all Recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These A La Carte RK&A services typically include, but are not limited to, the following:

1. Loan Processing;

2. Brokerage services/account maintenance (if offered by the plan);

3. Distribution services; and

4. Processing of qualified domestic relations orders.

42.    All top tier Recordkeepers capable of servicing a plan with 30,000 participants provide all the RK&A services set forth above.

### C.    Retirement Plan Services Fee Categories

#### 1.    Bundled Service Offering

43.    As noted above, for large DC plans all Recordkeepers provide the Bundled RK&A services on a "buffet-style," "all-you-can-eat" basis with a single fee rate that includes materially all the Bundled RK&A services.

44.    Because dozens of Recordkeepers can provide the complete suite of required RK&A services, plan fiduciaries can ensure that the services offered by each specific Recordkeeper are apples-to-apples comparisons.

45.    In other words, plan fiduciaries use the Bundled RK&A fee rate as the best and most meaningful way to make apples-to-apples comparisons of the Retirement Plan Services fee rates proposed by Recordkeepers.

46.    More specifically, plan fiduciaries request bids from Recordkeepers by asking what the Recordkeeper's Bundled RK&A revenue requirement is to administer the plan. And they request that the Bundled RK&A revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice.

47.    Recordkeepers collect their fees for Bundled RK&A services through direct compensation, indirect compensation, or a combination of both.

48.    Plan fiduciaries acting consistent with the standard of care, custom and practice also treat the Bundled RK&A as a commodity when negotiating with Recordkeepers given the nature of such services and because that achieves the best results for plan participants.

#### 2.    A La Carte RK&A Fees / Participant Transaction Fees

49.    As noted above, the industry standard is to charge participants additional fees for transactions that are specific to that participant based on participant-specific activity, e.g., a loan

14

initiation and maintenance fee.

50.    The fees charged for participant-specific services (A La Carte RK&A) typically account for a relatively small portion of the total fees charged by Recordkeepers for providing RK&A services. As illustrated below, during the Class Period the effective average A La Carte RK&A transaction fees paid per participant was $9.98 and ranged from a high of $11.73 to a low of $4.84. *See* Eversource_0024502 through Eversource_0024701. *See also* Exhibit 3.

|  | Min | Average | Max |
|---|---|---|---|
| Transaction Revenue ($/pp) | $4.84 | $9.98 | $11.73 |

51.    Additionally, differences between Recordkeepers in the fee rates for these A La Carte RK&A services are typically not deemed material when evaluating the fee proposals of Recordkeepers.

### 3.    Other Ad Hoc Billable Fees

52.    In some cases, Recordkeepers attempt to negotiate separate fees ("Other Ad Hoc Billable Fees") for some of the services that are often included in the standard Bundled RK&A services. In those cases, the Bundled RK&A services provided are not any different, rather the Recordkeeper has effectively negotiated a higher fee for the Bundled RK&A services in a less transparent way.

53.    In most cases, for large plans, any differences in Other Ad Hoc Billable Fees are considered immaterial for the purposes of comparing the Bundled RK&A fee rates of different Recordkeepers to determine a reasonable fee.

54.    On the other hand, however, some Recordkeepers attempt to charge separately for some of the Bundled RK&A services on an ad hoc basis for "as requested" additional services. In virtually all cases, fiduciaries of large DC plans can get those types of fees waived and/or built

15

into the Bundled RK&A services fee.

55.    Prudent plan fiduciaries of large plans can typically get Recordkeepers to waive these types of additional fees and include the service as part of the Bundled RK&A fee.

56.    Like the A La Carte RK&A Fees, differences between the fee rates of recordkeepers for these separate Ad Hoc Other Billable services are typically not deemed material when evaluating the fee proposals of Recordkeepers for large 401(k) plans.

57.    In summary, because differences in the A La Carte RK&A fee rates and the Ad Hoc Other Billable fee rates among Recordkeepers are virtually always considered immaterial, it is part of the industry standard of care to use the Bundled RK&A fee rate to create apples-to-apples RK&A fee comparisons.

58.    On the other hand, however, when the Other Ad Hoc Billable fees vary materially from what other recordkeepers would charge then prudent plan fiduciaries make adjustments to the Bundled RK&A fee rate to make apples-to-apples comparisons and ensure that the Plan Participants are paying only reasonable fees for the services they are receiving.

59.    In this case, during the Class Period, the effective average Other Ad Hoc Billable fees paid per participant was $3.28 and ranged from a high of $9.14 to a low of $1.40.  *See* Eversource_0024502 through Eversource_0024701.  *See also* Exhibit 3.

**D.    Retirement Plan Services Fee Structures**

60.    Practically speaking, as noted above, the Bundled RK&A services are almost always offered to plan sponsors of large plans through some type of per participant rate or through an asset-based fee rate.

61.    As noted above, for large DC plans, the Bundled RK&A services are essentially a commodity to plan sponsors and there are no material differences in the services provided. This is incontrovertibly illustrated by the fact that plan sponsors can request a quote from any

Recordkeeper to provide the required standard Bundled RK&A services while providing only basic demographic and plan information (e.g., the number of participants, the amount of assets, the plan type, and the cashflow into the plan) and all Recordkeepers will provide a quote.

62.     Thus, while there may be minor differences in the way the Bundled RK&A services are delivered, those differences are not deemed material to the price comparisons in virtually all cases. If a specific Recordkeeper provided additional services that were not offered by the other Retirement Plan Services providers, and those additional services were deemed material, then the plan fiduciaries would make a downward adjustment to the price proposed by that specific Recordkeeper in the amount of the value added by the additional service to make an apples-to-apples comparison with the other Retirement Plan Services offerings. That virtually never happens because there are no material differences in the Bundled RK&A service offerings that would warrant a price adjustment.

63.     The standard of care for prudent plan fiduciaries is to ensure that Recordkeepers are not charging separate unreasonable fees for services that should be included in the Bundled RK&A fee from a competitive perspective.

### 1.     Asset-based

64.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates circumstances in which the RK&A services do not change but, because of market appreciation and contributions to the plan, the revenue received by the Recordkeeper increases. This structure was historically preferred by Recordkeepers because it allowed them to obtain an increase in revenue without having to ask the client to pay a higher fee.

65.     As a result, it is generally considered a best practice to avoid asset-based fees. As Mercer pointed out in 2013, "utilizing a pricing model that is dependent on the value of plan

assets arbitrarily 'builds' in fee increases that are not linked to the level or the quality of the recordkeeper's services."[4]

66.    Finally, during the Class Period, in most cases, asset-based Bundled RK&A fees were paid through revenue sharing.

### 2.    Flat Per Participant Fee Rate

67.    Alternatively, the Bundled RK&A services can be provided by the Recordkeeper on a flat per participant fee basis.

68.    Because, as explained below, the costs to the Recordkeeper are driven primarily by the number of participants in the plan, this method is considered a best practice. It prevents the Recordkeeper from earning more revenue while providing the exact same Bundled RK&A when the plan assets increase due to participant or employer contributions or market appreciation.

69.    Some Recordkeepers, however, use certain pricing methodologies designed to position their pricing structure as a per participant structure, while at the same time taking the benefit of asset-based appreciation, leading to actual revenues being higher than a per participant "target."

### E.    Revenue Sharing

70.    As noted above, revenue sharing is a common method of paying for Retirement Plan Services but has been decreasing in popularity, especially among larger plans, largely due to its lack of transparency.

71.    Practically speaking, in the context of DC plans, any revenue that is collected through the total asset-based fee rate of an investment option in a DC plan and allocated to the provision of RK&A or other Retirement Plan Services is referred to as "revenue sharing." In other words, in

---

[4] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013).

the context of DC plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RK&A and, in some cases, other services provided to a plan.

72.     Because Recordkeepers provide the RK&A related to participant investments, Recordkeepers are essentially providing services on behalf of asset managers that the asset managers would otherwise have to provide on their own.

73.     As a result, the asset managers often allocate a portion of the total expense ratio for the investment options selected by plan fiduciaries to the provision of services that the Recordkeeper provides on behalf of the investment manager. The portion of the total expense ratio of an investment option paid by an asset manager to a Recordkeeper is referred to as "revenue sharing."

74.     In the case of mutual funds, the revenue sharing rate can vary from mutual fund to mutual fund and by share class within a given mutual fund. Likewise, other investment options such as annuities also allocate a portion of their revenues to cover services performed by Recordkeepers on behalf of the investment option.

75.     For example, if a mutual fund has a total expense ratio fee of 1.25%, the mutual fund provider may agree to pay the Recordkeeper 0.15% of the 1.25% total expense ratio fee that is paid by investors in that mutual fund (in this context the Plan Participants). That 0.15% portion of the 1.25% total expense ratio fee is known as the "revenue sharing."

76.     This payment is effectively made as compensation to Fidelity's Retirement Plan Services division for providing the RK&A services to those participants, but it is not paid "directly" by participants in that it is not visible as a deduction from plan assets.

77.     Rather, the 0.15% portion of the total expense ratio that is paid to the recordkeeper is considered "indirect compensation" and is not transparent to plan participants.

78.    Additionally, some firms like Fidelity provide additional compensation when a plan uses both recordkeeping and investment management services. For example, some Fidelity mutual funds provide an additional 10 basis points of "Additional Value" when the fund is used by a plan that also uses Fidelity as its recordkeeper. *See, e.g.*, Eversource_0003206.

79.    The Eversource Plan Fiduciaries should have understood Fidelity's revenue sharing rates, including the "Additional Value" and how they are both used to pay for RK&A.

**F.    Net Investment Expense Available to Retirement Plan Participants**

80.    The net investment management fee is derived by subtracting the revenue sharing rate (sometimes called the pricing credit rate) of a particular investment option from the total expense ratio.

81.    In other words, the difference between the total expense ratio and the revenue sharing rate is the net investment expense ("Net Investment Expense"). When a plan adopts prudent and best practices, the net investment expense is the actual rate a plan participant pays for the investment management services provided by a portfolio manager.

82.    Like the hypothetical example above, the Morgan Stanley Emerging Markets mutual fund used by the Plan had a total expense ratio for part of the class period of 1.25%, of which 0.15% was allocable to Fidelity for providing RK&A services. Subtracting the 0.15% revenue sharing rate from the Total Expense Ratio of 1.25% results in a Net Investment Expense rate of 1.10%.

83.    Large DC plans are considered "institutional" investors by the SEC and, as a result of their significant assets, are often given access to many share classes that are not available to individual investors. Because of their access to multiple share classes and the leverage they can exert as a large plan, plan fiduciaries of large DC plans can often obtain access to investment options at effective fee rates that are not available to other investors.

84.    The Eversource Plan Fiduciaries should have understood that Net Investment Expense is an important consideration related to the selection and monitoring of investment options and Recordkeepers.

### G.    Market for Retirement Plan Services

85.    It is important to understand that, unlike the fees for mutual funds and many other investment options, the market for Retirement Plan Services is not transparent.

86.    The expense ratios of mutual funds and other investment options are published in readily accessible sources and easily available online for free as well as disclosed through fund prospectuses.

87.    In contrast, no Recordkeeper publishes their competitive RK&A fee rates for large plans with greater than 5,000 participants. Recordkeepers are not required to share their RK&A contracts or Fee Disclosure documents for all of their clients with each individual client or the public. As a result, knowing that a plan's Bundled RK&A fee rate is $50 per participant is not meaningful without the ability to compare that $50 per participant rate to the rates available in the market.

88.    Because the market for RK&A fees is not transparent and the reasonable market fee rate is not published, the most accurate way to determine the market rate for RK&A for any specific plan is to solicit bids from several Recordkeepers.

89.    Similarly, the only reliable way to determine the reasonable RK&A fee rate for any particular plan is to request proposals through a formal process (such as an RFP) in which the plan fiduciaries signal to the non-incumbent market that there is a real opportunity to win new business and signal to the incumbent that the plan fiduciaries may take their RK&A business to a new provider. This competitive environment is what enables plan fiduciaries to ensure they are paying no more than the reasonable rate for RK&A services.

90.     If the plan fiduciaries do not solicit bids through a process that signals a real opportunity for Recordkeepers, the Recordkeepers will not provide their best pricing.

91.     By the early 2000s, prudent fiduciaries of large plans and their consultants demanded recordkeeping and administrative services be priced separately from investment management services. They also sought an "open architecture" investment structure, i.e., the ability to include non-proprietary investment options in the retirement plan where the recordkeeper provides recordkeeping and administrative services for both proprietary and non- proprietary investment options.

92.     Likewise, plan fiduciaries increasingly demanded more fee transparency for RK&A services which led to increased pricing pressure in competitive situations.

