**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KIMBERLY GARTHWAIT, ET AL. | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:20-CV-00902 (JCH) |
| v. | : | |
| | : | |
| EVERSOURCE ENERGY | : | |
| COMPANY, ET AL., | : | |
| Defendants. | : | JULY 29, 2022 |

**RULING ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 120) AND MOTIONS TO PRECLUDE (DOC. NOS. 119, 121, & 122)**

**INDEX**

I.    INTRODUCTION ........................................................................................... 2
II.   BACKGROUND ............................................................................................. 3
      A.    Factual Background ............................................................................. 3
      B.    Procedural Background ...................................................................... 12
III.  LEGAL STANDARDS ................................................................................. 14
      A.    Motion to Preclude............................................................................. 14
            1.    Qualifications ........................................................................... 15
            2.    Reliability................................................................................... 15
            3.    Relevance ................................................................................. 16
      B.    Motion for Summary Judgment.......................................................... 17
IV.   DISCUSSION .............................................................................................. 17
      A.    Motions to Preclude ........................................................................... 17
            1.    Plaintiffs' Motion to Preclude Expert Mann (Doc. No. 122) ................. 18
            2.    Plaintiffs' Motion to Preclude Expert Wermers (Doc. No. 121)............ 24
            3.    Defendants' Motion to Preclude Expert Geist (Doc. No. 119) ............ 24
      B.    Defendants' Motion for Summary Judgment (Doc. No. 120) .................... 35
V.    CONCLUSION ............................................................................................ 39

## I.      INTRODUCTION

A class of former and current participants in the Eversource 401(k) Plan ("the Plan") brings this action against Eversource Energy Company ("Eversource") and other defendants under section 1132(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), section 1001 of title 29, et seq., of the U.S. Code.  Four named plaintiffs, Kimberly Garthwait ("Garthwait"), Cumal T. Gray ("Gray"), Kristine T. Torrance ("Torrance") and Michael J. Hushion ("Hushion"), represent a class of all participants and beneficiaries in the Plan from June 30, 2014 to the present ("Class Period").  They assert their claims against the following defendants: Eversource; Eversource's Board of Directors ("the Board"); the Eversource Plan Administrative Committee ("Plan Administrative Committee"); the Eversource Investment Management Committee ("Investment Management Committee"); and Christine M. Carmody, Robert J. DeAngelo, Richard J. Morrison, and Michael P. Synan, Gregory B. Butler, Christine M. Carmody, James J. Judge, Philip J. Lembo, Thomas J. May, David R. McHale, and John M. Moriera, who were members of the Board, the Administrative Committee, or the Investment Management Committee.

The defendants have filed a Motion for Summary Judgment (Doc. No. 120), which the plaintiffs oppose.  See Pls.' Opp'n to Mot. for Summ. J. (Doc. No. 133).  Both parties have also filed Motions to Preclude expert testimony, seeking to disqualify the following witnesses: plaintiffs' expert Michael Geist (Doc. No. 119); defendants' expert Kathleen Mann (Doc. No. 122); and defendants' expert Dr. Russell Wermers (Doc. No. 121).  For the reasons discussed below, all four Motions are denied in full.

## II.    BACKGROUND

### A.    Factual Background

Eversource sponsors the Plan, a defined-contribution, individual account retirement plan for the company's employees.  See Pls.' L.R. 56(a)2 Stmt. at ¶ 1 ("Pls.' SOF") (Doc. No. 132).[1]  The Plan served 11,484 participants as of December 31, 2018, and offered eighteen investment options.  Id. at ¶ 2.

#### 1.    Plan Monitoring and Administration

The defendants play varying roles in managing and monitoring the Plan.  These duties are laid out in the Plan's Investment Policy Statement, which "describes the roles and responsibilities of committee members, staff, and consultants . . . and sets forth broad guidelines regarding how the Investment Management Committee . . . selects and monitors the Plan's investment options."  Id. at ¶ 3.

 The first of the two committees, the Plan Administrative Committee, is a named fiduciary responsible for "day-to-day operations of the Plan", including hiring or replacing the Plan's recordkeeper.  Id. at ¶ 6.

The second committee, the Investment Management Committee, is a named co-fiduciary which "select[s] and review[s] the Plan's investment options."  Id. at ¶ 4.  Committee members include Eversource's CEO, CFO, General Counsel, Senior Vice President for Human Resources, and Treasurer.  Id. at ¶ 5.  An in-house team of four to

---

[1] As is required by Local Rule 56(a), the plaintiffs have reproduced and responded to each paragraph of the defendants' Local Rule 56(a)1 Statement of Material Facts.  See Pls. SOF; Defs.' L. R. 56(a)1 Stmt. ("Defs.' SOF") (Doc. No. 120-2).  Thus, the court cites to the Plaintiffs' Statement of Facts alone where the parties have agreed upon the relevant facts, and cites to both statements where a disputed fact arises.  As is appropriate at this stage of the litigation, the court construes the facts in the light most favorable to the plaintiffs as the non-moving party.  See LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

five investment management staff,[2] led by director Robert DeAngelo, assists the

Investment Management Committee in the day-to-day oversight of the plan.  Such

oversight includes: "the establishment and maintenance of employee records,

administrative matters, and the computation and processing of benefits."  Id. at ¶ 7.

While the staff carries out much of the everyday work related to the Plan, the

Investment Policy Statement specifies that committee staff have no fiduciary

responsibility in connection with the Plan.  Pls.' L.R. 56(a)2 Stmt. of Additional Material

Facts at ¶ 68 ("Pls.' AMF").

        Since March 2016, Eversource and the Committees have also relied on NEPC,

LLC, an independent fiduciary which advises the Plan as to due diligence, performance

monitoring, and fund searches.  Pls.' SOF at ¶ 8.  The defendants engaged NEPC as

an investment advisor without soliciting competitive bids, and their selection was not the

result of a determination that NEPC was better suited to the Plan than other providers.

Pls.' AMF at ¶ 69.  As a part of its services, NEPC provided the investment

management staff with a quarterly Plan Performance Review.  These review materials

were provided to the staff and were not distributed directly to the Investment

Management Committee.  See id. at ¶ 70.

        Ultimately, the investment management staff prepared its own presentation

materials for the Investment Management Committee's quarterly meetings.  Pls.' SOF at

¶ 11.  NEPC representatives and investment management staff also met with

Investment Management Committee members before each of the Committee's quarterly

---

[2] In the interest of clarity, the court notes that, with the exception of Director DeAngelo, committee staff are not committee members.

meetings.  Id. at ¶ 10.  However, the record contains no minutes from any of these "pre-meetings."

At the quarterly meetings, the staff presented an "Investment Market Update" to Committee members.  Id. at ¶ 12.  Each update included a review of the Plan's investments and their performance, returns relative to benchmarks, and ranks relative to their peer groups.  Id.  At least one NEPC representative and several staff members attended every meeting of the Investment Management Committee, although NEPC's involvement in the meetings was limited.  Id. at ¶ 13.

The plaintiffs emphasize that several members of the Investment Management Committee were unfamiliar with basic concepts necessary to monitor the Plan's investments,  such as the concept of target date glide path, whether certain funds charged expenses, and whether the underlying investments in the Plan's funds were actively or passively managed.  See Pls.' AMF at ¶ 72.  Moreover, the fact that the materials and recommendations of NEPC were distributed to Committee staff rather than to Committee members themselves led to disconnects.  In one instance, NEPC recommended that the Investment Management Committee consider a lower-fee replacement for a series of funds in the Plan.  However, the staff failed to relay this recommendation to the Investment Management Committee.  See id. at ¶ 77.  These dynamics left important decisions in the hands of the staff rather than Committee members.  Id. at ¶ 78.  This issue was further exacerbated by the fact that the Plan's Investment Policy Statement did not establish a watchlist—a list of funds to monitor for underperformance—or other fund replacement procedures.  Id. Indeed, the Investment

Policy Statement itself was drafted by staff and NEPC, not by the Investment Management Committee or its members.  Id. at ¶ 79.