93.     These factors have contributed to the market for RK&A services becoming more competitive. As a result, the RK&A fee rate that Recordkeepers have been willing to accept for providing RK&A services has significantly decreased since the early 2000s. This decline began with larger DC plans and has migrated to all market segments.

94.     Well prior to the start of the Class Period, the market for RK&A was and remains highly competitive, especially for plans with greater than 10,000 participants. As explained in detail below, these plans offer significant economies of scale and provide a valuable opportunity to Recordkeepers in the marketplace.

95.     There are numerous Recordkeepers in the industry that are capable of providing quality RK&A services to large DC plans.

96.     Yet there are still many plan sponsors which have not obtained reasonable market rates for their RK&A. As a result, the average RK&A fee from a random sample of retirement plans is extremely unlikely to be a meaningful indicator of a reasonable RK&A fee.

97.     For example, if a significant portion of plans are paying higher than market rate fees

and only a small percentage of the plans achieve market rate fees in any given year, then the average fees paid by all plans will be higher than the market rate.

98.    Accordingly, surveys and benchmarking reports that characterize "average" fee rates as meaningful indicators of the market for RK&A services are not accurate or useful for determining reasonable fees.

99.    As noted above, the only foolproof, accurate way to determine the market rate is to solicit contemporaneous bids.

100.    Because the cost of providing RK&A services is not dependent on the amount of assets invested in the plan, as assets increase, the Recordkeeper's asset-based compensation paid through revenue sharing likewise increases even though the services provided to the plan, and the cost for providing those services, have not changed.

101.    For instance, from 1985 to 2000, the assets in DC plans increased dramatically. As assets grew, the asset-based fees collected by Recordkeepers increased in proportion to the asset growth while the RK&A services provided by Recordkeepers did not materially change. Over time, this often resulted in dramatic increases in RK&A fees paid by plan participants.

102.    The underlying cost to a Recordkeeper of providing RK&A services to a DC plan is primarily dependent on the number of participant accounts in the plan rather than the amount of assets in a participant's account.

103.    All else being equal, the incremental cost of providing RK&A services for a participant with an account balance of $500,000 is the same as for a participant whose account balance is $5,000, with the same investments. In the aggregate, any differences in investment holdings from one participant compared to another are immaterial from a cost perspective to the Recordkeeper.

104.    Service providers for large DC plans experience certain economies of scale that lead

23

to a reduction in the effective per-participant cost as the number of participants increases because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for DC plans. When the number of participants with an account balance increases in a DC plan, the Recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

105.    These economies of scale are achieved because a significant portion of the costs associated with providing recordkeeping services are fixed in relation to the plan, and thus, are not avoided if the client leaves. The portion of the marketing, administrative, and overhead expenses at the firm level that are allocated to the recordkeeping business unit do not typically change if the Recordkeeper loses a plan or acquires a new plan. Additionally, the Recordkeeper invests in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services). These costs also do not materially change with the loss or acquisition of a new plan, and do not vary based on the amount of assets in the plan or in an individual's account. When more participants in a plan are on a recordkeeping platform, the Recordkeeper allocates its fixed costs over a larger participant base, thereby reducing the per-participant cost. As a result, the incremental (or marginal) cost to add a new participant to a plan is relatively low.

106.    Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A services are primarily dependent on the number of participants with account balances in a DC plan, the cost on a per-participant basis declines as the number of plan participants increases.

107.    The economies of scale experienced by larger DC plans were described as far back as

1998 in the "Study of 401(k) Plan Fees and Expenses"[5] submitted to the Pension and Welfare

Benefits Administration of the Department of Labor ("DOL") and published by the DOL on its

website consistently since 1998.

**Table IV-4**
**Average 401(k) Plan Recordkeeping Fees, 1995**
By Number of Plan Participants

| Number of Participants | Costs Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

109.    The table ("Simple Hypothetical Illustration of the Impact of Scale on the Per-

Participant Costs of providing Recordkeeping Services") and graphic below ("Impact of Scale")

illustrate the basic economics of providing recordkeeping services to DC plans. As the number of

participants increases, the average cost per participant decreases until it approaches the variable

cost per participant. And the variable costs account for a larger portion of the total plan cost,

which drives down the average cost per participant and enables a Recordkeeper to provide the

services at a lower price-point.  *See* Exhibit 4.

---

[5] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf, page 48.

| Simple Hypothetical Illustration of the Impact of Scale on the Per-Participant Costs of providing Recordkeeping Services | | | | | | |
|---|---|---|---|---|---|---|
| Hypothetical fixed costs: | | | $100,000 | | | |
| Hypothetical variable cost per participant: | | | $15 | | | |
| Number of Participants | Total Fixed Cost | Total Variable Costs | Total Plan Costs | Average cost per participant | Percent of Total Plan Costs derived from Variable Costs | Variable Cost Per Participant |
| 100 | 100,000 | 1,500 | $101,500 | $1,015.00 | 1.48% | $15 |
| 1,000 | 100,000 | 15,000 | $115,000 | $115.00 | 13.04% | $15 |
| 2,500 | 100,000 | 37,500 | $137,500 | $55.00 | 27.27% | $15 |
| 5,000 | 100,000 | 75,000 | $175,000 | $35.00 | 42.86% | $15 |
| 7,500 | 100,000 | 112,500 | $212,500 | $28.33 | 52.94% | $15 |
| 10,000 | 100,000 | 150,000 | $250,000 | $25.00 | 60.00% | $15 |
| 15,000 | 100,000 | 225,000 | $325,000 | $21.67 | 69.23% | $15 |
| 20,000 | 100,000 | 300,000 | $400,000 | $20.00 | 75.00% | $15 |
| 25,000 | 100,000 | 375,000 | $475,000 | $19.00 | 78.95% | $15 |
| 30,000 | 100,000 | 450,000 | $550,000 | $18.33 | 81.82% | $15 |
| 35,000 | 100,000 | 525,000 | $625,000 | $17.86 | 84.00% | $15 |
| 40,000 | 100,000 | 600,000 | $700,000 | $17.50 | 85.71% | $15 |
| 45,000 | 100,000 | 675,000 | $775,000 | $17.22 | 87.10% | $15 |
| 50,000 | 100,000 | 750,000 | $850,000 | $17.00 | 88.24% | $15 |



26

110.    As a result, it is axiomatic in the Retirement Plan Services industry that, all else being equal: 1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and 2) as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

111.    As a result, large DC plans have significant bargaining power to obtain low RK&A service fees compared to smaller plans.

112.    Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for Recordkeepers.

113.    As noted above, another critical element of the market for Retirement Plan Services is that Recordkeepers routinely provide discounts to the Bundled RK&A fee rates as plans include more proprietary assets in the investment lineup.

114.    Similar to the economies of scale for Recordkeepers, asset managers also have tremendous economies of scale with respect to the investment options offered to plan participants. For example, all mutual funds with a track record of solid performance have achieved economies of scale such that the incremental marginal cost to manage an extra dollar invested in the mutual fund is, in almost all cases, close to zero ($0). Additionally, the revenues of mutual fund providers increase as the market increases with virtually no additional costs to manage the assets.

115.    As a result, adding $100,000,000 to an existing mutual fund is a very high margin and profitable endeavor for asset management firms like Fidelity, Vanguard, and Empower.

116.    Accordingly, these types of Retirement Plan Services firms who also provide asset management services to DC plans almost always provide a discount on their RK&A fee as plans use more of their asset management services. Providing these discounts as an incentive to include certain investment options in a plan is in the financial interest of these Recordkeepers.

117.    For example, consider a proprietary mutual fund with a Net Investment Expense rate

of 0.50%. Adding an incremental $100,000,000 in assets to that proprietary mutual fund will deliver an additional $500,000 in Net Investment Expense revenue with virtually no increase in costs. Now, consider a hypothetical plan with around 30,000 participants, like the Plan. A Recordkeeper that proposes to reduce its RK&A fee by $5 per participant if the plan uses the proprietary mutual fund may lose $150,000 in RK&A revenue but gains $500,000 in Net Investment Expense revenue for a net incremental increase of $350,000 in revenue virtually all of which flows to the bottom-line profitability of the firm. This concept is also axiomatic in the Retirement Plan Services industry.

118.    A final element of the competitive market for Retirement Plan Services is that it is not difficult to transition large plans to new Recordkeepers. Recordkeepers that service large DC plans have dedicated personnel, often referred to as conversion teams, who specialize in transitioning DC plans from the old Recordkeeper to the new recordkeeping platform. Because all Recordkeepers that service large plans routinely engage in plan transitions, they are fully prepared and equipped to make the transition. They also have personnel who assist the plan sponsor during the conversion and perform other necessary administrative tasks to effectuate the change, such as preparing participant communications.

119.    Thus, because a large plan can easily move to a new RK&A provider, the incumbent RK&A provider's fixed costs (overhead) will stay the same if the client leaves (leading to an increase in the overall cost per participant for the recordkeeping business), and because the incumbent Recordkeeper often stands to lose a lot of proprietary investment management revenue if the client leaves, plan fiduciaries for large plans have significant leverage to require incumbent providers to match or beat the fees of competitors.

120.    All of these concepts are axiomatic in the Retirement Plan Services industry. The Eversource Plan Fiduciaries should have understood all these concepts.

28

## VI.     FACTUAL BACKGROUND

### A.     The Plan

121.    The Plan is a DC or individual account plan available to eligible employees of Eversource within the meaning of Section 3(34) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participants' accounts.

122.    Like other companies that sponsor 401(k) plans for their employees, Eversource enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.

123.    The Plan at all times during the Class Period had over 11,000 participants and $2.6 billion in plan assets.

### B.     The Eversource Plan Fiduciaries

124.    Eversource is the Plan sponsor and a fiduciary of the Plan.  Eversource delegated responsibility for Plan management and administration to two committees ("Committees").

### C.     The Investment Committee

125.    Prior to the Class Period and effective October 9, 2012, the Board of Directors of NUSCO created the NUSCO Investment Management Committee ("NIMC") as a fiduciary to the Plan. *See* EVERSOURCE_0014431-33.

126.    The charter document creating the NIMC specifically provides that the NIMC had the power and authority relating to several "Benefit Plans" (including the Plan) to "[a]ppoint, remove

and monitor . . . professional service providers" as well as "[m]onitor and evaluate the Benefit

Plan recordkeeping, investment, and other costs and fees, as appropriate."  Id.

127.    Effective July 1, 2015. the Eversource Energy Services Company Board of Directors

created the Eversource Investment Management Committee ("IMC") as a fiduciary of the Plan.

*See* EVERSOURCE_0000595-597.

128.    The charter document creating the IMC used the same language as the NIMC charter

providing that the IMC had the power and authority to "[a]ppoint, remove and monitor . . .

professional service providers" as well as "[m]onitor and evaluate Benefit Plan recordkeeping,

investment, and other costs and fees, as appropriate."  Id.

129.    In the six-year period starting with the beginning of the class period, the NIMC or

IMC has met 22 times which works out to slightly less than once per quarter.

130.    Of those 22 meetings, the IMC mentioned recordkeeping or administration fees paid

by the Plan only five times.  The NIMC never mentioned recordkeeping or administration fees

paid by the Plan at all.

131.    Of the five times the IMC mentioned Plan recordkeeping or administration fees, four

of the mentions came in a roughly one-year period following the hiring of NEPC, LLC as a

consultant to assist with the administration of the Plan.

132.    From September 2017 through February 2020 the IMC made no mention of the

recordkeeping or administration fees paid by the Plan.

    **D.    The Administrative Committee**

133.    In 2015 the Eversource Energy Services Company Board of Directors established the

Eversource Plan Administration Committee ("PAC") as a fiduciary of the Plan. *See*

EVERSOURCE_0000598.

134.    The PAC has "the authority to appoint, remove or replace agents and service

providers to carry out specific duties in connection with the operation of the Plans . . . ."
EVERSOURCE_0000599.

135.    In the six years since it was created in July 2015, the PAC has minutes referring to
only five meetings.

136.    Additionally, I have reviewed an unsigned and undated charter document creating the
NUSCO Plan Administration Committee ("NPAC") but there are no meeting minutes for any
meetings of this committee.  EVERSOURCE_0014428-30.  To the extent this charter document
was ever executed, presumably the NPAC never conducted any meetings during which the Plan's
investments or recordkeeping arrangements were discussed.

### E.    Relevant Service Providers

137.    From at least 2012, if not earlier, and throughout the entire Class Period, Fidelity
provided RK&A services to the Plan as well as other services for which it charged separate and
additional fees.