 2. Challenged Funds

The parties dispute how well the Plan's investment options performed over the class period.  The disagreements stem, in part, from fundamental differences as to the appropriate performance metrics for each fund.  The Investment Policy Statement establishes that, for any given fund:

> Historical performance should generally be equal to or greater than the median return for an appropriate, style-specific benchmark and peer group over one-, three- and/or five-year periods and/or other period determined by the Committee in its sole discretion.

Investment Policy Statement at 4 (Doc. No. 132-3).  In their Statements of Facts, the parties focus primarily on four investments or suites of investments: the Morgan Stanley Inception Small Company Growth Fund ("Inception Fund"), the Freedom Funds, the Morgan Stanley Institutional Emerging Markets Fund, and the Frank Russell Small Cap Fund.

 a. Inception Fund

The plaintiffs' and defendants' polarized perspectives as to the performance of the Inception Fund derives, in part, from the difference in the fund's long- and short-term returns.  While the defendants point to short term spikes in performance, see, e.g., Pls' SOF at ¶ 22 (discussing quarterly performance), the plaintiffs rely largely on longer-term trends.  See id. (discussing one-year, three-year, and five-year returns).  As the plaintiffs note, the Plan's Investment Policy Statement states that the Investment Management Committee "intends to evaluate manager performance from a long-term perspective."  Id.

6

Both parties agree that the Inception Fund's returns ranked in the 18th and 2nd percentiles in 2012 and 2013, outperforming its peers.  See Pls.' SOF at ¶ 16. However, the plaintiffs emphasize that, as of the start of the class period (June 30, 2014), the Inception Fund's trailing five-year return ranked in the 60th percentile, below the median five-year return of its peers.  Id.  As the Investment Management Committee staff itself acknowledged, the fund experienced "periods of significant underperformance followed by periods of strong performance."  Id. at ¶ 19.  Mixed returns marked the Inception Fund over the course of the class period.  See id. at ¶ 20.

At a June 7, 2016 meeting of the Investment Management Committee, committee staff noted that the fund was underperforming its benchmark, but stated that they "continued to be comfortable with the manager" and would "continue to monitor their performance."  Id. at ¶ 21.  However, as of February 21, 2017, the staff had not yet started its review of the Inception Fund.  Id. at ¶ 23.  It was not until September 30, 2017, that the NEPC recommended to the staff for the first time that the Plan should "consider terminating" the Inception Fund.  Id. at ¶ 26.  On the basis of NEPC's recommendation, the staff advised the Investment Management Committee on November 29, 2017, and the Committee voted to remove the Fund from the Plan's menu.  Id.  The Inception Fund was removed as of March 31, 2018.  Id. at ¶ 27

b.    Freedom Funds

The Plan also offered Fidelity's Freedom Funds, a suite of "[m]ulti-asset class target date funds . . . with a mix of equity and fixed income exposures . . . that become more conservative as the target date . . . approaches."  Id. at ¶ 28.  These funds served as the Plan's Qualified Default Investment Alternative, where a participant's

contributions would be automatically invested if that participant did not affirmatively direct her investment elsewhere.  See Pls.' AMF at ¶ 74.

The parties dispute whether the Freedom Funds performed well over the class period and whether they prudently selected or retained.  The defendants contend that the funds had "widespread approval by independent industry analysists at Morningstar . . . ."  See Pls.' SOF at ¶ 29.  The plaintiffs, however, emphasize other contemporary assessments of the funds' performance which highlighted their underperformance.  Id. NEPC observed in 2016 that sixty percent of Fidelity's target date fund clients in the $1 billion to $3 billion asset range had moved to alternative funds.  Id. at ¶ 32.  The plaintiffs also point to nearly $5.4 billion in divestment from the Freedom Funds in 2018. Id.  These funds remained in the Plan's menu as the Qualified Default Investment Alternative throughout the class period.

c.     Morgan Stanley Institutional Emerging Markets Fund

With respect to the Emerging Markets Fund, the defendants and plaintiffs again disagree as to how the fund performed during the class period.  See id. at ¶ 33.  The defendants point to the fund's three-star (representing "average" performance) Morningstar rating from June 2014 through September 2021.  Id. at ¶ 34.  The plaintiffs, on the other hand, focus on the fund's Lipper rating of two (i.e., between the 60th and 80th percentiles).  Id.  Plaintiffs also highlight the Emerging Markets Fund's trailing three- and five- year returns, which have underperformed "the peer group median throughout the entire period."  Id. at ¶ 33.

NEPC discussed the Emerging Markets Fund before the Investment Management Committee at their December 3, 2019 meeting.  Id at ¶ 36.  At the meeting, NEPC stated that the fund had "an experienced and stable team" and had

"lower fees" than comparable funds.  Id.  However, the same meeting materials also note that the fund had undergone a "period of significant underperformance" extending as far back as 2016.  Id.  Nonetheless, this fund was included in the Plan's investment menu throughout the class period.

d.   <u>Frank Russell Small Cap Fund</u>

The Frank Russell Small Cap Fund was also available for the duration of the class period.  Its Morningstar ratings ranged from two stars (December 2016, March 2017) to three stars (remaining quarters from June 2014 to September 2021).  <u>Id.</u> at ¶ 37.  The fund received a Lipper rating of two in 2015, but was rated three in 2016 and 2017 and four in 2014, 2018, 2019, 2020, and 2021.  <u>Id.</u>  Throughout the class period, the fund remained on the investment menu and charged lower fees than most comparable mutual funds.  <u>Id.</u> at ¶ 28.

3.   Recordkeeping Fees and Revenue Sharing

The parties also dispute the reasonableness of the Plan's fees and revenue sharing practices.  Two types of fees are at issue in this case: (1) recordkeeping and administration fees, which were paid through revenue sharing, and (2) investment fees paid to the fund manager for each investment option.

To provide recordkeeping services, the Plan retained Fidelity Investments Institutional Operations Company, Inc. ("Fidelity").  <u>Id.</u> at ¶ 44.  Neither the Plan Administrative Committee nor the Investment Management Committee, at any point during the class period, initiated a competitive bidding process to invite competition for

9

the Plan's recordkeeping services.[3]  Id. at ¶ 43.  Under the Plan's Investment Plan Strategy, all recordkeeping costs were to be paid to Fidelity from Plan assets through revenue sharing payments "associated with . . . the Plan's investment options."[4]  Id. at ¶ 45.  Through this revenue sharing arrangement, Fidelity received a fixed, per-participant fee for its recordkeeping services.  Id. at ¶ 46.

At the beginning of the class period, the Plan paid Fidelity a $55 per participant fee for recordkeeping services.  Id. at ¶ 54.  The record does not reflect whether the defendants negotiated for this fee.[5]  On January 1, 2017, the per participant fee reduced from $55 to $45.  Id. at ¶ 57.  The parties dispute and the record evidence is mixed as to whether the defendants' actions brought about this decrease in rate.  Id.

Furthermore, the ten-dollar decrease in fees did not apply to most participants. Any Plan participants invested in the Common Share Fund—held by 89 percent of participants—continued to pay an additional $4 charge, so most participants' effective fee was reduced by only $6.  Id.  After the reduction, NEPC's 2017 and 2018 fee surveys showed that the Plan's recordkeeping fee fell below the median fee charged by purportedly comparable plans.  Id. at ¶¶ 58-59.  The 2019 survey showed the Plan's $45 fee was equal to the median of purportedly comparable plans.  Id. at ¶ 60.