138.    On March 3, 2016, Eversource hired NEPC, LLC ("NEPC") to provide Retirement
Plan Consulting services to the Plan to assist with the administration of The Plan.  *See*
Eversource_0001750 (contract between NEPC and Eversource).

## VII.    BACKGROUND ON FIDUCIARY DUTIES UNDER ERISA

139.    ERISA sets forth the obligations that a fiduciary owes to a retirement plan and its
participants and beneficiaries. While this Report does not reach legal conclusions, industry
custom and practice are informed by the applicable fiduciary duties under ERISA. Accordingly,
this Report reviews certain relevant statutory and regulatory sections.

140.    Under ERISA Section 404(a)(1), 29 U.S.C. §1104(a)(1), a fiduciary must "discharge
his duties with respect to a plan solely in the interest of the participants and beneficiaries." When
performing his duties, the fiduciary must act "for the exclusive purpose" of "providing benefits to

participants and their beneficiaries" and "defraying reasonable expenses of administering the

plan." 29 U.S.C. §1104(a)(1)(A).

141.    The fiduciary also must act "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims." 29

U.S.C. §1104(a)(1)(B).

## VIII.    APPLICATION OF THE STANDARD OF CARE FOR PLAN FIDUCIARIES

142.    The DOL has stated that employers are held to a "high standard of care and

diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service

providers;" "[e]nsure that fees paid to service providers and other plan expenses are reasonable in

light of the level and quality of services provided;" and "[m]onitor . . . service providers once

selected to make sure they continue to be appropriate choices."[6]

143.    Similarly, the duty to evaluate and monitor plan service provider fees includes those

fees directly paid by participants, because "[a]ny costs not paid by the employer, which may

include administrative, investment, legal, and compliance costs, effectively are paid by plan

participants."[7]

144.    By 2013 at the latest, and prior to the class period, the impact of the 2012 Fee

Disclosure regulations (first proposed in 2007) was incorporated into the standard of care and

was well known, understood, and established among prudent plan fiduciaries based on DOL

guidelines, case law, and best practices as shared by retirement plan professionals.

---

[6] *See* United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 *(Sept. 2019),*
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.
[7] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

145.    For example, in its 2013 publication, "DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance," Mercer LLC summarized the standard of care for prudent retirement plan professionals and plan fiduciaries "[b]ased on DOL guidelines, case law, and extensive marketplace experience" as follows:

1.    Price administrative fees on a per-participant basis;

2.    Benchmark and negotiate recordkeeping and investment fees separately;

3.    Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size;

4.    Benchmark and negotiate recordkeeping and trustee fees at least every other year;

5.    Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.

6.    Monitor actual fees paid against contractual requirements; and

7.    Review services annually to identify opportunities to reduce administrative costs.[8]

146.    Accordingly, it is indisputable under the fiduciary requirements set forth under ERISA, explained by the DOL, and adopted by retirement plan professionals, that if a plan is currently paying, e.g., $50 per participant for RK&A and the identical RK&A services are available for, e.g., $25 per participant, then paying more than $25 is not reasonable.

147.    It is also important to recognize that, just like in the medical and legal fields, the standard of care evolves over time in response to new information, methodologies, technologies, etc. As a result, *per se* pronouncements regarding the standard of care prior to, e.g., the 2012

---

[8] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013).

DOL fee disclosure regulations, are not reflective of the standard of care during the Class Period, which was greatly influenced by the tremendous discussion in the industry for over four years during the drafting of the fee disclosure regulations.

148.    From the time the DOL proposed enhanced fee disclosure regulations in 2007 until their adoption in 2012, the information and knowledge of plan fiduciaries increased substantially and there was an enhanced dissemination of best practices regarding the RK&A fees. As a result, the standard of care for prudent fiduciaries changed and improved.

## IX.    STANDARD OF CARE FOR FIDUCIARIES PRIOR TO AND DURING THE CLASS PERIOD

149.    Set forth below is the standard of care as understood by prudent plan fiduciaries both before and throughout the Class Period. The standard of care that I describe below is based on my experience working at T. Rowe Price from 2005 through 2016, as well as my experience acting as a fiduciary consultant for plan sponsors and a consultant in the retirement plan industry.

150.    The standard that I describe is well known throughout the industry and has been discussed by many industry professionals in multiple settings repeatedly since prior to the Class Period, e.g., at industry conferences, in publications, etc.

151.    Plan fiduciaries are required to fully understand all sources of revenue received by Recordkeepers. Fiduciaries must regularly monitor the revenue being paid to Recordkeepers to ensure that the compensation received is and remains reasonable in view of the services being provided.

152.    Prudent fiduciaries take advantage of the leverage they obtain through the entire relationship with the Recordkeeper which includes any revenue earned by the RK&A provider or its affiliates as a result of services provided by the Recordkeeper including, e.g., investment management revenue, managed account revenue, participant advice revenue, or self-directed

34

brokerage revenue.

153. The duty to evaluate and monitor plan service provider fees includes those fees directly or indirectly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[9]

154. Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for RK&A by periodically soliciting competitive bids from other Recordkeepers to perform the same services currently being provided to the plan.

155. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. For plans with a large number of participants, like the Plan, most Recordkeepers would require only basic plan and demographic information such as the plan type, number of participants and the amount of the assets to provide a quote for RK&A services, and this process can easily be accomplished in a month or two.

156. Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new Recordkeeper to provide the same (or better) services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

157. After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RK&A fee. The employer/plan sponsor can pay the RK&A fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable Recordkeeper would accept. Often, however, the employer decides to have the plan (i.e., participants) pay the

---

[9] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

RK&A fees. If the RK&A fees are paid by participants, the fiduciaries can allocate the negotiated RK&A fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

158.    In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the RK&A fees *pro rata* to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 in RK&A fees. If the plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the plan could allocate the $500,000 to participants by requiring that each participant pay 10 basis points of their account balance.

159.    The duty to monitor RK&A fees is critical when recordkeeping services are paid through an asset-based pricing structure. Under this structure, the amount paid for services may dramatically increase based on an increase in plan assets even though the services provided do not materially change. In this circumstance, the Recordkeeper's compensation can easily exceed a negotiated fee or target. A prudent fiduciary would take prompt and corrective action to remedy this overpayment caused by an increase in plan assets to ensure that the Recordkeeper only receives reasonable compensation.

160.    If the asset-based compensation through revenue sharing exceeds the negotiated per-participant revenue threshold, a prudent fiduciary would require the return or rebate of this excess revenue sharing directly to the plan and/or plan participants.

161.    In most cases, it is a best practice to allocate all revenue sharing back to participants who generated the revenue sharing, and separately deduct the recordkeeping fee directly from all participants' accounts. The use of a per-participant revenue requirement pricing structure ensures that the recordkeeper does not receive compensation that exceeds the negotiated fee.

36

162.    Prudent fiduciaries use an informal request for information ("RFI") or benchmarking process to quickly obtain a meaningful estimate of the reasonable fee for its required RK&A services. A prudent fiduciary recognizes, however, that lower fees can almost always be obtained by issuing a more formalized RFI or RFP.

163.    For example, in an RFI or benchmarking process, the identity of the plan and plan sponsor may or may not be disclosed, although some minimal plan characteristics (i.e., number of participants and value of the plan assets) are typically required to enable Recordkeepers to provide a pricing bid. The information received from respondents in an informal RFI or benchmarking is less detailed than what would be provided under a more formal RFI or RFP process.

164.    Although candidates submit informal pricing proposals under an informal RFI or benchmarking process, these do not always result in the lowest fee for the desired level of service. This is because, among other reasons, a formal RFI or RFP process sends a clearer message to vendors that the plan fiduciary is more seriously considering a change in the service provider and the RK&A services are open to competitive bidding. In contrast, under an informal RFI or benchmarking process, a Recordkeeper may not provide the most competitive pricing proposal if it determines that the plan fiduciary is not committed to considering a change in providers.

165.    That said, the results of a quick RFI or benchmarking process can result in an immediate reduction in the RK&A fee offered by the incumbent Recordkeeper. As a result, if the plan fiduciary determines that the current provider is charging unreasonable fees, the plan fiduciary can obtain an immediate RK&A fee reduction through this process and then obtain a commitment for a retroactive reduction upon the results of an RFP.

166.    As a result, a prudent fiduciary acting consistent with custom and practice would

proceed to issue a RFP (or a more formal RFI) to create a competitive bidding process after the initial benchmarking to obtain a reasonable recordkeeping fee for a DC plan. This is the surest way to obtain the lowest recordkeeping fee for a desired level of services, and the only reliable way a plan fiduciary can maximize its bargaining power to obtain the best fee for the desired level of services available in the marketplace.

167.    Under a competitive RFP bidding process, the plan fiduciary, often with the assistance of an independent fiduciary or consultant, sends out a formal request seeking proposals from vendors to provide RK&A services to a DC plan. The request will provide detailed information on the services requested and the characteristics of the plan, and a questionnaire for detailed information about the bidder and the services it will provide, as well as the fees it would charge. Large DC plans that send out RFPs can expect to receive several responses from sophisticated Recordkeepers because such large plans are highly valued sources of business for such providers.

168.    Critically, an effective RFP process is not complete once responses are received from bidders. Rather, the pricing proposals along with the written responses are only the starting point for negotiations. Once the responses are received, a prudent fiduciary begins negotiations with each provider.

169.    A prudent fiduciary should engage in a competitive RFP bidding process every three years. Throughout my professional career, this has been the accepted custom and practice among prudent fiduciaries and industry professionals. This is consistent with guidance from the DOL. For example, in 2010, the DOL noted that "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."

170.    A prudent fiduciary acting consistent with industry custom and practice regularly evaluates the reasonableness of the RK&A fees charged to the plan even if no significant

changes in the plan have occurred in the intervening three years. That is particularly true if the plan has agreed to an asset-based fee structure and the assets have increased significantly due to market appreciation, employer contributions, or plan mergers, etc.

171.    Importantly, however, to be maximally helpful to the plan and its participants, the information and improvements in services and price reductions that are obtained through a competitive RFI or RFP must be put into effect in a timely fashion. Fee negotiations should be memorialized via service agreements and monitored to ensure that actual fees reflect the agreed upon price effective immediately, if not retroactive to before the RFP process began.

172.    Accordingly, prudent plan fiduciaries are required to understand the RK&A fees paid by their participants and review fee disclosure documents provided to them by service providers such as Recordkeepers (e.g., 408(b)(2) Fee Disclosure Documents) to ensure that the only fees charged are those that are consistent with the contractual agreement.

173.    The standard of care for prudent fiduciaries is to meet regularly to monitor investment performance and the services and fees of all covered service providers. For a plan the size of the Plan, the standard would have been to meet quarterly. *See, e.g.*, EVERSOURCE_0016438 (outlining a quarterly meeting schedule to assist the Eversource Plan Fiduciaries.

## X.    DETAILED APPLICATION OF STANDARD OF CARE

174.    Below I describe in more detail how prudent plan fiduciaries apply the standard of care described above in practice.

### A.    Process for Determining Reasonable RK&A Fees

175.    Free surveys reporting the expenses charged to DC plans for retirement services are the least useful resource when determining a reasonable fee for a plan's RK&A services. High quality, accurate and reliable surveys cost money, because they require extensive work to be

done well. Even then, the information is of limited value because it is not plan-specific, whereas the information obtained through a competitive and formal RFI or RFP bidding process is specific to a particular plan.

176.    In a market in which a significant portion of Recordkeepers collect their fees through asset-based fees and the market has appreciated, the effective price being paid currently by plans often does not reflect the fees the Recordkeeper would be willing to accept to provide identical services. As a result, any average of a random sample of retirement plans will most likely not reflect the current price that can be obtained through a competitive bidding process.

### B.    Impact of Proprietary Assets

177.    All else being equal, most Recordkeepers will provide a lower Bundled RK&A fee when they are able to place proprietary investment options in the lineup.

178.    In other words, the higher the proportion of proprietary assets, the lower the RK&A fee. Specifically, almost all Recordkeepers that are affiliated with an asset manager will provide discounts to their RK&A fee if the plan uses some proprietary assets. A Recordkeeper that providers an "Open Architecture" Bundled RK&A fee of $50 per participant will provide a Bundled RK&A fee based on 50% proprietary assets of less than $50, e.g., $25 per participant.

179.    Understanding this concept is and has been a critical part of the standard of care for prudent plan fiduciaries during the Class Period.