---

[3] Administrators of other plans will often issue requests for proposals or requests for information for recordkeeping or administrative services every three to five years to ensure that a plan's fees remain reasonable.  Pls.' AMF at ¶ 87.

[4] The Plan Administrative Committee was responsible for determining that the Plan would hold fund share classes that engaged in revenue sharing.  Id. at ¶ 42.

[5] Director of Investment Management, Robert DeAngelo testified that neither he nor his staff ever requested written records "regarding where Eversource's 401(k) recordkeeping fees . . . stacked up in comparison to other" similar funds.  Id.; see also DeAngelo Depo. at 112-14 (Doc. No. 134-14)  He further testified that any assurances from Eversource came in the form of an undocumented verbal exchange in which he accepted the representation of Fidelity's representative that the Plan's fees were reasonable. Id.

At the beginning of 2021, the per-participant recordkeeping fee again decreased, falling to $42 per participant.  Id. at ¶ 61.  The parties again disagree as to whether this decrease resulted from any negotiations by the defendants.  Id.

To operationalize the revenue sharing, the Plan had a Revenue Credit Account from which it would rebate participants for any overpaid fees not used for recordkeeping or administration.  The agreement governing the return of excess revenue to participants became effective January 1, 2014.  Id. at ¶ 63.  Yet no excess revenue was returned to Plan participants for nearly two years from the beginning of the class period through June 30, 2016.  Id. at ¶ 63.  Once rebates began, the Plan rebated $2,300,000 in 2016, $900,000 in 2017, $1,000,000 in 2018, and $1,500,000 in 2019.  Id.

To monitor the Plan's "all-in" fees (including recordkeeping fees and fees paid to the fund manager for each investment manager), NEPC provided an annual benchmarking analysis from 2016 to 2019.  Id. at ¶ 52.  However, the record does not indicate which plans were included as comparators.  Id.  While NEPC determined in 2014 and 2015 that the Plan's total costs as a percentage of assets were below the median for a subset of comparable plans, the plaintiffs contend that NEPC did not identify an appropriate peer group for these analyses.  Id. at ¶ 55.  When NEPC formally became an advisor to the Plan, it measured the Plan's fees against data from NEPC's defined contribution fee survey, relaying that information to staff.[6]  Id. at ¶ 56.  The staff would report to the Investment Management Committee after discussing with NEPC

---

[6] The plaintiffs argue that NEPC's 2016 fee survey is hearsay and should be excluded.  See Pls.' SOF at ¶ 56.  "[H]earsay that would not be admissible at trial is likewise not competent evidence on a motion for summary judgment[.]" Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 259 n.9 (E.D.N.Y. 2009), aff'd, 371 F. App'x 115 (2d Cir. 2010).  Because the court denies summary judgment to the defendants, it need not decide the issue of the fee survey's admissibility at this time.

representatives the Plan's "recordkeeping costs, investment, and other costs and fees." Id. at ¶ 53.

To evaluate the fees associated with each of the Plan's particular investment options, NEPC benchmarked each fund's expense ratio against the "Morningstar institutional median."  Id. at ¶ 41.  The Morningstar institutional median includes all institutionally priced mutual funds and is not limited to fees paid by plans of similar size to the Eversource Plan.  Id.

        4.    Losses

The plaintiffs' damages expert calculated the Plan's losses due to the retention of each of the challenged funds as follows:

- Fidelity Freedom Funds: $ 10,845,014

- Russell Small Cap B CIT: $4,093,422 to $5,481,938

- MS Inception Fund: $9,336,250 to $48,822,418

- MS Emerging Market Fund: $201,372 to $13,032,832

See Pls.' AMF at ¶ 98.  He also calculated the losses attributable to the defendants' failure to use the cheapest share class for certain investments, which totaled $31,075,344.01.  Id. at ¶ 99.  Lastly, he determined that the Plan's losses associated with the defendants' failure to prudently monitor the Plan's recordkeeping and administration fees amounted to $3,311,043.

        B.    Procedural Background

Plaintiff Garthwait filed this suit against the defendants on June 30, 2020, as a putative class action.  See Compl. (Doc. No. 1).  Plaintiffs Gray, Torrance, and Hushion filed a related action on August 11, 2020, which was consolidated into this matter.  See

Consolidated Am. Compl. (Doc. No. 26).  In response, the defendants filed a Motion to

Dismiss.  <u>See</u> Mot. to Dismiss (Doc. No. 52).  While the Motion to Dismiss was pending,

the plaintiffs filed a Motion to Certify the Class.  <u>See</u> Mot. to Certify Class (Doc. No. 78).

In September, 2021, the court granted the defendants' Motion as to of the

plaintiffs' claims related to individual funds, because the plaintiffs had failed to allege

that they owned any particular funds and, thus, they lacked standing.  <u>See</u> Ruling

Granting in Part Mot. to Dismiss (Doc. No. 103); Am. Ruling Granting in Part Mot. to

Dismiss (Doc. No. 107).  The plaintiffs timely amended their Complaint to add

allegations that they owned each of the challenged funds.  <u>See</u> Second Am. Compl.

(Doc. No. 110).  In the operant Second Amended Complaint, filed October 18, 2021, the

plaintiffs allege three counts: (1) breach of fiduciary duty; (2) failure to monitor

fiduciaries and co-fiduciary breaches; and (3) in the alternative, liability for knowing

breach of trust.  <u>Id.</u> at ¶¶ 142-58.

The court held an Oral Argument on the Motion to Certify the Class on April 29,

2022.  <u>See</u> Minute Entry (Doc. No. 151).  On May 25, 2022, the court granted in part the

Motion to Certify the Class, certifying the following class:

> participants and beneficiaries in the Plan at any time on or after June 30,
> 2014, to the present, including any beneficiary of a deceased person who
> was a participant in the Plan at any time during the Class Period. The class
> is certified only as to the plaintiffs' claims for retrospective relief.

<u>See</u> Ruling on Mot. to Certify Class (Doc. No. 153).

Now pending before the court is the defendants' Motion for Summary Judgment

(Doc. No. 120), as well as three Motions to Preclude the testimony of expert witnesses

for each party (Doc. Nos. 119, 121, & 122).  The court now turns to the pending

Motions.

13

### III.   LEGAL STANDARDS

A.   <u>Motion to Preclude</u>

Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence, which provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rules of Evid. 702.  The district court acts as a gatekeeper, charged with the task of deciding whether the expert's testimony satisfies Rule 702's general requirements.  <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 113 (1993). In the Second Circuit, courts embrace a "particularly broad standard for the admissibility of expert testimony", <u>Colon ex rel. Molina v. BIC USA, Inc.</u>, 199 F. Supp.2d 53, 75 (S.D.N.Y. 2001), wherein expert testimony should only be excluded if it is "speculative or conjectural", if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples to oranges comparison.'" <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F. 3d 18, 21 (2d Cir. 1996) (quoting <u>Shatkin v. McDonnel Douglas Corp.</u>, 727 F.2d 202, 208 (2d Cir. 1984)).

In defining the gatekeeping role of the district court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.  <u>See</u> <u>Nimely v. City of New York</u>, 414 F.3d 381, 396–97 (2d Cir. 2005).

1.    Qualifications

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself.  Vale v. United States of Am., 673 F. App'x 114, 116 (2d Cir. 2016) (summary opinion) (citing Nimely, 414 F.3d at 396 n.11).  A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).

2.    Reliability

If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable and relevant.  In Daubert, the Supreme Court identified several factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation' " and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 593–94) (internal quotations and citations omitted).  These factors, the Supreme Court noted, do not constitute a "definitive checklist or test."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).  Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id.