180.    The Eversource Plan Fiduciaries should have understood this concept.

### C.    Understanding the Different Business Models of Recordkeepers

181.    Prudent Fiduciaries understand that different Recordkeepers have different business models and those different business models impact how the Recordkeepers structure their proposals. All national Recordkeepers that have significant market share for plans with greater than 10,000 participants have affiliated business entities that allow these providers to obtain

ancillary revenue through the sale of other services to plans and sponsors, including:

1. Asset management services;

2. Participant advice services;

3. Consulting fees; and

4. Other plan services, e.g., non-qualified plans, employee stock purchase plans, defined benefit plans.

### D.    Obtaining a Reasonable Fee from a Recordkeeper

182.    Based on my extensive experience in the recordkeeping industry, provided below are the custom and practice that a knowledgeable prudent fiduciary would follow when establishing, monitoring, and overseeing the RK&A fees charged to a DC plan. These are the same standards and practices that were in place prior to 2014.

183.    When soliciting bids through either an informal process or a formal RFI or RFP, a prudent plan fiduciary solicits bids with a minimum of two scenarios to try to determine the Recordkeeper's high and low bid based on any available discounts. In most cases, that involves soliciting an "open architecture" bid that does not assume any proprietary assets. The easiest and most common effective way to solicit the lowest bid is to solicit a bid that assumes a reenrollment into a proprietary Qualified Default Investment Alternative ("QDIA"), typically a target date fund, which results in anywhere from between 70% and 80% of the assets being invested in the QDIA. In cases in which the incumbent manages more than 70% then the request could be to assume the same proportion of proprietary assets currently held by the incumbent.

184.    A reenrollment scenario occurs when a plan follows best practices and uses a "reenrollment" process in which all participants are given an opportunity to create a new asset allocation. If participants do not proactively create a new asset allocation, they will have their assets reinvested in the appropriate QDIA.

41

185.    Accordingly, requesting an "open architecture bid and a "reenrollment" bid (or another bid based on over 70% proprietary assets) provides a prudent fiduciary with a high bid and a low bid at any given stage in the competitive process. Failing to require all bidders to provide these two bids at a minimum and/or comparing open architecture bids to proprietary bids are clear errors and do not achieve the best results for plan participants.

186.    When evaluating and clarifying informal or formal RFI or RFP responses, the plan fiduciary should compare the services offered and the pricing proposals across vendors. If any further information is necessary to evaluate any material differences in the services offered by each provider, the plan fiduciary should promptly request that information. With the detailed information provided by the bidders, the plan fiduciary can break the pricing proposals down on a per-participant basis to ensure an "apples-to-apples" comparison is made. This process allows the plan fiduciary to gain a detailed understanding of the pricing approaches among various Recordkeepers.

187.    After evaluating the pricing proposals on an "apples-to-apples" basis, and considering other detailed information provided in the RFP responses, a prudent fiduciary should separately negotiate with each provider. In doing so, the fiduciary would provide each provider and the incumbent the comparative pricing of their competitors and request that each provider offer pricing reductions to remain under consideration. The plan fiduciary should then narrow the list of providers to a total of three or four finalists, including the incumbent.

188.    When nearing a final decision on the Recordkeeper, the plan fiduciary should request that each finalist provide its final bid. If the incumbent is not the lowest bid, the plan fiduciary should then request that incumbent beat the competitor's price to remain under consideration. In these situations, the incumbent Recordkeeper will conduct a financial analysis comparing the scenario of keeping the business at the lower recordkeeping price to losing the

client, which would include the inherent risk of losing any proprietary investments and other supplementary revenue derived from the relationship. In most cases, the incumbent determines that maintaining the client at the lower price is in its economic interest.

189.    Due to the competition among Recordkeepers and their motivation to secure the business, the final fee quotes presented to the plan fiduciary are often substantially lower than initial bids. Even the threat of engaging in an RFP process can cause an incumbent to renegotiate its contract to reduce its compensation significantly.

## XI.    ANALYSIS OF THE EVERSOURCE PLAN FIDUCIARIES' CONDUCT

190.    A detailed analysis of the Eversource Plan Fiduciaries' process during the Class Period reveals a multitude of significant errors and an imprudent process.

### A.    The Eversource Plan Fiduciaries did not monitor the Plan's recordkeeping and administrative fees consistent with the standard of care, custom and practice.

191.    Based on my experience, the standard of care, custom, and practice for plan fiduciaries of large plans such as the Plan prior to and during the Class Period includes conducting quarterly meetings. This standard of care is validated by the testimony of some of the Plan Fiduciaries, the recommendations of NEPC, and the decisions of Plan fiduciaries.

192.    For example, Robert DeAngelo, a plan fiduciary stated that from June 2014 to the present "it was a policy of the company that the IMC met quarterly during that time period." *See* Deposition of Robert DeAngelo, p. 23-24. Likewise, NEPC structured a "Fiduciary Calendar / Action Plan" for the "Eversource Energy Service Company 401(k) Plan" and outlined quarterly meetings. See, e.g., EVERSOURCE_0016438. Though the Eversource Plan Fiduciaries recognized this standard of care, they set a lower bar in regards to the PAC: Jeff Hall who attended the January 15, 2016 meeting of the PAC responded to an email sent to him by Richard Morrison, noting "Fiduciary responsibility by Committee members was discussed and was

43

decided to have at least at a minimum, one annual 401k Administrative Committee meeting for audit." EVERSOURCE_0024330.

193.    In fact, however, the PAC went twenty-seven months without meeting at all. The meeting history of the PAC is illustrated below: *See* Exhibit 6.



194.    Likewise, there is no evidence that the NPAC met at all during 2014.

195.    Similarly, despite explicitly having the responsibility to monitor the Plan's recordkeeping and administration fees as set forth in the charter, the NIMC and IMC rarely even mentioned recordkeeping and administrative fees during their meetings as reflected in the meeting minutes. In most cases the minutes reflect only that the committees reviewed the "performance of the investment options available to employees under the NUSCO [or Eversource] 401k Plan. No concerns were noted." See, e.g., EVERSOURCE_0000284.

196.    The topics covered in the IMC meetings based on the meeting minutes are illustrated below. *See* Exhibit 7.

## Exhibit 7 - Investment Committee Meetings

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|
| RK&A Fees Not Reviewed | RK&A Fees Not Reviewed | RK Fee Reduction / Shifting | NEPC RK Survey Reviewed | RK&A Fees Not Reviewed | RK&A Fees Not Reviewed | NEPC RK Survey Reviewed |

197.    The failure to fulfill its commitment and duty to regularly monitor the Plan's recordkeeping and administration fees contributed to many of the Eversource Plan Fiduciaries' fiduciary lapses described below.

**B.    The Eversource Plan Fiduciaries employed no process to monitor the recordkeeping and administrative fees paid by Plan participants during significant portions of the class period.**

198.    As illustrated above, when considering the conduct of both the PAC and the IMC, it is apparent that the Eversource Plan Fiduciaries did not monitor the Plan's recordkeeping and administration fees at all in 2014, 2018, or 2019 and not until September of 2015. *See also* EVERSOURCE_0002602 (noting June of 2016 that the "last formal review" of recordkeeping fees took place in 2013). Failing to review RK&A fees for stretches of time close to or exceeding two years *twice* during the Class Period is contrary to custom and practice and the standard of conduct for fiduciaries of plans as large as the Plan in terms of both participants and assets.

**C.    The Eversource Plan Fiduciaries naively relied on a statement by its recordkeeper Fidelity that the RK&A fees charged by Fidelity were reasonable and that the Plan "compares well" to other Fidelity clients without asking for, or receiving any, proof or verification of the facts supporting that statement from Fidelity.**

199.    In his deposition, Mr. DeAngelo betrays a startling level of naivete when discussing how he attempted to determine a reasonable recordkeeping and administration fee for the Plan. To prepare for negotiations with Fidelity, Mr. DeAngelo noted that he would ask for information

from Fidelity's relationship manager, Mr. Jay Dawson, in a conversation – not in writing. *See* DeAngelo deposition, p 108, l. 5 – p. 109, l. 23.

200.    Mr. DeAngelo also acknowledged that, with respect to the negotiation of the $45 per-participant fee, he was the person who took the lead for Eversource and the Plan. *See* DeAngelo deposition, p 110, l 8-12.

201.    While acting as the primary negotiator with Fidelity, Mr. DeAngelo did not request any documentation from Fidelity. *See id.*, p. 113, l. 7-16. Rather, Mr. DeAngelo accepted Mr. Dawson's word that the Plan's fees were consistent with Fidelity's recordkeeping fees from other similar clients. *See id.*, p. 113, l. 18 – p. 114, l. 2. This is consistent with the hands-off approach demonstrated by other Plan Fiduciaries. *See* Morrison deposition, p. 100 ("Q: Do you recall if the [PAC] itself or any of its members reached out to Fidelity or discussed fees with Fidelity? A: I don't recall that happening, no."); Judge deposition, pp. 56-57 ("Q: As a member of the [IMC] . . . did you ever engage in any independent investigation of the expenses of the plan? A: Not that I recall.").

202.    As explained above, even if Mr. Dawson's representation was true, that does not mean that the fee rate was a reasonable market rate. In my experience, recordkeepers can choose the parameters of "similar" plans such that the fees of the plan in question look "competitive." This is because most recordkeepers have some clients that have not followed prudent processes and are not paying the reasonable market rate.

203.    Moreover, Fidelity's economic interests stand in direct conflict with the economic interests of Plan participants. All else being equal, Plan participants are better off with lower fees and Fidelity is better off with greater revenues (higher fees).

204.    For this and many other reasons, the only reliable way to ensure recordkeeping and administration fees are reasonable is to solicit bids in some sort of competitive process. This has

been the standard of care prior to and throughout the Class Period. Failing to follow that process does not provide any assurance that a fee rate is the reasonable market rate. Failing to follow a process known to result in the reasonable market rate is not in the best interest of the Plan's participants and falls short of industry custom and practice.

205.    In fact, as further evidence prudent plan fiduciaries do not rely on verbal statements by their recordkeepers, it is worth noting that, during the October 30, 2017 meeting of the PAC, Ms. Laughlin inquired of Fidelity's representative, Mr. Dawson as to whether the "rebate [of excess revenue to Plan participants] could be structured based on the participant level in funds that generated the credits . . . ." The minutes go on to state that "[a]s a follow up item to this meeting, Mr. Dawson informed Mr. DeAngelo that Fidelity was unable to structure the rebate in this manner." EVERSOURCE_0001079.

206.    In fact, however, Fidelity did have the capability to do what Ms. Laughlin requested. This is proven by the information contained in the Form 5500 disclosure of the Sutter Health 403(b) plan in 2015. The Plan's auditor's notes to the financial statements specifically state:

> The Plan Sponsor has a revenue sharing agreement with Fidelity. Effective October 1, 2015, the revenue sharing agreement was amended to change the quarterly funding of revenue credits directly to participants (instead of the Revenue Credit Account) and the participant revenue credits were allocated based on the average quarterly balances in specified funds and the rates earned for each type of fund invested. During the 2016 Plan year, the Plan earned $384,912 in revenue credits to participants and reported the credits in the financial statements as other income. As of December 31, 2015, revenue credit receivables to the Plan, reported in the financial statements as other receivables were $123,536.[10]

207.    So, contrary to Mr. Dawson's statement, as of October 2015 Fidelity did have the capability to provide the revenue sharing directly to the participants who earned them based on

---

[10] Sutter Health 403(b) Savings Plan Form 5500, see page of the Notes to Financial Statements

the specific revenue sharing rates of the funds selected by each individual participant.

208.    This is important and also evidence of the Eversource Plan Fiduciaries' failure to meet the standard of care, custom, and practice because in 2015 many providers had the capability to refund the revenue sharing back to the specific participants who earned it. In fact, this was considered a best practice and is necessary to prevent Plan participants who invest in funds that generate revenue sharing, such as the Freedom Funds, from subsidizing Plan participants who invest in company stock or the Fidelity 500 Index fund. The Eversource Plan Fiduciaries have continued to allow that to take place.

**D.    The Eversource Plan Fiduciaries improperly failed to return millions of dollars in unreasonable and excess fees paid by Plan participants in a timely manner.**

209.    Prior to the start of the class period, even Fidelity acknowledged that it was collecting unreasonable and excess revenue in relation to the services it was providing. Thus, at least starting in 2014, Fidelity began to implement a process of returning unreasonable and excess revenue to the Plan.

210.    The method employed by Fidelity in returning the unreasonable and excess revenue was governed by an agreement effective January 1, 2014. EVERSOURCE_0002310-63. The specific terms were set forth in detail in Schedule L-1 (*see* EVERSOURCE_0002349). Schedule L-1 specifically provided that the Eversource Plan Fiduciaries could "direct Fidelity to allocate amounts in the Revenue Credit Account to Eligible Participant accounts" "once per calendar quarter." EVERSOURCE_0002353.