15

In assessing reliability, "[t]he district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses." Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d 360, 362 (D. Conn. 2001)).  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

        3.     Relevance

In addition to ensuring that expert testimony is reliable, the court must decide whether the expert's testimony is relevant, i.e., whether it will "help the trier of fact." In re Mirena IUD Prod. Liab. Litig., 169 F.Supp.3d 396, 413 (S.D.N.Y. 2016).  Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

However, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it", United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), does not aid the jury in making a decision. In re Mirena IUD Prod. Liab. Litig., 169 F.Supp.3d at 413.  Accordingly, this court permits experts to state opinions, not "conclusions." See Bilzerian, 926 F.2d at 1294 (holding that, while an expert "may opine on an issue of fact within the jury's province", he "may not give testimony stating ultimate legal conclusions based on those facts"); see also Snyder v. Wells Fargo Bank, N.A., 594 F. App'x 710, 714 (2d Cir. 2014) (same).[3]

16

"Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." Royal Ins. Co. of Am., 208 F. Supp. 2d at 426.

      B.    Motion for Summary Judgment

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016). If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016). Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.   DISCUSSION

      A.    Motions to Preclude

The parties have proffered the following six experts:

- Plaintiffs' Expert Michael Geist: opining as to the conduct of fiduciaries and the reasonableness of fees.  <u>See</u> Geist Report (Doc. No. 119-3).

- Plaintiffs' Expert Gerald W. Buetow: opining as to damages. <u>See</u> Buetow Report (Doc. No. 132-4).

- Plaintiffs' Expert Roger L. Levy: opining as to whether the defendants' conduct conformed to the applicable standard of care. <u>See</u> Levy Report (Doc. No. 137-6).

- Defendants' Expert Dr. Russell Wermers: opining as to the reasonableness of including challenged funds in the investment lineup and responding to Buetow's opinions.  <u>See</u> Wermers Report (Doc. No. 120-21).

- Defendants' Expert Kathleen Mann: opining as to whether the defendants' conduct conformed to the applicable standard of care and responding to Levy's opinions.  <u>See</u> Mann Report (Doc. No. 120-9).

- Defendants' Expert Steve Gissiner: opining as to the reasonableness of the Plan's fees and responding to Geist's opinions. <u>See</u> Gissiner Report (Doc. No. 120-67).

The plaintiffs have moved to preclude a number of Mann's and Wermers' opinions, while the defendants have moved to preclude several of Geist's opinions.  For the following reasons, the court denies all three Motions.

               1.     Plaintiffs' Motion to Preclude Expert Mann (Doc. No. 122)

The plaintiffs move to preclude certain opinions and testimony of the defendants' expert, Kathleen Mann.  <u>See</u> Mot. to Preclude Mann (Doc. No. 122).  In seeking preclusion, the plaintiffs contend that unreliable methodology undercuts Mann's opinions that the the defendants adhered to the applicable standard of care and that the Plan's fee monitoring was reasonable.[7] <u>Id.</u>

---

[7] The plaintiffs do not contend that Mann is unqualified to serve as an expert.  As a threshold matter, this court had concluded that Mann is "qualified by knowledge . . . [or] experience . . . to render

a.      Mann's Report

In her February 7, 2022 expert Report, Mann opines that the defendants

exercised the requisite standard of care in administering and monitoring the Plan.  She

summarizes her opinions as follows:

a. In my experience, no two retirement plans are alike . . . .  Plans may be
structured differently from one another, and yet each can be managed by
their respective investment committees in a sound fiduciary manner . . . .
Based on the materials I have reviewed, Eversource's [Investment
Management Committee ("IMC")] and [Plan Administrative Committee
("PAC")] utilized reasonable practices and made decisions in the best
interests of Plan participants with the level of care consistent with industry
standards and practices.

b. Although a retirement plan is not required to have an Investment Policy
Statement ("IPS"), the IMC acted diligently in codifying its responsibilities in
the Plan's IPS. The Plan's IPS established reasonable standards and
guidelines, . . . The standards established in the Plan's IPS were not overly
restrictive and allowed the IMC appropriate leeway to exercise fiduciary
discretion and make decisions on behalf of Plan participants . . . . The IMC
and its investment management staff reviewed extensive materials on
behalf of Plan participants in advance of and during meetings that were held
four times a year and attended by experienced and knowledgeable
professionals who were retained to assist the IMC in performing its fiduciary
duties with respect to the Plan.

c. Consistent with the selection criteria established in the Plan's IPS, the
IMC ensured that a diversified set of investment options (including a self-
directed brokerage window) was available to Plan participants.

d. In accordance with the long-term investment philosophy memorialized in
the Plan's IPS, the IMC was diligent in selecting, monitoring, and removing
investment options, as appropriate, based on its review of extensive data.
The IMC devoted a portion of each regular meeting to monitor and evaluate
the performance of the Plan's investment options in a manner consistent
with the guidelines set forth in the Plan's IPS. These monitoring efforts were
consistent with industry standards and practices.

---

. . . her opinions as an expert." Nimely, 414 F.3d at 396 n.11.  The court had reached this determination
based on Mann's resume, which shows that she holds over two decades of experience in senior
investment management positions with a focus on fiduciary duties and retirement plan governance.  See
Mann Report at 1-2

e. The IMC performed a range of work to limit the costs of the Plan appropriately and reasonably. As a matter of normal practice, the IMC periodically reviewed Plan expenses associated with each investment option and regularly noted how Plan fees stood relative to those of peers. This monitoring of Plan fees was consistent with industry standards and practices.

f. The IMC and PAC also acted consistent with prudent fiduciary standards in monitoring Plan recordkeeping expenses. The IMC periodically reviewed information provided by NEPC (a third[-]party consultant that the Plan retained) concerning the Plan's recordkeeping fees relative to other plans of similar size. As evidence that the IMC and PAC were appropriately monitoring recordkeeping fees, the Plan secured a reduction in recordkeeping fees charged by Fidelity from $55 to $45 per participant in 2016. These efforts to lower administrative expenses are consistent with industry standards and practices.

g. . . .[Plaintiffs' expert] Mr. Levy's conclusions regarding: (A) the Plan's IPS; (B) the role of NEPC; (C) the PAC and the Plan's recordkeeping arrangements; (D) the IMC; and (E) oversight of the Director and the other Staff are incorrect and do not reflect either the standards of prudence or what Mr. Levy calls both "minimum standard of care" and "best practices."

See Mann Report at ¶ 10.  Roughly the first half of Mann's report provides more detail as to her opinions (labeled a. through f. above) regarding the reasonableness and prudence of the defendants' conduct.  See Mann Report at pp. 5-27.  She dedicates the remainder of the Report to rebutting the Report of one of the plaintiffs' experts, Dr. Levy. See id. at pp. 27-45.

The plaintiffs specifically seek to exclude Mann's opinion that the defendants used reasonable fee-monitoring practices to maintain reasonable fees.  Mem. in Support of Mot. to Preclude Mann at 1 (Doc. No. 122-1).  The plaintiffs also argue for preclusion of Mann's first opinion: that the defendants made decisions "in the best interests of Plan participants with the level of care consistent with industry standards and practices."  Id. at 1 n. 1.  In essence, the plaintiffs challenge the reliability of Mann's opinions, arguing that they are unsupported by the record evidence.

                b.      <u>Reliability of Mann's Opinions</u>

The plaintiffs contend that Mann's opinion that the defendants' fee-monitoring practices were reasonable lacks support in the record. In her Report, Mann opines that the monitoring processes were reasonable for two primary reasons: (1) because the defendants reasonably relied on third-party consultant NEPC to monitor fees, <u>see</u> Mann Report at ¶¶ 54, 58-59; and (2) because the Plan's recordkeeping fees fell from $55 to $45 per participant in 2016. <u>Id.</u> at ¶ 59. The plaintiffs challenge the sufficiency of either of these two reasons to support Mann's opinion that the defendants' monitoring processes were reasonable.

                i.      Whether Mann's Reference to the Defendants' Reliance on NEPC Is Speculative and Unsupported by Record Evidence

As to Mann's first reason for finding the defendants' monitoring reasonable—their reliance on consultant NEPC—the plaintiffs argue that the record contains little evidence of the actual monitoring processes the fiduciaries undertook or the quality of NEPC's materials. <u>See</u> Mem. in Support of Mot. to Preclude Mann at 4-5.