211.    It was well known in the retirement plan industry well prior to the Class Period that excess revenue collected from participants (as in this case) should be returned to participants as soon as administratively practicable and in a worst-case scenario always as soon as administratively practicable after the end of each calendar year. This is clear because the excess

revenue has been paid by participants throughout the year and failing to return it to Plan participants quickly is not in the best interest of Plan participants. In other words, if Plan participants are owed money, failing to return that money quickly is not in the exclusive best interest of the Plan participants.

212.    As of January 1, 2014, Fidelity's bundled RK&A fee was $55 per participant. EVERSOURCE_0002341. The investment options selected by the Plan fiduciaries would generate revenue sharing allocable to the RK&A fee in an amount far greater than $55. Accordingly, until the amount paid by participants for the Bundled RK&A in excess of the $55 per participant was returned to the Plan participants, the participants effectively paid over $55 per participant. In order for the participants to benefit from a Bundled RK&A rate of $55 per participant, the Eversource Plan Fiduciaries would need to return the excess revenue paid by Plan participants.

213.    In fact, however, the Eversource Plan Fiduciaries allowed Plan participants to pay much more than the $55 per participant in both 2014 and 2015 and did not return that excess to Plan participants until around June 30, 2016 – between one and two and a half years after the Plan participants paid the fees.

214.    It is hardly surprising that the over two-year delay in returning the excess fees to Plan participants from 2014 through around June of 2016 coincided with the roughly two-year period during which the Plan Fiduciaries failed to monitor the Plan's RK&A fees. This failure to act by the Plan Fiduciaries and return the excess fees to Plan participants was clearly motivated by something other than the exclusive best interest of the Plan participants.

215.    As further evidence of the Plan Fiduciaries failure to take their responsibilities seriously, during this two-year period in which the plan participants were not even benefiting from the reduced fee of $55 per participant, many Plan Fiduciaries appeared completely unaware

of the actual impact of their delay and failure to act. For example, until NEPC firmly pointed out that the Plan Fiduciaries conduct in failing to return the excess revenue to Plan participants exposed them to fiduciary liability, the Plan Fiduciaries made no mention of returning the excess revenue in any meeting minutes. *See* EVERSOURCE_0024330 (Mr. Hall's email to Mr. Morrison summarizing the conversation in the January 15, 2016, PAC meeting stating "NEPC was very firm on recommending the committee reallocate a portion of the $2M (less Q4 20015 [sic] invoice expenses) in the Revenue Credit account to participants from a Fiduciary liability perspective."). Indeed, members of the PAC testified that they do not recall the PAC ever discussing the revenue credit account. *See* Morrison deposition, p. 88. Perhaps unsurprisingly, certain PAC members could not articulate the basic mechanics of the revenue credit account. *See id.* ("Q: [Do] You understand what the source of that income is? A: No. Q: Do you know if it comes from a service provider? A: No."). Without this understanding, a prudent fiduciary could not have independently and adequately assessed the reasonableness of maintaining such a significant balance in the revenue credit account and whether to return excess sums to participants.

216.    This failure to consider the impact of their conduct on Plan participants is further evidence that the Eversource Plan Fiduciaries did not take their fiduciary duties seriously and/or were ignorant of how Fidelity's RK&A fees were collected from Plan participants.

### E.    The Eversource Plan Fiduciaries failed to follow the standard of care, custom, and practice by solely using an unreliable industry survey to attempt to determine the reasonableness of its recordkeeping and administrative fees.

217.    As noted above, relying on Fidelity's statement that the Plan's RK&A fees were reasonable is woefully naive. Likewise, relying on industry surveys in general, and the NEPC survey in particular is not a method of ensuring a specific fee rate is reasonable that meets industry custom and practice. There are several reasons why even NEPC acknowledged that its

surveys were meant to merely "serve as an interim check-up" (EVERSOURCE_0005673) and that the "[b]est practice is to compare fees and services through a record keeping vendor search Request for Proposal ("RFP") process." EVERSOURCE_0011875.

218.    First, the survey only captures data from a very small portion of defined contribution plans. There have been around 600,000 defined contribution and deferred compensation plans each year during the class period. NEPCs survey includes data from around 100 plans of all sizes which represents less than 0.1% of all the plans. Because plans with more participants pay less per participant than plans with fewer participants, comparisons and averages across the entire market are not meaningful.

219.    To attempt to account for that challenge NEPC breaks its survey sample into different segments based on participant count. Relevant to this Plan, for its "2016 Plan & Fee Survey" which was based on survey respondents' data as of December 31, 2015, NEPC created a segment that contained, e.g., 14 plans with between 10,001 and 15,000 participants.  See, e.g., EVERSOURCE_0005672-87, EVERSOURCE_0005683. Even in that participant segment, 14 plans represent just over 4% of the 345 defined contribution plans filing form 5500 for the year ending 2015. It appears Plan Fiduciaries did not seek to determine whether data gleaned from fourteen plans ranging from 10,001 to 15,000 participants actually provided any meaningful information to serve as a basis for any assessment of the reasonableness of the Plan's fees. *See* Morrison deposition, p. 82; *see also* McHale deposition, p. 48 ("Q: At the time you retired, did you have an understanding of what examples of comparably sized 401(k) plans in the marketplace would have been. A: No.").

220.    Second, there is also a selection bias in terms of the plans that choose to be included in NEPC's survey. In my experience, plans that choose to rely solely on surveys tend to be plans that are looking for shortcuts to avoid soliciting bids from competitor recordkeepers which

NEPC acknowledges is the "best practice." EVERSOURCE_0011875.

221.    Third, and perhaps most importantly, as set forth in detail above, in a non-efficient, non-transparent market such as the market for RK&A services, the average price or median price is not the reasonable market price.

222.    Rather, based on my extensive experience setting the Bundled RK&A price that T. Rowe Price would bid to provide retirement plan services, including dozens with over $1B in assets, as well as my experience soliciting bids from recordkeepers while at ClearSage Advisory Group, it is much more likely that the prices from the NEPC survey results on the bottom of the range are representative of the reasonable market price.

223.    In other words, in the retirement plan services market there is no rational reason to assume that all the plans in the survey are paying a reasonable market rate or had gone through a competitive process to determine the reasonable market rate.  And if all the firms in the survey are not paying a reasonable market fee rate and some are paying higher than the market rate, then definitionally the average is higher than the market rate.

224.    For example, as we have seen from the data in this case, the Eversource Plan Fiduciaries had previously been paying around $100 per participant in 2013 which was clearly unreasonable and excessive. *See* Eversource_0005423. This is indisputable because Fidelity agreed to reduce its fee 45% with no reduction in services. Yet, if the Plan's fee of $100 was included in the NEPC survey then the "average" fee was pulled up by the Plan's unreasonable and excessive fee of $100 per participant.

225.    It is also worth noting that the participant range for Eversource's participant segment, i.e., 10,0001 to 15,000 is very wide. A 15,000-participant plan has 50% more participants than a 10,000-participant plan. There is no way of knowing if the plans showing the low range of fees in that segment have only 10,000 participants (meaning all else being equal the

fees would be higher) or if they have 15,000 participants (meaning all else being equal the fee would be lower.). The lack of precision and meaningfulness created through the NEPC survey's methodology is illustrated by the fact that the range of fees in the 10,001-15,000 segment in 2014 was around $26 to $110. In 2016 the range was $38-$87.  And in 2018 the range from the 5th percentile to the 95th percentile was around $19-$90. See, EVERSOURCE_0011860-75.

226.    Fourth, it is well known and understood by retirement plan industry professionals that, as plans grow and markets appreciate, the price many recordkeepers might be charging a specific plan for RK&A services is often much higher than what that same recordkeeper would bid to bring that plan on as a new client, as well as much higher than what that same recordkeeper would accept to prevent the client from moving to a new recordkeeper.

227.    Similarly, it is well known and understood by retirement plan industry professionals that plan sponsors who merely ask their incumbent recordkeeper for a price reduction do not receive as low a price as if the plan sponsor solicited competitive bids from other recordkeepers and used those bids to negotiate with the incumbent recordkeeper. Because this is well known and understood, the standard of care for a prudent plan fiduciary requires that the fiduciary solicit bids to determine the actual reasonable market rate.

228.    In addition, it is well known by retirement plan professionals that while differences in services can have minor differences in the fee rates plans pay, in virtually all cases those differences are immaterial and are most often charged separately from the RK&A fee, e.g., managed account fees or company stock fees. As a result, for large plans any differences in the services tend to be immaterial and the primary drivers of price differentiation are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

229.    Finally, it is apparent that many of the Plan Fiduciaries did not possess a sufficient

53

understanding of the marketplace for recordkeeping services and recordkeeping fees to engage in any meaningful assessment of the Plan's fees. For example, Mr. Morrison, who served as Secretary of the PAC for nearly the entire relevant time period, testified that he had no understanding of the dynamics of the recordkeeping market apart from what he read in documents *during his deposition*. *See* Morrison deposition, p. 100 ("Q . . . do you have an understanding of how if at all the marketplace for recordkeeping fees was changing around of the time of this November 9, 2016 meeting? A: I remember a few minutes ago reading a slide that seemed to say that recordkeeping fees were going down, but that's all I've ever read or known about recordkeeping fees."). Similarly, several members of the IMC testified that they did not have an understanding of how recordkeeping fees were paid to Fidelity. *See* Butler deposition, p. 21; May deposition, pp. 22-24. The level of understanding demonstrated by numerous Plan Fiduciaries is entirely inconsistent with a process capable of assessing and ensuring the Plan and its participants paid only reasonable fees for recordkeeping and administrative services.

230.    For all these reasons, relying solely on surveys and statements from recordkeepers to conclude that the Plan was paying reasonable market rate RK&A fees was not consistent with the expected standard of care for prudent fiduciaries.

**F.    The Eversource Plan Fiduciaries failed to solicit any bids from any competitor recordkeepers to determine the reasonable market price to provide the RK&A services required by the Plan.**

231.    For all the reasons set forth above related to the unreliability of surveys, the standard of care requires plan fiduciaries to, at a minimum solicit bids through some sort of competitive process to determine the reasonable market rate for RK&A services for any specific plan.

232.    I have seen no evidence that, at any time during the Class Period, the Eversource

Plan Fiduciaries requested bids from any competitor Recordkeepers to provide services to the Plan to determine whether the fees charged by Fidelity were comparable to the fees competitors would charge for providing the identical services required by the Plan. In fact, there is little to suggest that the Eversource Plan Fiduciaries even understood or considered the specific services that Fidelity provided to the Plan. *See* Morrison deposition, pp. 48 ("Q: Do you have an understanding of what recordkeeping services Fidelity provided to the Plan? A: Other than the single word 'recordkeeper,' I do not. They kept the records."), 63-65 ("Q: Do you have an understanding of what terms other than pricing the committee considered with respect to its recordkeeping arrangement? A: No . . . Q: Do you have an understanding of what the drivers of recordkeeping fees are? A: No . . . Q: Do you have any recollection of whether the [PAC] discussed the level of service or quality of service provided by Fidelity for the Plan? A: I don't.").

233.    Failing to solicit any bids from competitor Recordkeepers during the class period was not consistent with the standard of care for prudent fiduciaries.

234.    Likewise, the failure of the Eversource Plan Fiduciaries to solicit bids from competitor Recordkeepers is evidence that the Eversource Plan Fiduciaries did not take their fiduciary responsibilities RK&A fees seriously and did not employ a prudent process consistent with custom and practice.

**G.     The Eversource Plan Fiduciaries failed to conduct a formal RFP to determine the reasonable market price for the Plan's required RK&A services.**

235.    Similarly, the only reliable way to ensure that the Plan was paying only reasonable RK&A fees was to request proposals from competitor Recordkeepers. As NEPC has noted, using an RFP process is known to be a "best practice." An RFP process is considered a "best practice" and is consistent with industry custom and practice because it is known to be the only

reliable way to ensure that the Plan is paying no more than the reasonable market price for the exact RK&A services required by the Plan.

236.    By failing to issue an RFP at any time during the Class Period, the Eversource Plan Fiduciaries did not act consistent with the standard of care for prudent plan fiduciaries.

237.    Likewise, the failure of the Eversource Plan Fiduciaries to issue an RFP for recordkeeping services at any point during the class period is evidence that the Eversource Plan Fiduciaries did not take their fiduciary responsibilities related to RK&A fees seriously and did not employ a prudent process consistent with custom and practice.