In her Report, however, Mann references record evidence in support of her opinion. She cites to the meeting notes of both the Investment Management Committee and the Plan Administrative Committee, as well as materials provided by consultant NECP. <u>See, e.g.</u>, Mann Report at ¶¶ 54-56; <u>see also</u> Mann Report at Ex. 6A (summarizing the Investment Management Committee's meetings); <u>see also</u> Mann Report at Ex. 6B (summarizing the Plan Administrative Committee's meetings). Thus, Mann's opinions are not speculative and unreliable. Rather, her opinions result from her applying her specialized knowledge and experience as an investment professional to analyze these meeting notes, materials, and the other record evidence she cites in

her Report.  <u>See, e.g.</u>, <u>In re Puda Coal Sec. Inc., Litig.</u>, 30 F. Supp. 3d 230, 257

(S.D.N.Y. 2014), <u>aff'd sub nom.</u> <u>Querub v. Hong Kong</u>, 649 F. App'x 55 (2d Cir. 2016)

(determining, where an expert had "experience with the type and purpose of certain

documents referenced as part of plaintiffs' case" that the expert's opinions regarding

such documents were "not <u>ipse</u> <u>dixit</u> but instead based on his experience with these

types of documents").

        The plaintiffs also argue that Mann failed to address "significant gaps in the

knowledge of members of the IMC and PAC" whose depositions indicated that they

lacked an understanding of Fidelity's services.  <u>See</u> Mem. in Support of Mot. to

Preclude Mann at 6-7.  However, as the plaintiffs themselves acknowledge, Mann <u>did</u>

discuss the Committee members' alleged lack of knowledge in her deposition, where

she stated that the "industry standard or practice" does not require a fiduciary to

"know[ ] some of the details of what a recordkeeper does."  <u>See id.</u> (citing Mann Depo.

at 134 (Doc. No. 129-2)).  Moreover, Mann's purported failure to adequately address

certain evidence does not reduce her opinion to "speculative or conjectural" testimony.

<u>Boucher</u>, 73 F.3d at 21.  Thus, her opinion is admissible.  The plaintiffs may contest the

factual underpinning of her expert opinion through "vigorous cross examination,

presentation of contrary evidence, and careful instruction on the burden of proof."

<u>Daubert</u>, 509 U.S. at 596 (citations and quotations omitted).

                        ii.     Whether Mann's Reference to the Defendants' Role in
                                Deceasing Fees Is Speculative and Unsupported by
                                Record Evidence

        With regards to Mann's second supporting pillar for her opinion that the

defendants' monitoring processes were reasonable—the 2016 decrease in the Plan's

fees—the plaintiffs contend that Mann fails to show that the fee reduction was caused

by the defendant fiduciaries' acts.  See Mem. in Support of Mot. to Preclude Mann at 8-11.  However, Mann's opinion linking the defendants' actions to the fee reduction is not so speculative as to be inadmissible.  As Mann explained in her Deposition, she formed her opinion on the basis of her findings that "the committee monitored fees on a periodic basis, compared those fees to peers and benchmarked those fees against other plans, [ ] and reduced fees."  Mann Depo. at 46.  She elaborated: "[s]atisfying industry standards and practices around fees involves monitoring those fees, comparing them to peers and determining to make change as appropriate, which is what . . . [t]hese committees did."  Id. at 41-42.  Rather than speculating, she properly "tie[d] [her] observations to [her] conclusions through . . . truths derived from . . . [her] specialized experience" as an investment professional.  See Nicholas v. Bratton, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (cleaned up).

While the plaintiffs contend that the record lacks support for Mann's statement that the defendants "negotiated a per head participant fee reduction", Mann does not opine that the reasonableness of the defendants' monitoring processes depends upon whether or not they negotiated these fees.  See Mann Report at ¶ 84.  Indeed, she states that "plan sponsors do not always enter into time consuming negotiations with plan service providers; and . . . Eversource nevertheless secured a fee reduction from $55 to $45 per participant." See id. at ¶ 84, n. 175.  Moreover, to the extent that the plaintiffs argue that Mann's opinion is unsupported by the record evidence, this goes to the weight, not the admissibility of her opinion.  See Royal Ins. Co. of Am., 208 F. Supp. 2d at 426.

For the above reasons, the plaintiffs' Motion to Preclude Mann's opinions is denied in full.

       2.    Plaintiffs' Motion to Preclude Expert Wermers (Doc. No. 121)

The plaintiffs also move to preclude the testimony of defendants' expert Dr. Russell Wermers.  <u>See</u> Mot. to Preclude Wermers (Doc. No. 121).  In support of their Motion to Preclude, the plaintiffs argue that Dr. Wermers' opinions regarding the reasonableness of the challenged funds are unreliable and unhelpful to jurors.[8]  <u>See</u> Mem. in Support of Mot. to Preclude Wermers (Doc. No. 121-1).

       a.    <u>Dr. Wermers' Report</u>

In his February 7, 2022 Report, Dr. Wermers opines that the Plan's funds were economically reasonable investment options.  <u>See</u> Wermer Report at 7 (Doc. No. 120-21).  He provides the following summary of his opinions, portions of which the court has omitted for the sake of brevity:

> a. Evaluating the economic reasonableness of investment options requires holistic considerations across a wide range of factors, including the following:
>
>     i. Qualitative factors . . . .
>
>     ii. Quantitative factors . . . .
>
>     iii. Fees and expenses.
>
> b. Based on the totality of information that I have analyzed, I conclude that each of the At-Issue Funds was an economically reasonable investment option for the Plan during the Relevant Period and that it was both

---

[8] The plaintiffs do not challenge Dr. Wermer's qualifications.  He is Chairman of the Department of Finance at the Smith School of Business at the University of Maryland.  <u>See</u> Smith Report at ¶ 1.  He also serves as Director of the Center for Financial Policy at the University, and he conducts research on investment fund performance evaluation.  <u>Id.</u> at ¶¶ 1-2.  His resume provides sufficient bases for the court to conclude that he is "qualified by knowledge . . . [or] experience . . . to render his . . . opinions as an expert."  <u>Nimely</u>, 414 F.3d at 396 n.11.

objectively reasonable and appropriate to retain the At-Issue Funds in the Plan's investment lineup during that time period. . . .

c. The Buetow Report provides mechanical calculations of (i) alleged damages relating to the At-Issue Funds and (ii) alleged fee "damages" relating to the Fee At-Issue Funds, but Dr. Buetow does not attempt to tie those calculations to any alleged fiduciary breach or to tether them to any foundational economic principles. Dr. Buetow's calculations, which, therefore, lack any sound economic foundation, provide no insight into the economic reasonableness of the Plan's investment choices or the economic harm, if any, that resulted from those choices.

d. Dr. Buetow identifies purported "fiduciary issues" with the Fidelity Freedom Funds relating to: (i) the underlying funds' track-record length, and their returns relative to prospectus benchmarks as of the beginning of the Relevant Period; and (ii) changes in the Fidelity Freedom Funds' glide path. I disagree with both of Dr. Buetow's assertions. . . .

e. Dr. Buetow provides no opinion on the economic reasonableness of the At-Issue-Funds. Rather, he cherry-picks purported best-in-class "replacement" funds with the benefit of perfect hindsight, then performs a mechanical calculation of damages relative to these alternatives. Such a calculation does not provide a scientific basis for a critique of the At-Issue Funds . . . .

f. Dr. Buetow's calculation of alleged fee damages is a mechanical exercise that is entirely divorced from reality. Dr. Buetow calculates alleged fee damages based on the differences in the net-of-fee returns between the Plan's share class and the highest net-of-fee returns across all share classes of the same fund. He carries out this exercise without knowing exactly in which share class he is proposing the Plan should have invested, whether the Plan would have been eligible for this proposed alternative vehicle, or whether his proposed replacement share class would have been economically beneficial for the Plan. . . .