238.    In fact, during the Class Period, the Eversource Plan Fiduciaries were clearly aware of the importance of issuing RFPs for investment service providers.  See, Deposition of Robert DeAngelo, p. 131, l. 5-8, p. 132, l. 6-12 (Mr. DeAngelo discussing RFPs for investment professionals).

**H.    The Eversource Plan Fiduciaries did not monitor all the revenue earned by its recordkeeper Fidelity to ensure the fees paid by Plan participants were reasonable.**

239.    The standard of care for prudent plan fiduciaries requires the plan fiduciaries to understand and monitor all sources of revenue earned by the Recordkeeper through its relationship with the plan.  This is part of the standard of care because it helps ensure that participants are only paying reasonable fees.

240.    In this case, the Plan paid Fidelity hundreds of thousands of dollars in revenue that was not fully disclosed through Fidelity's standard Fee Disclosure documents.

241.    The Eversource Plan Fiduciaries did not request additional information related to this supplemental revenue and did not review or monitor it to determine whether the fees charged were reasonable.

242.    These additional sources of Fidelity revenue include revenue earned from the PAS

at work service, which increased from $107,697 in 2014 ($8 per participant on average) to $513,497 in 2019 ($41 per participant on average). This is a 377% increase in revenue for Fidelity. Fidelity also earned additional revenue through brokerage services, which was not specifically disclosed in Fidelity's Fee Disclosure documents. Fidelity also earned additional revenue through stock custody and trading services.  See, Exhibit 24.

243.    Fidelity has also recently restructured some contracts with "unaffiliated product providers" in such a manner that certain fees "are not in connection with Fidelity's service to the plan and are not considered indirect compensation under 408(b)(2) regulations." *See, e.g.*, EVERSOURCE_0024698. Fidelity also collects additional revenue from unaffiliated product providers from a marketing, engagement, and analytics program.  Fidelity takes the position that this revenue is not considered indirect compensation under 408(b)(2) regulations.

244.    The Eversource Plan Fiduciaries did not inquire about any of this additional revenue and did not include it when comparing its "contractual rate" for the bundled RK&A services to the fees paid by other plans in the NEPC survey.

245.    Moreover, the Eversource Plan Fiduciaries agreed to let Fidelity make up some of the revenue it was losing by reducing the contractual rate from $55 to $45 by shifting fees to Plan participants holding the company stock, in a manner completely lacking in transparency to participants.

246.    Thus, the actual level of fees being paid by Plan Participants was closer to $50, *not* $45.  Despite this knowledge, the Eversource Plan Fiduciaries allowed NEPC to use the $45 figure for comparison purposes.

247.    By failing to inquire about Fidelity's extra sources of revenue and failing to take such revenue into consideration when negotiating RK&A fees, the Eversource Plan Fiduciaries did not act consistent with the standard of care, custom or practice.

248.    Similarly, Fidelity charged extra "Ad Hoc Billable Fees" that were passed on to Plan Participants, e.g., a $9,000 fee for nondiscrimination testing.  By soliciting bids from competitor recordkeepers, the Eversource Plan Fiduciaries would have been able to eliminate those additional fees. In a competitive environment, prudent plan fiduciaries can require recordkeepers to waive ad hoc fees to enable a meaningful apples-to-apples comparison.

249.    There is no evidence that the Eversource Plan Fiduciaries did any of this.

## XII.    LOSSES

250.    The evidence makes clear the Eversource Plan Fiduciaries' conduct during the Class Period failed to adhere to the standard of care, custom or practice for plan fiduciaries and directly caused Plan participants to pay unreasonable RK&A fees during the Class Period.

251.    Indeed, based on the evidence in the case, the Eversource Plan Fiduciaries could and should have achieved a reasonable RK&A fee from its Recordkeeper prior to the start of the Class Period.

252.    Had the Eversource Plan Fiduciaries followed the standard of care prior to and at the beginning of the Class Period, Plan Participants would have paid a reasonable fee for RK&A services.

### A.    Methodology

253.    Using publicly available information and the data we have in the case, combined with my extensive experience, we can derive an estimate of the reasonable market rate for RK&A services.[11]

254.    First, using publicly available data and information from the Form 5500 filings of

---

[11] Because the Plan did not conduct *any* competitive benchmarking, such as RFI or RFP processes, during the relevant period, this publicly available information represents the best proxy and methodology for determining the bids that the Plan would have received had it engaged in competitive benchmarking consistent with industry custom and practice.

similarly-sized 401(k) plans during the Class Period, we can find other plans that were paying fees lower than what the Plan was paying. That is evidence that the reasonable market rate is lower than what the Plan is paying since these comparable plans were able to negotiate lower fees for materially identical services.

255.    The table below lists the average RK&A Fees paid by several similarly-sized plans during the Class Period. Some of these plans used Fidelity as their Recordkeeper, while others used different high-quality, national Recordkeepers. The table also indicates the average number of participants each plan had as well as the average assets. Using averages over a period of years can help eliminate fee rates that are the result of the impact of accounting timing issues such as mid-year fee reductions or mid-year rebates of excess revenue. The detailed methodology used to derive the fees paid by the comparable plans listed below is set forth in Appendix B.

| Comparable Plans' RK&A Fees Based on Publicly Available Information from 2014-2019 Form 5500 | | | | |
|---|---|---|---|---|
| Plan | Avg Participants | Avg Assets | Avg RK&A Fee /pp | Recordkeeper |
| The Boston Consulting Group, Inc. Employees' Savings Plan... | 8,844 | 1,059,017,012 | $41 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,474 | 904,815,428 | $50 | Fidelity |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 8,779 | 323,874,727 | $53 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 8,601 | 553,276,289 | $48 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 6,949 | 91,697,282 | $51 | Great-West |
| Southern California Permanente Medical Group Tax Savings... | 9,785 | 720,781,250 | $53 | Vanguard |
| Sutter Health Retirement Income Plan | 12,114 | 418,199,870 | $37 | Fidelity |
| Fortive Retirement Savings Plan | 12,272 | 1,619,518,471 | $31 | Fidelity |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 14,295 | 684,935,643 | $30 | Vanguard |
| Michelin 401(K) Savings Plan | 16,122 | 2,330,744,086 | $36 | Vanguard |

256.    The graph below visually illustrates the average RK&A fees paid by these similarly sized plans during the class period and shows the average RK&A fees paid by the Eversource Plan participants compared to what the other similarly sized plans paid. The green data point labels represent plans that used Fidelity as their Recordkeeper. The white data points represent plans that used other quality Recordkeepers. The blue line represents the trend line created by all the data points. The green line represents the trend line for plans that use Fidelity as a

recordkeeper.



257. These data points and the trend lines reflect the general trend in the retirement plan industry that plans with more participants can obtain lower effective per participant fee rates.

258. It is important to keep in mind that the average RK&A fee that is calculated from each plan's Form 5500 reflect both the bundled RK&A fee rate (Fidelity's contractual rate) plus other revenue such as transaction and loan revenue. Thus, just as the Plan's average RK&A fee rate from 2014 through 2019 as calculated from the Form 5500 filing is $69 per participant, which is higher than the Plan's contractual Bundled RK&A fee rate of $55 and $45, the bundled RK&A fee rate of each of these comparable plans is also lower than the RK&A fee rate reflected in the chart.

259. Additionally, each of the NEPC surveys also supports a conclusion that comparable plans were able to obtain in the $30s or lower.

260.    Moreover, the RK&A fees illustrated in the graph are consistent with: 1) RK&A fee rates that T. Rowe Price bid when I was responsible for the pricing and bidding models and governance; 2) RK&A fee rates obtained by some T. Rowe Price clients; and 3) RK&A fee rates and bids I have seen through work I have performed through ClearSage Advisory Group.

261.    Accordingly, the evidence in the case, combined with an analysis of publicly available information about the RK&A fees paid by similar plans and validated by my experience, supports a finding that the Plan could have and should have obtained an RK&A fee of around $36 as set forth in the table.

262.    Thus, had the Eversource Plan Fiduciaries followed the standard of care and solicited bids from competitor recordkeepers through a competitive process, the Plan would have received an RK&A fee of $36 prior to the start of the class period.

263.    As is set forth below in detail in Schedule A, the Plan had, and still has, substantial leverage when negotiating with Fidelity. Accordingly, if the Eversource Plan Fiduciaries had been monitoring the RK&A fees, they would have been able to effectively and successfully negotiate for a lower RK&A fee around 2017.

264.    At that point Fidelity's total revenue related to its role as a recordkeeper had increased $693,462 while providing no different services. *See* Exhibit 24, Fidelity Revenue. What's more, that increase of $693,462 does not even include the other revenue Fidelity earned, e.g., from the self-directed brokerage service, as well as the $25,000 of revenue that Fidelity shifted into the NAV of the company stock account.  *See, e.g.*, EVERSOURCE_0024590-97, EVERSOURCE_0024595, EVERSOURCE_0024597.

265.    That works out to an additional $83 per participant and a 22% increase in Fidelity revenue per participant in three years. Of the $693,462 increase in Fidelity revenue, over 98% of that increase was Net Investment Management Fee revenue. The incremental profit on that

61

increased revenue is well above 95%. As a result, based on my experience, Fidelity would have

accounted for the additional benefits from its relationship with the Plan by agreeing to a

decrease of approximately $3 per participant in its Bundled RK&A fee rate, which would

represent a decrease of less than 1% of their total revenues, to reduce the RK&A rate down to

$33 per participant.

266.    Accordingly, in conclusion, as a result of the analysis above, the evidence in the

case, and my extensive experience, it is my conservative opinion that prudent Eversource Plan

Fiduciaries would have easily obtained the reasonable Bundled RK&A Fee rates set forth in the

chart below during the Class Period.

| Year(s) | Reasonable Fee (per participant) |
|---------|----------------------------------|
| 2014    | $36                              |
| 2015    | $36                              |
| 2016    | $36                              |
| 2017    | $33                              |
| 2018    | $33                              |
| 2019    | $33                              |

**B.    Calculations**

267.    From June 30, 2014 through December 31, 2019, and using the Vanguard

Institutional Index (VIIIX) as a proxy for an investible S&P 500 index to apply appropriate

interest to the Plan's annual losses, Plan participants lost $3,311,043 through unreasonable

RK&A fees.[12]

268.    I used the S&P 500 Index to calculate the investment returns the Plan participants

could have achieved if the excess amounts paid for recordkeeping and administrative services

---

[12] Plan losses calculated in this report will be brought forward through the date of judgment.

were invested. The S&P 500 Index is a widely recognized proxy for the U.S. stock market. It

also is the most widely used benchmark and most recognized benchmarks among investors.

269.    The detailed calculations supporting these damages are set forth in Exhibit 27 and

Exhibit 28 and summarized in the tables below.

### Exhibit 27 - Losses Calculations - Statement of Services and Compensation - 408(b)2 Method

| Plan Demographics | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Year-End Assets | $2,816,463,143 | $2,709,705,541 | $2,802,616,624 | $3,166,138,053 | $2,981,223,352 | $3,545,349,871 |
| Participant Accounts with a Balance | 13,006 | 12,485 | 12,185 | 12,167 | 12,136 | 12,391 |
| Average Account Balance | $216,551 | $217,037 | $230,005 | $260,223 | $245,651 | $286,123 |
| **Fidelity RK&A Fees** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| Fidelity Contract Rate ($) | $715,356 | $686,656 | $670,128 | $547,474 | $546,092 | $557,565 |
| Transaction ($) | $137,640 | $123,400 | $118,725 | $123,150 | $125,575 | $135,725 |
| Fee for Service ($) | $9,802 | $10,279 | $79,433 | $37,844 | $25,031 | $8,339 |
| NDT Annual Fees ($) | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |
| **Fidelity RK&A Fee ($)[1, 2]** | **$871,798** | **$829,335** | **$877,286** | **$717,468** | **$705,698** | **$710,629** |
| Fidelity RK&A Fee (%)[1, 2] | 0.03% | 0.03% | 0.03% | 0.02% | 0.02% | 0.02% |
| Fidelity RK&A Fee ($/pp)[1, 2] | $67 | $66 | $72 | $59 | $58 | $57 |
| **Reasonable RK&A Fees** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| Reasonable RK&A Fees ($/pp) | $36 | $36 | $36 | $33 | $33 | $33 |
| Total Reasonable RK&A Fees ($) | $468,216 | $449,460 | $438,660 | $401,511 | $400,488 | $408,903 |
| **RK&A Fee Losses** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| RK&A Fee Annual Losses ($/pp)[3] | $17.77 | $30.43 | $36.00 | $25.97 | $25.15 | $24.35 |
| RK&A Fee Annual Losses ($)[3] | $203,450 | $379,875 | $438,626 | $315,957 | $305,210 | $301,726 |
| Compounding percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| Cumulative Compounded RK&A Losses | $203,450 | $586,153 | $1,094,824 | $1,649,671 | $1,882,130 | $2,776,350 |

| Revenue Credit Delay Losses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Revenue Credit Delay Annual Losses ($/pp) | $6 | $1 | $19 | $0 | $0 | $0 |
| Revenue Credit Delay Annual Losses ($) | $82,261 | $16,403 | $237,498 | $0 | $0 | $0 |
| Compounding percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| Cumulative Compounded Revenue Credit Delay Losses | $82,261 | $99,807 | $349,232 | $425,434 | $406,672 | $534,693 |

| Total Losses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Total Cumulative Compounded Losses | $285,710 | $685,960 | $1,444,055 | $2,075,105 | $2,288,802 | $3,311,043 |