Wermers Report at ¶ 15.  The plaintiffs seek to preclude Dr. Wermer's opinions and testimony in its entirety.  See Mot. to Preclude Wermers.  Their Motion primarily addresses the reliability and relevance of Dr. Wermers' opinion that the challenged funds were economically reasonable investments (labeled b. above).

25

b.     Reliability of Wermers' Opinions

First, the plaintiffs argue that Wermers' opinions are unreliable because he has failed to account for the Plan's Investment Policy Statement.  See Mem. in Support of Mot. to Preclude Wermers at 5-9.  Because Dr. Wermer's Report excludes the Investment Policy Statement from his analysis, the plaintiffs argue, his opinions suffer from an "analytical gap" and should be precluded.  Id. at 6.

However, Dr. Wermers' lack of analysis as to the Investment Policy Statement does not warrant the preclusion of his testimony.  As the defendants explain in their Opposition:

> Dr. Wermers is not opining on whether the [Investment Management Committee] followed a prudent process in monitoring the challenged funds. Nor is Dr. Wermers opining on whether the monitoring process described in the [Investment Policy Statement] is itself prudent.  Instead, Dr. Wermers is offering an opinion from an economic perspective as to the objective reasonableness of maintaining the challenged funds on the Plan's menu under the circumstances . . . .

Defs.' Opp'n to Mot. to Preclude Wermers at 8.  Given that Dr. Wermers' Report opines that the investment options were "economically reasonable", see Wermers Report at ¶ 15, and that their retention was "objectively reasonable and appropriate",  id., the lack of references to the Plan's Investment Policy Statement does not undermine the reliability of his methodology.

To the contrary, Dr. Wermers relied on sufficient facts and data to reach his opinion regarding the reasonableness of the Plan's investment options.  He employed several of the investment criteria set forth in the Investment Policy Statement itself to compare the returns of each fund against the very same benchmarks or peer groups specified in Schedule A to the Investment Policy Statement.  See, e.g., Wermer Report at Exs. 8B-8H (Doc. No. 121-3 at 114-128); Investment Policy Statement at Schedule A

(Doc. No. 120-7 at 9); <u>see also</u> Defs.' Opp'n at 9.  Indeed, the plaintiffs concede that his Report relies on "some of the same performance criteria as the IPS" which are based on "investment principles [that] are universally accepted and applied" and use "databases [that] are generally-accepted reference points."  <u>See</u> Pls.' Reply to Mot. to Preclude Wermers at 8.

Especially in light of his use of "universally accepted" measurements to reach his conclusions, the fact that he does not directly address the IPS does not render his opinions "speculative or conjectural" such that they are unreliable.  <u>Boucher</u>, 73 F.3d at 21.  To the extent that Dr. Wermers' failure to directly reference the Investment Policy Statement weakens his testimony, the plaintiffs may challenge it through "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." <u>Daubert</u>, 509 U.S. at 596 (citations and quotations omitted).

c.    <u>Relevance of Wermers' Report</u>

The plaintiffs also argue that, because Wermers opines only as to the general economic reasonableness of the challenged funds, his Report will not assist the trier of fact.

However, the performance of the funds is relevant to the question of whether, and to what extent, that defendants caused losses to the Plan.  Under ERISA, a fiduciary "who breaches any [fiduciary] responsibilities, obligations, or duties . . . shall be personally liable to make good to such plan <u>any losses to the plan</u> resulting from each such breach . . . ." 29 U.S.C. § 1109.  As the Second Circuit has explained recently, losses to the plan are measured by "a comparison of what the [p]lan actually earned on the . . . investment with what the [p]lan would have earned had the funds

27

been available for other [p]lan purposes. If the latter amount is greater than the former, the loss is the difference between the two." <u>Sacerdote v. New York Univ.</u>, 9 F.4th 95, 112 (2d Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 1112 (2022) (citation omitted); <u>see also</u> <u>Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.</u>, 843 F.3d 561, 567 (2d Cir. 2016) ("If, but for the breach, the plan would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable.").  In an action for breach of fiduciary duty under ERISA, the plaintiff bears the burden of proving loss before the burden shifts to the defendant to show that "the loss was not caused by the breach of fiduciary duty." <u>Sacerdote</u>, 9 F.4th at 113.

Wermers' assessment of the funds' performance bears on the questions of whether, "but for [the alleged] breach, the plan would have earned more than it actually earned", <u>Ivy Asset Mgmt.</u>, 843 F.3d at 567, and whether any of the plaintiffs' losses were caused by the defendants' breaches of fiduciary duty.  <u>Sacerdote</u>, 9 F.4th at 113. Thus, because Wermers' testimony "makes the existence of [a] fact that is of consequence to the determination of the action more probable or less probable", Fed. R. Evid. 401, it is relevant to the trier of fact and does not warrant preclusion.

For the foregoing reasons, the court denies the plaintiffs' Motion to Preclude Wermers in full.

 3. Defendants' Motion to Preclude Expert Geist (Doc. No. 119)

The defendants move to preclude the testimony of plaintiffs' expert Michael Geist.  <u>See</u> Mot. to Preclude Geist at 1 (Doc. No. 119).  Geist's opinions regarding the

reasonableness of the Plan's fees are inadmissible, the defendants contend, because

he failed to apply a reliable methodology in line with the <u>Daubert</u> standards.[9] <u>Id.</u>

a.   <u>Geist's Report</u>

In his expert Report dated December 17, 2021, Geist opines that the defendants

failed to "discharge[ ] their duties to the Plan" with the "level of care, skill, prudence and

diligence" of a "knowledgeable and prudent" fiduciary.  <u>See</u> Geist Report at ¶¶ 1-2; 21-

25 (Doc. No. 119-3).  His analysis focuses largely on the fees charged to the Plan

which, he opines, were "unreasonable and excessive."  <u>Id.</u>  In support of his conclusion,

Geist identifies multiple "process lapses", which he summarizes as follows:

> 1.  The Eversource Plan Fiduciaries did not monitor the Plan's recordkeeping and administrative fees consistent with the standard of care, custom and practice.
>
> 2. The Eversource Plan Fiduciaries did not employ any process to monitor the recordkeeping and administrative fees paid by Plan participants during significant portions of the class period.
>
> 3. The Eversource Plan Fiduciaries naively relied on a statement by its recordkeeper Fidelity that the recordkeeping and administrative fees charged by Fidelity were reasonable and that the Plan "compares well" to other Fidelity clients without asking for, or receiving any, proof or verification of the facts supporting that statement from Fidelity.
>
> 4. The Eversource Plan Fiduciaries improperly failed to return millions of dollars in unreasonable and excess fees paid by Plan participants in a timely manner.
>
> 5. The Eversource Plan Fiduciaries failed to follow the standard of care, custom, and practice by using an unreliable industry survey to attempt to determine the reasonableness of its recordkeeping and administrative fees.

---

[9] The defendants do not argue that Geist, who owns and operates the retirement plan consulting firm ClearSage Advisory Group, is unqualified.  <u>See</u> Geist Report at ¶ 3 (Doc. No. 119-3).  Based on his resume, the court has concluded that Geist is "qualified by knowledge . . . [or] experience . . . to render his . . . opinions as an expert." <u>Nimely</u>, 414 F.3d at 396 n.11.