### Exhibit 28 - Losses Calculations - 5500 Method

| Plan Demographics | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Year-End Assets | $2,900,300,629 | $2,754,211,785 | $2,846,026,655 | $3,209,332,663 | $3,023,341,879 | $3,588,747,512 |
| Participant Accounts with a Balance | 12,192 | 11,651 | 11,507 | 11,470 | 11,484 | 11,722 |
| Average Account Balance | $237,886 | $236,393 | $247,330 | $279,802 | $263,266 | $306,155 |
| Fidelity RK&A Fees | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Direct Compensation (Schedule C) ($) | $173,902 | $166,214 | $217,828 | $178,549 | $180,566 | $182,429 |
| Indirect Compensation (Revenue Share) ($) | $1,675,944 | $1,692,787 | $1,703,169 | $2,151,515 | $1,901,651 | $2,373,751 |
| Administrative Credit to Plan ($) | ($978,722) | ($1,007,386) | ($951,942) | ($1,413,355) | ($1,705,234) | ($1,690,514) |
| Fidelity RK&A Fee ($)[1,2] | $871,124 | $851,615 | $969,055 | $916,709 | $376,983 | $865,666 |
| Fidelity RK&A Fee (%)[1,2] | 0.03% | 0.03% | 0.03% | 0.03% | 0.01% | 0.02% |
| Fidelity RK&A Fee ($/pp)[1,2] | $71 | $73 | $84 | $80 | $33 | $74 |
| Reasonable RK&A Fees | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Reasonable RK&A Fees ($/pp) | $36 | $36 | $36 | $33 | $33 | $33 |
| Total Reasonable RK&A Fees ($) | $438,912 | $419,436 | $414,252 | $378,510 | $378,972 | $386,826 |
| RK&A Fee Losses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| RK&A Fee Annual Losses ($/pp)[3] | $20.30 | $37.09 | $48.21 | $46.92 | -$0.17 | $40.85 |
| RK&A Fee Annual Losses ($)[3] | $217,882.03 | $432,179 | $554,803 | $538,199 | -$1,989 | $478,840 |
| Compounding percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| Cumulative Compounded RK&A Losses | $217,882 | $653,090 | $1,285,937 | $2,104,728 | $2,009,920 | $3,121,483 |

| Revenue Credit Delay Losses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Revenue Credit Delay Annual Losses ($/pp) | $7 | $1 | $21 | $0 | $0 | $0 |
| Revenue Credit Delay Annual Losses ($) | $82,261 | $16,403 | $237,498 | $0 | $0 | $0 |
| Compounding percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| Cumulative Compounded Revenue Credit Delay Losses | $82,261 | $99,807 | $349,232 | $425,434 | $406,672 | $534,693 |

| Total Losses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Total Cumulative Compounded Losses | $300,143 | $752,896 | $1,635,169 | $2,530,162 | $2,416,592 | $3,656,176 |

270.     It is worth noting that there are several methodologies available for estimating damages due to several different plan data sources many of which are inconsistent (which may also be evidence that the Eversource Plan Fiduciaries' conduct failed to meet the standard of care, custom and practice), e.g., the asset values in the Form 5500 that are supposed to represent the plan assets as of year-end 2018 do not match up with Fidelity's 408(b)(2) fee disclosure which is also supposed to reflect the value of the plan assets at year-end 2018.

271.     In all instances in which competing methodologies produced different results based on different underlying data, we conservatively utilized the methodology that produced the lower damages amount.

Respectfully submitted,

Exhibit 1

## Documents Considered[13]

In addition to the materials cited in my report and supporting reliance spreadsheet, I considered the following documents:

| | |
|---|---|
| EVERSOURCE_0000001 | EVERSOURCE_0002252 |
| EVERSOURCE_0000078 | EVERSOURCE_0002256 |
| EVERSOURCE_0000170 | EVERSOURCE_0002261 |
| EVERSOURCE_0000226 | EVERSOURCE_0002263 |
| EVERSOURCE_0000279 | EVERSOURCE_0002265 |
| EVERSOURCE_0000282 | EVERSOURCE_0002276 |
| EVERSOURCE_0000383 | EVERSOURCE_0002281 |
| EVERSOURCE_0000386 | EVERSOURCE_0002285 |
| EVERSOURCE_0000390 | EVERSOURCE_0002291 |
| EVERSOURCE_0000394 | EVERSOURCE_0002295 |
| EVERSOURCE_0000601 | EVERSOURCE_0002297 |
| EVERSOURCE_0000609 | EVERSOURCE_0002299 |
| EVERSOURCE_0000612 | EVERSOURCE_0002300 |
| EVERSOURCE_0000615 | EVERSOURCE_0002310 |
| EVERSOURCE_0000618 | EVERSOURCE_0002310 |
| EVERSOURCE_0000623 | EVERSOURCE_0002364 |
| EVERSOURCE_0000681 | EVERSOURCE_0002366 |
| EVERSOURCE_0000943 | EVERSOURCE_0002595 |
| EVERSOURCE_0001005 | EVERSOURCE_0002642 |
| EVERSOURCE_0001072 | EVERSOURCE_0003202 |
| EVERSOURCE_0001077 | EVERSOURCE_0003224 |
| EVERSOURCE_0001133 | EVERSOURCE_0004536 |
| EVERSOURCE_0001203 | EVERSOURCE_0005378 |
| EVERSOURCE_0001211 | EVERSOURCE_0005416 |
| EVERSOURCE_0001328 | EVERSOURCE_0005446 |
| EVERSOURCE_0001335 | EVERSOURCE_0005672 |
| EVERSOURCE_0001339 | EVERSOURCE_0006119 |
| EVERSOURCE_0001343 | EVERSOURCE_0006175 |
| EVERSOURCE_0001527 | EVERSOURCE_0006234 |
| EVERSOURCE_0001760 | EVERSOURCE_0006288 |
| EVERSOURCE_0001851 | EVERSOURCE_0006337 |
| EVERSOURCE_0002118 | EVERSOURCE_0006389 |
| EVERSOURCE_0002122 | EVERSOURCE_0006459 |
| EVERSOURCE_0002123 | EVERSOURCE_0006487 |
| EVERSOURCE_0002124 | EVERSOURCE_0006550 |
| EVERSOURCE_0002182 | EVERSOURCE_0006671 |
| EVERSOURCE_0002202 | EVERSOURCE_0007252 |
| EVERSOURCE_0002210 | EVERSOURCE_0007368 |
| EVERSOURCE_0002220 | EVERSOURCE_0007445 |
| EVERSOURCE_0002241 | EVERSOURCE_0007576 |
| EVERSOURCE_0002243 | EVERSOURCE_0007695 |
| EVERSOURCE_0002246 | EVERSOURCE_0007811 |
| EVERSOURCE_0002247 | EVERSOURCE_0009735 |
| EVERSOURCE_0002249 | EVERSOURCE_0010025 |

---

[13] Any sources cited in the body of the Report are incorporated by reference.

EVERSOURCE_0010206
EVERSOURCE_0010388
EVERSOURCE_0010401
EVERSOURCE_0011584
EVERSOURCE_0011743
EVERSOURCE_0011860
EVERSOURCE_0012180
EVERSOURCE_0012311
EVERSOURCE_0014766
EVERSOURCE_0014877
EVERSOURCE_0015212
EVERSOURCE_0015457

EVERSOURCE_0016437
EVERSOURCE_0018196
EVERSOURCE_0020734
EVERSOURCE_0023237
EVERSOURCE_0024324
EVERSOURCE_0024437
EVERSOURCE_0024502
GARTHWAIT_000121
HUSHION_000001
TORRANCE_000001

Deposition Transcript - Robert DeAngelo
Deposition Transcript - Christine Carmody
Deposition Transcript - Phil Lembo
Deposition Transcript - Thomas May
Deposition Transcript - James Judge
Deposition Transcript - Richard Morrison
Deposition Transcript - John Moriera
Deposition Transcript - Gregory Butler
Deposition Transcript - David McHale

Eversource Plan Form 5500 Filings from 2014-2019

Consolidated Amended Complaint

Ruling on Defendants' Motion to Dismiss 9/28/2021

Exhibit 2

Michael J. Geist, J.D., MBA, CFPA

11 Newburg Avenue, Suite 101
Catonsville, Maryland 21228

**CURRICULUM VITAE**
**of**
**Michael J. Geist, JD, MBA, CFPA**

**PROFESSIONAL EXPERIENCE**

Michael Geist has over twenty-four years of experience in the retirement plan, database marketing, consulting, and legal industries. As part of ClearSage Advisory Group, Mike currently provides consulting services in the retirement plan, recordkeeping, and asset management industries.

Mike provides deep expertise regarding recordkeeping fees and fee negotiations, revenue sharing, fee leveling solutions, and other strategic issues related to the retirement plan industry. This includes financial and market analysis, including pricing, related to the retirement plan industry. His expertise also includes the interrelationship between different asset management distribution channels, including retail, third-party, and institutional distribution as well as distribution through retirement plans. It also includes the analysis of the distribution of new or improved services through retirement plans. In conjunction with these consulting services Mike also provides litigation support services and has been retained and testified as an expert witness in retirement plan and recordkeeping fee litigation.

As part of Geist Law Group, Mike currently focuses on legal services at the intersection of ERISA, retirement assets, and domestic relations as well as retirement plan aspects of ERISA.

Mike also served as an adjunct professor in the R. H. Smith School of Business School at the University of Maryland in the summer of 2020.

Before founding ClearSage Advisory Group and Geist Law Group, Mike spent over eleven years working for the Retirement Plan Services division of T. Rowe Price. Mike held a variety of senior level roles in multiple functional areas including Pricing, Business Development, Finance, Product Development, Sales, and Data Strategy. Mike developed extensive expertise regarding fee negotiations and best-practices utilized by effective plan fiduciaries while he was responsible for governing, evaluating, and approving thousands of retirement plan pricing proposals. Mike also gained expertise in comprehensive business process optimization and governance in the sales, service, marketing, finance, and legal functions of retirement plan services and recordkeeping providers.

While at T. Rowe Price, among other things Mike led the development of revenue sharing

Exhibit 2

allocation solutions and recordkeeping pricing solutions, led and supported several regulatory and compliance projects, led the implementation of a new CRM system, redesigned the sales process (including the bidding, pricing, and negotiation process) in the retirement sales distribution channel, served as the retirement plan distribution channel subject matter expert on a firm-wide global asset management distribution strategy project, and was responsible for delivering, governing, or evaluating over 20,000 retirement plan services pricing proposals.

Mike has been a frequent speaker at industry conferences covering topics including: Fees, Pricing, and the Future of Revenue Sharing; The Effect of Fee Disclosures on DC Plans; The Data Partnership Between DCIOs, Recordkeepers, and Broker-Dealers; and Tackling Data Gaps and Reporting Challenges.

For eighteen years Mike also provided strategic coaching and training for corporate executives, executive MBA students, and other MBA students to enhance their resource allocation and decision-making effectiveness.

Prior to joining T. Rowe Price, Mike served as the Director of Marketing for E-centives, an online database marketing company.

Prior to joining E-centives, Mike practiced law for over five years primarily in the areas of small business representation and domestic relations.

## CHRONOLOGICAL PROFESSIONAL EXPERIENCE

Owner and Founder of ClearSage Advisory Group, LLC (2017 to present)

Owner and Founder of Geist Law Group, LLC (2017 to present)

Sr. Vice President, Product Development & Management, T. Rowe Price (2015 – 2016)

National Pricing Governance & Data Strategy Manager, T. Rowe Price (2012 – 2015)

National Sales Support & Business Development Manager, T. Rowe Price (2010 – 2012)

National Small Market Sales Manager, T. Rowe Price (2009 – 2010)

National Sales Operations Manager, T. Rowe Price (2008 – 2010)

Retirement Sales Executive, T. Rowe Price (2005 – 2007)

Director of Marketing / Senior Product Marketing Manager, E-centives (2002 – 2004)

Associate Attorney, Jenkins & Awalt (1995 – 2000)

Law Clerk, Jenkins & Awalt (1993 – 1995)

Exhibit 2

**EDUCATION**

Mike earned his JD from the University of Baltimore School of Law and his MBA from the University of Maryland, Robert H. Smith School of Business. He earned his BS in Anthropology and Social Sciences from Towson University.