6. The Plan Fiduciaries failed to solicit any bids from any competitors to determine the reasonable market price to provide the recordkeeping and administrative fees required by the Plan.

7. The Eversource Plan Fiduciaries failed to conduct a formal [Request for Production ("RFP")] or some other competitive process to determine the reasonable market price for the Plan's required retirement plan services.

8. The Eversource Plan Fiduciaries did not monitor all the revenue earned by its recordkeeper Fidelity to ensure the fees paid by Plan participants were reasonable.

See Geist Report at ¶ 23.

It is in Section XI of his Report that Geist delivers his opinions regarding the conduct of the Eversource Plan fiduciaries and the reasonableness of the Plan's recordkeeping and administration fees.[10]  See Geist Report at ¶¶ 190-249.  The defendants' Motion nominally seeks to preclude the "entirety" of Geist's testimony,  see Mot. to Preclude Geist at 1.  However, the defendants only put forth arguments regarding the reliability of Geist's opinions about the reasonableness of the plan's recordkeeping and administration fees.  See generally, Mem. in Support of Mot. to Preclude Geist; Reply to Mot. to Preclude Geist (Doc. No. 143).  Thus, the court considers only whether Geist's opinions regarding those fees are inadmissible for a lack of reliability.

### b.   The Reliability of Geist's Methods

The defendants argue that Geist failed to use a reliable or discernable methodology to determine whether the Plan paid excessive recordkeeping and

---

[10] In Sections V through X of his report, Geist provides background regarding the defined contribution plan industry (Section V); the Eversource Plan and its fiduciaries (Section VI); fiduciary duties under ERISA (Section VII); the applicable standard of care for Plan fiduciaries (Section VIII); the standard of care for fiduciaries before and during the class period (Section IX); and a detailed application of the standard of care (Section X).

administration fees.  <u>See</u> Mot. to Preclude Geist at 1; Mem. in Support of Mot. to

Preclude Geist at 9.  Geist reached his opinions that the Plan paid excessive fees by

calculating the fees for ten "comparable" plans.  To calculate these fees, he surveyed

data from 5500 forms for the ten plans.  Then, he generated two trendlines, one of

which includes all ten comparator plans, and one of which includes only four Fidelity

plans.  <u>See</u> Geist Report at p. 60.  In seeking to preclude Geist's opinions, the

defendants contest: (i) his use of a survey to determine the reasonableness of the fees;

(ii) his trendline methodology; and (iii) his reliance on 5500 Forms.

As the court discusses in more detail below, the challenges that the defendants

raise should be addressed, not through preclusion of Geist's testimony, but through

"vigorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof . . . ."  <u>Daubert</u>, 509 U.S. at 596.

i.    Whether Geist Consistently Applied His Methodology

First, the defendants object to Geist's reliance on a survey to determine whether

the Plan's fees were excessive.  <u>See</u> Mem. in Support of Mot. to Preclude Geist at 9-11.

They argue that Geist contradicts himself: he rejects the fiduciaries' survey-based

methods as unreasonable, then applies less-stringent versions of the same methods.

<u>Id.</u>

The thrust of the defendants' argument is that, in assessing the reasonableness

of recordkeeping fees, "Geist impermissibly applies one standard to [the defendants],

and an entirely different one to himself."  <u>Id.</u>  To support their argument, though, the

defendants engage in a bit of sleight of hand.  First, they point out that Geist opines

that, for plan fiduciaries, "the only reliable way to determine the reasonable RK&A fee

rate for any particular plan is to request proposals through a formal process."  <u>See</u> Geist

Report at ¶¶ 89-90.  Then, they argue that Geist fails to apply the very methodology he endorses because, in his role as an expert witness, he derived his own figure for "reasonable" recordkeeping fees from a survey rather than from an RFP or competitive bidding process.  Mem. in Support of Mot. to Preclude Geist at 9-11.

The defendants' criticism does not warrant preclusion.  Geist identified one possible flaw in the defendants' exercise of their fiduciary duties: failure to engage in a competitive bidding process.  See Geist Report at ¶¶ 89-90.  The fact that he himself could not engage in such a competitive bidding process does not make his testimony inadmissible.  Indeed, he opines that fiduciaries should engage in a competitive request for proposals precisely because fee pricing information is generally unavailable to the public.  See id. at ¶ 88.  Such a process is the best way, Geist opines, to determine the market rate and create a "competitive environment" to minimize recordkeeping fees. See id. at 88-89.  Presuming this is true, given that Geist is not a plan representative with the ability to solicit bids during the relevant period, Geist could not have applied the methodology he advocates for plan fiduciaries.  Geist instead relied on the publicly available data to construct a survey, for which he details his methodology and the data upon which he relied.  See id. at ¶¶ 253-266.  The defendants are free to cross examine Geist as to his use of a survey rather than a competitive bidding process, see Daubert, 509 U.S. at 596, but the court does not preclude Geist's testimony on this ground.

ii.   Trendline Methodology for Calculating Reasonable Recordkeeping and Administration Fee Per Participant

The defendants also object to Geist's use of a trendline derived from only ten data points to plot the excess fees per participant.  See Mem. in Support of Mot. to Preclude Geist at 10.

In his Report, Geist does criticize the defendants' use of the NEPC study that included a small sample of 14 plans with 10 to 15,000 participants consisting of fewer plans and a broader range of participants. See Geist Report at ¶¶ 218-19. Then, he proceeds to derive a figure for a reasonable fee on the basis of his own survey, which consists of only 10 plans with 7,000 to 16,000 participants. See id. at ¶¶ 253-266. Furthermore, he relies on another survey derived from only 4 plans, all of which used Fidelity. See id.

Considering the "nature of the issue", the "subject of his testimony", and Geist's "particular expertise", Kumho Tire Co., 526 U.S. at 150, the court concludes that Geist's methodology is sufficiently reliable as to be admissible. First, to the nature of the issue and the subject of his testimony, Geist opines on a particular issues—the reasonableness of fees charged to retirement plans—for which, he testifies, he is relying on the "best proxy" available to an individual who is not a plan administrator. See Geist Report at ¶ 253 n.11; see also pp. 31-32, supra. Second, Geist applied his "particular expertise" as a retirement plan consultant with over a decade of experience. Furthermore, to support his results, Geist not only relied on his experience and expertise, but also cross-checked his own figures against NEPC surveys. See id. at ¶¶ 259-62. His testimony therefore demonstrates sufficient indicia of reliability.

The defendants also challenge Geist's trendline on a second ground: in constructing his ten-plan survey, Geist selected and relied on "plans paying . . . lower fees" than the Eversource Plan. See Geist Depo. at 239; Geist Report at ¶ 254. The defendants argue that he improperly "cherry picked" his data. See Cunningham (cited on p. 11 of Mem in Support.).

However, to the extent that the defendants attack the factual assumptions underpinning Geist's trendline, the Second Circuit has made clear that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony."  Amorgianos, 303 F.3d at 267.  The defendants may, on cross examination, challenge Geist's underlying factual assumptions guiding his decision to include particular plans in his analysis.  This court "is not charged with weighing the correctness of [Geist's] testimony, nor must the court choose between the testimony of competing expert witnesses." Royal Ins. Co. of Am., 208 F. Supp. 2d at 426 (citing Travelers, 150 F. Supp. 2d at 362).  It is the province of the fact finder, not this court, to determine whether the factual assumptions underlying Geist's loss calculations are valid.

iii.    Reliance on Form 5500s

Finally, the defendants contend that it was inappropriate for Geist to rely on Form 5500s to determine the recordkeeping fees for plans.[11]  They argue that he has previously opined that Form 5500s are not reliable sources, citing his testimony in another case criticizing use of such data to calculate reasonable RK&A fees.  Mem. in Support of Mot. to Preclude Geist at 13-14 (citing Troudt, 369 F Supp. 3d at 1140-41).