**LICENSES**

Mike has held the following NASD licenses: Principal/Supervisory Exam (Series 24 - General Securities Principal Examination); the General Industry/Products Exam (Series 7 - General Securities Representative Examination); and the Maryland State Securities Law Exam (Series 63 - Uniform Securities Agent State Law Examination).


Mike has also earned the Certified Fiduciary Plan Advisor designation from the National Association of Plan Advisors in affiliation with the Retirement Plan Academy of the American Retirement Association.


Mike is admitted to practice law in the State of Maryland.

Exhibit 2

APPENDIX A – Negotiation Leverage of Plan Fiduciaries

1.    Based on my experience and an analysis of the evidence in the case, large DC plans like the Plan have considerable leverage when negotiating with Recordkeepers, especially when the Recordkeeper has the potential to gain or lose proprietary assets.

2.    Based on my experience and an analysis of the evidence in the case, it would be in Fidelity's economic and financial interest to retain the Plan as a client at lower Bundled RK&A fee rates than risk losing significant investment management revenue in the event the Plan chose another Recordkeeper.

3.    Understanding this dynamic is part of the standard of care for plan fiduciaries during the Class period.

4.    As described above in the body of my report, most Recordkeepers, like Fidelity, which also provide asset management services, have an incentive to reduce their Bundled RK&A fee rate if they can obtain additional proprietary assets. Fidelity (like any economically rational firm) would happily reduce recordkeeping revenue by, e.g., $100,000 to gain, e.g., $1,000,000 in asset management revenue when the asset management revenue has a much higher profit margin than the recordkeeping revenue.

5.    This dynamic is at play in reverse when a client requests a lower Bundled RK&A fee rate in order to retain the Recordkeeper.

6.    This leverage of the Plan Fiduciary is derived from the practical consequences of replacing the incumbent Recordkeeper that provides proprietary investments in a plan lineup. In my experience, when a plan sponsor replaces an incumbent recordkeeper the investment menu is far more susceptible to significant changes. In many cases, the previous incumbent Recordkeeper will lose significant proprietary assets, especially stable value, money market, and target date

products. Understanding this dynamic is and was part of the standard of care, custom and practice of prudent plan fiduciaries at all times during the Class Period.

7.     In most cases, lineup changes are made at the time of conversion to the new Recordkeeper with the idea that it is better for participants to make all the changes, i.e., recordkeeper and investments, at the same time and do one set of communications to the participants. For both potential new recordkeepers and other investment managers, the potential change of recordkeepers represents an excellent opportunity to win new business. This puts competitive pressure on the incumbent Recordkeeper to retain the business.

8.     In the situation in which the incumbent Recordkeeper has proprietary assets, like here, the loss of the recordkeeping client, in this case the Plan, would represent a tremendous risk of the loss of some or all of the proprietary assets in the Plan.

9.     This is particularly the case when, as in this case, the proprietary investments offered by the incumbent Recordkeeper are not offered on the platform of a non-proprietary Recordkeeper with the same level of additional value. For instance, Fidelity K share mutual funds only provide 10 basis points of revenue sharing on other platforms as opposed to 10 basis points of revenue sharing plus 10 basis points of additional value on the Fidelity platform.

10.     When the net investment management expense changes for any given investment prudent plan fiduciaries will need to conduct a new review of the option and alternative share classes and open up the universe of other competing investments. As a result, a prudent fiduciary would have to engage in a diligent search process to identify potential replacements for those investments.

11.     If a plan fiduciary receives a bid for RK&A services that is lower than the incumbent Recordkeeper's bid for the desired level of services, a prudent fiduciary would use that competing bid to negotiate a lower fee with the incumbent. During this negotiation process, the

plan fiduciary would leverage the asset management revenue generated from the proprietary investments to demand a discounted fee. This is also part of the standard of care for plan fiduciaries.

12.     If a plan fiduciary requests that the incumbent Recordkeeper reduce its Bundled RK&A fee rate, the incumbent Recordkeeper would perform a detailed financial analysis to determine the financial consequences of losing the client. I performed this type of analysis hundreds of times in various roles at T. Rowe Price.

13.     The appropriate analysis would need to compare the firm's financial results under a scenario in which the client stays with the firm's financial results if the client leaves. The incumbent recordkeeper would have to make assumptions about how much proprietary assets would be lost if the client leaves for another recordkeeper.

14.     Based on my experience, in the vast majority of circumstances, particularly when the recordkeeper and/or its affiliates has a material percentage of plan assets in its investments, the recordkeeper would agree to a discounted RK&A fee rate to maintain the relationship because the impact to the firm as a whole, e.g., Fidelity, would be much worse if the plan moves to a different Recordkeeper and the firm loses proprietary assets.

15.     In my conservative application of the analysis to this case, I need only make one estimate. All the other information used in the model is based on data in the case.

16.     The one estimate I make is that the marginal cost per participant that Fidelity would use to perform its analysis was $30 per participant. This estimate is on the high side of the reasonable range of marginal costs per participant in the industry based on my knowledge and experience. Furthermore, any different cost assumptions within reasonable industry ranges would not change the conclusions that can be drawn from the scenario analysis.

17.    Before looking at the results of the analysis is also helpful to have some additional

context around the financial impact to Fidelity as a result of its relationship as the Recordkeeper

for the Plan.

18.    First, during the Class Period, Fidelity's net investment management revenue averaged

over $4M annually through 2019. On the other hand, Fidelity's RK&A fees were never more

than $900,000 through 2019. See Exhibit 24. This is also visually represented by the following

graph.



19.    In determining whether to offer a reduced fee in response to the request of Plan

Fiduciaries, Fidelity would need to determine the likelihood that its proprietary investments

would transition to a competing Recordkeeper.

20.    Based on my experience and the fact that the Plan used many K shares, it is my opinion

that Fidelity would have lost at least 50% of its proprietary assets if the Plan moved to a different

Recordkeeper.

21.     To illustrate the bargaining power that was available to the Plan to obtain a reduced recordkeeping fee based on any proprietary investments during a competitive bidding process, I prepared a simple financial model that is based on similar analyses I performed in my professional capacity when evaluating thousands of pricing proposals and the impact of losing proprietary investments if the incumbent recordkeeper is replaced.

22.     The bottom line of applying this analysis to this case reveals that, at all times immediately prior to and throughout the Class Period, Fidelity would be better off retaining the Plan as a Recordkeeping client at a much lower Bundled RK&A fee rate than risk losing several million dollars in ongoing investment management revenue. As a result, the Plan had substantial leverage to negotiate a lower RK&A fee.

23.     The model calculates the Break-Even Recordkeeping Fee Rate under a number of scenarios to replicate the analysis that would have been conducted by Fidelity in the event the Eversource Plan Fiduciaries attempted to negotiate with Fidelity regarding its RK&A fee.

24.     The Break-Even Recordkeeping Fee Rate (BE-RK) is the minimum Recordkeeping Fee required to maintain the same financial impact to the Recordkeeping Firm in a scenario in which the Recordkeeper reduces its Recordkeeping fee in order to keep the client as compared to a scenario in which the Client leaves the Recordkeeper, and the Recordkeeping firm loses revenue as a result of the Client's departure.

25.     Simply stated, the BE-RK Fee equals the Marginal Cost per participant minus the total estimated lost Revenue per participant. This is because the marginal costs per participant represent a reduction in costs if the client leaves. The fixed costs, however (as discussed in the body of my report), cannot be avoided. Thus, if the reduction in revenue to the firm if the client

leaves is greater than the reduction in costs, it is in the economic interest of the firm to retain the client.

26.     For example, if the Marginal Cost per participant is $30 and the estimated lost revenue is $20 per participant then the BE-RK Fee is $10 per participant. In other words, if the client leaves then the Recordkeeper avoids the marginal cost of $30. On the other hand, however, the Recordkeeper also loses $20 in revenue so as long as the Recordkeeper is charging more than $10 for the RK&A services then the Recordkeeper is better off keeping the client.

27.     In fact, however, in many cases (and in this case) the actual estimated lost revenue per participant is much greater than the marginal costs.

28.     The table below provides a conservative analysis of the leverage the Plan Fiduciaries had when negotiating with Fidelity to obtain a reasonable Bundled RK&A fee to stay with Fidelity. See Exhibit 25 for the actual model.

**Illustration of Evaluation of Incumbent Recordkeeper on Impact of Average Proprietary Assets Under Mgmt, Percent of Assets Under Mgmt Lost, and Net Asset Mgmt Fee Rate on Ability to Profitably Reduce RK&A Fees**

| | | Break-even Recordkeeping Fee Rate* | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Hypothetical Weighted Average Net Asset Mgmt Fee Rate of Proprietary Assets Lost: 0.34% | | | | | | | |
| | | Hypothetical Incremental Supplementary Contribution per Participant: $0 | | | | | | | |
| | | Hypothetical Marginal RK&A Costs: $30 | | | | | | | |
| | | Percent of Proprietary Assets under Management Lost | | | | | | | |
| | Average Proprietary Account Balance | 0% | 10% | 20% | 30% | 40% | 50% | 75% | 100% |
| | $79,000 | $30 | $3 | ($24) | ($51) | ($77) | ($104) | ($171) | ($239) |
| | $88,000 | $30 | $0 | ($30) | ($60) | ($90) | ($120) | ($194) | ($269) |
| | $97,000 | $30 | ($3) | ($36) | ($69) | ($102) | ($135) | ($217) | ($300) |
| | $119,000 | $30 | ($10) | ($51) | ($91) | ($132) | ($172) | ($273) | ($375) |

\* The Break-even Recordkeeping Fee Rate is the new Recordkeeping Fee that the incumbent provider could charge to deliver the same contribution to the firm as what is estimated to happen if the client chooses to terminate the Recordkeeping contract.  A negative value means the incumbent provider would be better off paying the client's participants than allowing the client to leave.

29.     As a result, at all times during the Class period, had the Plan Fiduciaries informed Fidelity that it would have to reduce its Bundled RK&A fee to match a competitor's bid to retain the Plan as a recordkeeping Client, Fidelity would have agreed.

30.     Moreover, my scenario analysis does not require assuming any value per participant for the other supplementary revenue a recordkeeper gains from having a client's participants on the recordkeeper's platform such as the PAS at work revenue which, by 2019 was over $500,000, or increased IRA rollover and Roll-in success, brokerage revenue, and any other supplementary revenue.

31.     This value is well known and understood in the retirement plan industry.  Understanding the additional supplementary contribution to the firm's revenue has been part of the standard of care for plan fiduciaries during the entire Class Period and that knowledge drove a lot of the

thinking around the recent DOL regulations related to rollovers.

32.    So, while my analysis conservatively assumes $0 for that supplementary value, in reality Fidelity and other firms do consider that value in their analysis.

33.    For example, Fidelity's "Additional Value for Fidelity Products" through which Fidelity provides the Plan with 10 additional basis points of revenue on some Fidelity proprietary investment options does not reduce the net asset management fee rate for the Fidelity investment options.  Rather, it represents, at least in part, a firm-level policy that explicitly recognizes the average value of a having a participant in the Plan. That value is in addition to the explicit revenue gained from recordkeeping fees and the net investment management revenue. Specific examples include IRA Rollover and plan Roll-in revenue.

34.    Based on my experience and analysis of the evidence in the case, the bottom line is that at all times during the Class period Fidelity would have been better off reducing its Bundled RK&A fee to match or provide a lower bid than competitor bids if required to retain the Plan as a client.

APPENDIX B – Methodology for determining RK&A Fees of Comparable Plans

1. We take the direct compensation paid to each plan's recordkeeper(s) directly from Schedule C of Form 5500.

2. We then review and record the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets.

3. We then review Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan.

4. We also cross reference publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan. We use our experience to correct any clear and obvious errors.

5. We then use the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper.

6. We then review the notes of the Audited Financial Statement attachment to Form 5500.  In many cases the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether any revenue sharing was allocated back to the plan and/or plan participants and, if so, how much.

7. We review the results for reasonableness and make revisions as appropriate using our experience evaluating plans at many different recordkeepers.