As the court has discussed above, see pp. 31-34, supra, Geist's use of publicly available data does not render his testimony unreliable.  He has identified the source of the data and mapped out his methodology in calculating losses on the basis of those data.  See Geist Report at ¶¶ 253-266.  To the extent that the defendants challenge the accuracy of the data, they may draw out any inconsistencies on cross examination.

---

[11] Form 5500s are annual reports filed by 401(k) plans to disclose a plan's financial status and investments.  They include fee disclosures and are publicly available.  See Geist Report at ¶ 45.

See Daubert, 509 U.S. at 596; see also Allen v. Dairy Farmers of Am., Inc., No. 5:09-CV-230, 2014 WL 266290, at *9 (D. Vt. Jan. 23, 2014) ("most 'challenge[s] to the facts or data relied upon by [an expert do] not go to the admissibility of his testimony, but only to the weight of his testimony'").

For the foregoing reasons, the defendants' Motion to Preclude Geist is denied in full.

B.   Defendants' Motion for Summary Judgment (Doc. No. 120)

The defendants also move for summary judgment as to all of the plaintiffs' claims.  Because genuine issues of material fact remain as to each of the plaintiffs' claims, the court denies the defendants' Motion.  See Fed.R.Civ.P. 56(c) (a party seeking summary judgment must demonstrate that "there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law."); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (same).

1.   Count One: Breach of Fiduciary Duty

Issues of fact preclude summary judgment as to Count One of the plaintiffs' Second Amended Complaint, which alleges breach of fiduciary duty under ERISA.  See Sec. Am. Compl. at ¶¶ 142-46.  ERISA fiduciaries owe both a duty of prudence and a duty of loyalty to plan participants.  To fulfill the duty of prudence, they must carry out their responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B).  A fiduciary's prudence "is measured according to the objective prudent person standard developed in the common law of trusts." Sacerdote v. New York Univ., 9 F.4th 95, 107 (2d Cir. 2021), cert. denied, 142 S. Ct. 1112 (2022)

35

(citations omitted).  Under this "prudent person" standard, a fiduciary's action must be assessed "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."  Id. (citations omitted). The analysis centers, therefore, on the "fiduciary's conduct in arriving at an investment decision, not on its results", and the relevant question is "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  Id.

Whether the defendants breached their duty of prudence depends on several contested issues of fact.  For instance, the parties dispute: whether the defendants' monitoring processes were reasonable; whether the challenged funds were reasonable investment options; and whether the Plan's fees were reasonable.  See, e.g., Mem. in Support of Mot. for Summ. J. at 9, 18, 24, 28.  Each of these questions turns on contested factual issues, including: the defendants' conduct and involvement in monitoring the funds, see Pls.' AMF at ¶¶ 78-80 (discussing the fiduciaries' failure to adopt a watchlist); Pls.' AMF at ¶¶ 69-79 (discussing the lack of communication between staff and committee members, as well as the committee members' lack of understanding of central investment monitoring concepts); the proper comparator and performance metric for each fund, see generally, e.g., Wermers' Report (opining that investments were economically reasonable); Buetow's Report (opining that investments were unreasonable); and the correct benchmark for recordkeeping fees and whether the defendants negotiated to lower those fees, see, e.g., Mann Report at ¶¶ 54-59 (opining that recordkeeping fees were reasonable and the defendants negotiated to decrease them); Geist Report at ¶¶ 253-266 (opining that recordkeeping fees were

36

unreasonable); DeAngelo Depo. at 112-14 (testifying that neither he nor his staff ever requested written records "regarding where Eversource's 401(k) recordkeeping fees . . . stacked up in comparison to other" similar funds).

Factual issues also exist as to whether the defendants breached their duty of loyalty.  The duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and [ ] for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).  To carry out this duty, fiduciaries must act "with an eye single to the interests of the participants and beneficiaries" of a retirement plan.  Moreno v. Deutsche Bank Am. Holding Corp., No. 15 Civ. 9936 (LGS), 2018 WL 2727880, at *2 (S.D.N.Y. June 6, 2018).

Here, the plaintiffs have identified testimony by the Director of the Investment Management Committee's staff that the Committee did not adopt a "watch list" for fund monitoring because he did not "want to have . . . somebody asking about the watch list all of the time."  Pls.' AMF at ¶ 79 (citing DeAngelo Sept. 15, 2021 Depo. at 13-14 (Doc. No. 134-14)).  The plaintiffs also point to evidence that the Investment Management Committee retained higher-fee share classes to avoid an inaccurate "perception" by union members that any change in the funds could lead to higher costs.  See Deangelo Sept. 15, 2021 Depo. at 28-29 (Doc. No. 120-43).  Thus,  genuine issues of material fact exist as to whether the fiduciaries acted "solely in the interest of the participants." 29 U.S.C. § 1104(a)(1)(A).

Because a reasonable juror could find in the plaintiffs' favor on the basis of the record evidence, which includes conflicting expert testimony, the court cannot resolve

these questions as a matter of law.  See, e.g., Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 79 (2d Cir.2002) ("[w]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment"); see also Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp., No. 09 CIV. 6273 RMB, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) ("Rarely will . . . a determination [as to ERISA's fiduciary reasonableness standard] be appropriate on a motion for summary judgment").  Thus, the Motion for Summary Judgment is denied as to Count One of the plaintiffs' Second Amended Complaint.

> 2.      Count Two: Derivative Co-Fiduciary Liability

The defendants also move for summary judgment as to Count Two (Derivative Co-Fiduciary Liability).  Issues of fact bar summary judgment as to this Count, as well.

In support of summary judgment on Count Two, the defendants primarily argue that plaintiffs "cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA."  See Mem. in Support of Mot. for Summ. J. at 37 (quoting Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 68 (2d Cir. 2016)).  However, the court has denied summary judgment as to the plaintiffs' underlying breach of duty claim, so summary judgment as to Count Two is not warranted on this ground.

The defendants also contend that "undisputed facts foreclose [the] monitoring claim."  Id. at 38.  However, genuine issues of material fact exist as to the extent of the fiduciaries' involvement in monitoring the Plan's investment options and fees.  See, e.g., Pls.' AMF at ¶¶ 72-79 (identifying monitoring failures); Geist Report at ¶ 23 ("Fiduciaries did not employ any process to monitor the recordkeeping and administrative fees paid

by Plan participants . . . ").  Thus, summary judgment as to Count Two would be inappropriate and is denied.

        3.      Count Three: Knowing Participation in a Breach of Trust

Finally, the defendants move for summary judgment on Count Three, which alleges knowing participation in a breach of trust.  In support of summary judgment, the defendants argue only that there is no "formal distinction between" the plaintiffs' claims in Count One (Breach of Fiduciary Duty) and Count Three (Knowing Participation in a Breach of Trust), and, thus, the claims must rise or fall together.  See Mem. in Support of Mot. for Summ. J. at 38-39.  Because the court has denied summary judgment as to Count One due to genuine issues of material fact, it likewise denies summary judgment as to Count Three.

The court recognizes that fiduciaries like the defendants often face "difficult tradeoffs", and that a wide "range of reasonable judgments" may result from their balancing act.  Hughes v. NW. Univ., 142 S. Ct. 737, 742 (2022).  However, where, as here, issues of material fact abound, the court cannot substitute its own judgment for that of the fact finder.  Thus, the Motion for Summary Judgment is denied in full.

**V.**    **CONCLUSION**

For the foregoing reasons, the court denies the Motion for Summary Judgment (Doc. No. 120) and the Motions to Preclude (Doc. Nos. 119, 121, & 122).

SO ORDERED.

      Dated at New Haven, Connecticut this 29th day of July 2022.


                          /s/ Janet C. Hall
                  Janet C. Hall
                  United States District Judge